SITE # _____

12/8/92

# CENTURY 21® REAL ESTATE FRANCHISE AGREEMENT

This Agreement is made by and between CENTURY 21 *Northeast, Inc.*, a *New Jersey* corporation and a licensed real estate broker, with principal offices in the State of *New York* (hereinafter called "CENTURY 21 Regional"), and *Dennehy/Feldscher Ventures, Inc.* (hereinafter called "Franchisee").

## RECITALS

A.  Century 21 Real Estate Corporation, a Delaware Corporation (hereinafter called "CENTURY 21 International"), is the owner of certain trademarks and service marks, including the name "CENTURY 21®," which have been registered on the Principal Register in the United States Patent and Trademark Office, with other appropriate state agencies in the United States, and with governmental agencies of foreign countries (which marks, together with certain other trademarks and service marks which are not registered or which are pending registration, are hereinafter collectively called "CENTURY 21 Marks");

B.  CENTURY 21 International has developed a system for the promotion and assistance of independently owned and operated real estate brokerage offices, including policies, procedures and techniques designed to enable such offices to compete more effectively in the real estate sales market (which system is hereinafter called the "CENTURY 21 System"). The CENTURY 21 System includes, but is not limited to, common use and promotion of certain CENTURY 21 Marks, copyrights, trade secrets, centralized advertising programs, recruiting programs, referral programs and sales and management training programs. CENTURY 21 International has from time to time revised and updated the CENTURY 21 System and plans to continue to do so as required in its best judgment;

C.  CENTURY 21 International has granted CENTURY 21 Regional the right to sublicense certain CENTURY 21 Marks, and to franchise the CENTURY 21 System to licensed real estate brokers whose offices are located within CENTURY 21 Regional's designated territory (hereinafter called "Region"); and

D.  Franchisee desires to obtain a franchise to operate a real estate brokerage office under the terms and conditions hereinafter set forth.

## TERMS OF AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises, and for other good and valuable consideration, the delivery, receipt and sufficiency of which are hereby acknowledged; and further, in accordance with and pursuant to all terms, conditions, covenants, agreements, representations and warranties contained herein, the parties hereby mutually agree as follows:

### 1. GRANT OF FRANCHISE

CENTURY 21 Regional hereby grants to Franchisee, and Franchisee hereby accepts, the non-exclusive right to use the CENTURY 21 System and certain CENTURY 21 Marks, as they are set forth in the CENTURY 21 Policy and Procedure Manual (hereinafter called the "P&P Manual"), as it may be revised and/or supplemented from time to time by CENTURY 21 International, for the operation of a licensed real estate brokerage office upon the terms and conditions set forth in this Agreement (hereinafter called the "Franchise"). The grant of this Franchise shall not be construed as granting Franchisee any right to purchase any additional franchises from CENTURY 21 Regional, or any right or priority as to the location of any additional franchise which may be granted by CENTURY 21 Regional. If CENTURY 21 Regional subsequently grants Franchisee any franchise (including any renewal franchise to be operated at Franchisee's Approved Location as hereinafter set forth) said grant shall be on such terms as CENTURY 21 Regional shall establish.

### 2. TERM OF FRANCHISE

The term of this Franchise shall be for a period of five (5) years (unless this Agreement is executed pursuant to an assignment or other transfer arrangement, in which case the term shall, unless otherwise agreed to by CENTURY 21 Regional be the remaining portion of the term specified in the respective assignor's or transferor's franchise agreement). The Commencement Date of this Franchise is *February 1*, 19*96*, and the Expiration Date of this Franchise shall be *January 31, 2001*, unless this Agreement is terminated at an earlier date as otherwise provided herein. THIS AGREEMENT SHALL NOT BECOME EFFECTIVE UNTIL IT IS EXECUTED BY AN AUTHORIZED CORPORATE OFFICER OF CENTURY 21 REGIONAL.

### 3. RENEWAL OF FRANCHISE

A.  Upon the expiration of the initial term hereof, Franchisee shall have the option to renew the Franchise for an additional term, subject to all of the following:

(i)  Franchisee shall deliver to CENTURY 21 Regional written notice of Franchisee's intent to renew not more than one hundred eighty (180) days and not less than ninety (90) days prior to the Expiration Date of the term under which Franchisee is then operating; if no such notice has been received by CENTURY 21 Regional at least ninety (90) days but not more than one hundred eighty (180) days prior to said Expiration Date, then Franchisee's option to renew  and any rights to assign this Agreement shall be deemed forfeited and CENTURY 21 Regional shall  have the right, during the ninety (90) day period prior to said Expiration Date, subject to local law, and notwithstanding any other provision of this Agreement (including, without limitation, the one-quarter mile provision of Paragraph 5D), to market, grant, place and/or operate franchises in the general vicinity (including locations within  a one-quarter mile radius of Franchisee's Approved Location) of Franchisee's Approved Location. As used in this Agreement, the term "renewal" shall mean: CENTURY 21 Regional's written

acceptance of a new franchise agreement which has been executed by Franchisee for Franchisee's present Approved Location;

(ii)  Upon renewal, Franchisee shall execute a new Franchise Agreement, which shall be the then current form of franchise agreement which CENTURY 21® Regional is then offering to new franchisees, and which new Franchise Agreement may contain terms materially different from those contained in this Agreement, except that in lieu of an initial franchise fee, Franchisee shall pay a Renewal Fee as specified in Paragraph 10 hereof, or such other amount as may be indicated in the Franchise Agreement under which Franchisee is then operating at the time of any subsequent renewal.  Franchisee shall execute the then current form of Franchise Agreement and shall pay the Renewal Fee not less than ninety (90) days prior to said Expiration Date of this Agreement;

(iii)  At the time of execution of the new Franchise Agreement, Franchisee shall not be in default under Franchisee's existing Franchise Agreement or any other agreement or obligation Franchisee may have with CENTURY 21 International or CENTURY 21 Regional (such as other CENTURY 21 franchise agreements), including, but not limited to, all obligations to pay service fees, National Advertising Fund contributions, Broker Council assessments, interest and late charges, audit fees and other properly chargeable amounts; responsibilities to comply with the P&P Manual, including trade name and logo guidelines; and obligations to comply with minimum performance standards as set forth in Paragraphs 11C (xii) and 17F hereof; and

(iv)  Franchisee, as a condition for renewal, shall make such reasonable expenditures as CENTURY 21 Regional may require, pursuant to Paragraph 11C(ix), as are necessary to conform with CENTURY 21 Regional's then current standards for interior and exterior office size, decor, overall attractiveness and cleanliness.

B.  If Franchisee continues to operate after the end of any term hereof without exercising an option to renew, Franchisee shall be deemed to be operating on a month-to-month basis under the terms and conditions of the Franchise Agreement then being offered by CENTURY 21 Regional to new franchisees. However, in such event, Franchisee's month to month franchise agreement may be terminated at the sole and absolute discretion of CENTURY 21 Regional at any time upon ten (10) days written notice from CENTURY 21 Regional. If local law requires that CENTURY 21 Regional give to Franchisee more than ten (10) days notice of such termination, then the month-to-month agreement shall remain in effect until CENTURY 21 Regional has given Franchisee such notice as required by law.  For so long as Franchisee operates on a month-to-month basis, Franchisee shall pay to CENTURY 21 Regional a monthly Administration Fee in the amount of *Two Hundred Fifty and 00/100 Dollars* ($250.00 ) in addition to the Franchise Service Fee payable pursuant to the provisions of Paragraph 8 of this Agreement.  Said Administration Fee shall be payable on the first day of each month in which Franchisee operates on a month-to-month basis.

C.  Notwithstanding anything to the contrary contained herein, CENTURY 21 Regional reserves the right not to renew this Franchise as a result of a decision to withdraw from the marketing area or territory in which Franchisee's office is located.

D.  In the event Franchisee is, on the Expiration Date of this Franchise Agreement, on probation for failing to have met the minimum operating standards set forth in Paragraph 17F hereof, or failing to have met the quality standards set forth in Paragraph 11C (xii) hereof, then and in either event, and notwithstanding any other provisions herein, any new franchise agreement then executed by Franchisee shall be subject to Franchisee's successful completion of its probation. Accordingly, such new franchise agreement shall be subject to the condition that Franchisee's failure to successfully complete said probation in a timely manner will, at the option of CENTURY 21 Regional, render the new franchise agreement null and void, upon written notice by CENTURY 21 Regional, causing all Franchisee's rights thereunder to terminate without further notice.

4.  NAME OF FRANCHISE

A.  Franchisee shall operate under the trade name "CENTURY 21 *Sentinel* (hereinafter called Franchisee's CENTURY 21 trade name") and shall use no other name in connection with any operations conducted at or from the location specified in Paragraph 5 hereof without the prior written approval of CENTURY 21 Regional.  In every visual display in which the CENTURY 21 modern building logo is used the portion of Franchisee's CENTURY 21 trade name immediately following the words "CENTURY 21," or other approved words, shall be in a five-to-one size relationship with the CENTURY 21 name and logo, as required in the P&P Manual, and the total appearance of Franchisee's CENTURY 21 trade name and other identifying words must be approved in advance in writing by CENTURY 21 Regional.  CENTURY 21 Regional reserves the right to review and require corrections and modifications to any display by Franchisee of the CENTURY 21 name or marks.  CENTURY 21 Regional's failure to promptly require corrections of or modifications to Franchisee's improper use of the name or marks shall not be deemed a waiver of CENTURY 21 Regional's right to do so.

B.  Franchisee shall display the aforementioned trade name for all purposes, including but not limited to, office signs, yard signs, stationery, business cards and advertising materials, in strict compliance with the requirements set forth in the P&P Manual.

C.  Franchisee shall file and keep current, in the county and/or state in which Franchisee's Approved Location is  situated and at such other places as may be required by law, a "Fictitious Name Certificate," or comparable instrument, with respect to Franchisee's CENTURY 21 trade name under which Franchisee has been approved to operate by CENTURY 21 Regional. If Franchisee is a corporation, Franchisee shall not, without the prior written consent of CENTURY 21 Regional, include the words "CENTURY 21" as part of Franchisee's corporate name. Prior to opening an office under said trade name, Franchisee shall supply evidence satisfactory to CENTURY 21 Regional that Franchisee has complied with all relevant laws regarding the use of fictitious or assumed names.

2

D.  Franchisee shall use Franchisee's CENTURY 21 trade name and such other CENTURY 21 Marks as Franchisee may be authorized to use from time to time, exclusively for the purpose of promoting and operating a licensed real estate brokerage office, and for such other lawful business activities as may have been authorized previously in writing by CENTURY 21 Regional; provided, however, that CENTURY 21 Regional has no obligation to authorize any such additional business activities.

## 5.  LOCATION OF FRANCHISE

A.  Franchisee shall operate the Franchise exclusively from the following location only (herein called "Approved Location": *121 Mount Vernon Street, Boston, MA  02108*.  Franchisee may not operate the franchised business from any other location or any additional locations without the prior written approval of CENTURY 21[*] Regional.  In the event that Franchisee seeks to change its Approved Location, it shall submit, no later than thirty (30) days before the date upon which it desires to change location, a written request to CENTURY 21 Regional specifying:  (1) the requested new location; (2)  the reason(s) Franchisee seeks a new approved location; and (3) any other factors which it believes are relevant to CENTURY 21 Regional's decision to approve or disapprove the new location.  CENTURY 21 Regional shall not unreasonably withhold its approval  of an application by Franchisee to relocate the office to another location within the Region which is in the general vicinity of the Approved Location.  The Approved Location set forth herein is subject to the terms and conditions, if any, set forth in Paragraph 11C(ix) of this Agreement.

B.  Franchisee shall operate a real estate brokerage business and franchisee shall not operate any other business and shall not engage in any other activity at or from the Approved Location, either under Franchisee's CENTURY 21 trade name or under any other name, without the prior written consent of CENTURY 21 Regional, which consent if granted may be subject to various conditions for each respective approval, including, but not limited to, requirements designed to apprise the public that the products or services offered are not associated with or endorsed by CENTURY 21 International, CENTURY 21 Regional, or any of their affiliates or CENTURY 21 franchisees.

C.  With the prior written consent of CENTURY 21 Regional, Franchisee may open a temporary tract sales office within or immediately adjacent to a new subdivision or development for the sole purpose of selling property in the subdivision or development.  CENTURY 21 Regional may impose such conditions as it deems necessary to  assure that such temporary tract sales offices are, in fact, temporary and are used only in conjunction with the initial sales program for a particular subdivision or development.

D.  During the term of this Agreement CENTURY 21 Regional shall not grant another franchised CENTURY 21 office at a location which is within one quarter (.25) mile (measured in a straight line, "as the crow flies," between exterior office walls) of Franchisee's Approved Location.  The provisions of this Paragraph 5D shall not apply in the event Franchisee is executing this Agreement pursuant to a renewal (or extension of an existing franchise agreement) and an existing CENTURY 21 franchisee is located within one quarter (.25) mile of Franchisee's Approved Location.  The provisions of this Paragraph 5D shall not apply to CENTURY 21 Regional's right to remarket, pursuant to Paragraph 3A(i), in the event Franchisee fails to give the required notice of intent to renew this Agreement.  Franchisee acknowledges that the franchise granted by this Agreement covers only the Approved Location described in this Paragraph 5 and does not in any way convey or imply any area, market, territorial rights, or protected area proprietary to Franchisee.

## 6.  SERVICES AND OBLIGATIONS TO FRANCHISEE

A.  CENTURY 21 Regional will impart to Franchisee its real estate brokerage, selling, promotional and merchandising methods and techniques associated with the CENTURY 21 System, and shall maintain a staff to give assistance and service to Franchisee.

B.  CENTURY 21 Regional will publish from time to time supply manuals suggesting sources of supply for  forms, signs, cards, stationery and other items necessary to operate a modern real estate brokerage business, which obligation may be fulfilled by distribution of a supply manual produced by CENTURY 21 International.  The suggested source of supply for items may be CENTURY 21 International, CENTURY 21 Regional, an affiliate of either, or an independent supplier.  Franchisee may purchase supplies either from a source of supply suggested by CENTURY 21 Regional, CENTURY 21 International or from any other supplier which can first demonstrate to the satisfaction of CENTURY 21 Regional that its products or services meet the specifications established from time to time by CENTURY 21 International.

C.  CENTURY 21 Regional will make available sample referral forms for use in referring business between CENTURY 21 franchisees.  CENTURY 21 Regional also will establish procedures for referrals between Franchisee and other CENTURY 21 franchisees; provided, however, that all referral commissions shall be subject to negotiation directly between the franchisees participating in the referral transaction.

D.  CENTURY 21 Regional will operate a sales training program on a periodic basis for CENTURY 21 franchisees and their sales personnel at a location or locations selected by CENTURY 21 Regional.  This program will include seminars and conferences of special interest to be held as  CENTURY 21 Regional deems necessary or advisable, as well as educational and informational bulletins relating to such topics as market conditions, sales motivation, sales aids, advertising and financing.  CENTURY 21 Regional may charge a registration fee or other fee for such programs, seminars and conferences.

E.  CENTURY 21 Regional shall pay certain of Franchisee's costs (unless this Agreement is executed pursuant to an assignment or renewal of an existing CENTURY 21 Franchise) for attendance by Franchisee or by Franchisee's designee (as approved by CENTURY 21 Regional) at the first available franchise orientation and management training program sponsored by CENTURY 21 International, including certain meals, lodging and transportation ("enrollment package"), but not including incidental expenses not covered or included in the enrollment package.  It is understood that CENTURY 21 Regional's obligation shall be to pay for only one (1)

enrollment package, notwithstanding the fact that the Franchise may be owned by more than one individual or that an individual may control more than one Franchise.

F.  CENTURY 21 Regional agrees to contribute timely to the National Advertising Fund, as further described in Paragraph 9 hereof, an amount of its own funds equal to ten percent (10%) of the service fees it receives from Franchisee.

### 7.  INITIAL FRANCHISE FEE

Concurrently with the execution of this Agreement, Franchisee shall pay CENTURY 21 Regional at its principal offices, or at such other place as CENTURY 21 Regional may designate, in cash, unless otherwise permitted in writing by CENTURY 21 Regional, an initial franchise fee in the amount of *Sixteen Thousand Nine Hundred and 00/100 Dollars ($16,900.00)* due and payable as follows: $2,900.00 due and payable upon the execution of this agreement and the balance of $15,000.00 due and payable as evidenced by delivery of the Promissory Note attached hereto.  This initial franchise fee is fully earned by CENTURY 21[8] Regional upon execution of this Agreement and is nonrefundable; provided, however, if Franchisee is not accepted by CENTURY 21 Regional within thirty (30) days of Franchisee's deposit of the initial franchise fee with CENTURY 21 Regional, Franchisee shall be entitled to a full refund of amounts so deposited and this Agreement shall be deemed rejected by CENTURY 21 Regional and of no force or effect.

### 8.  FRANCHISE SERVICE FEES

A.  (i)  Franchisee agrees to pay in cash to CENTURY 21 Regional at its principal offices, or at such other place as CENTURY 21 Regional may designate, in addition to the initial franchise fee set forth above in Paragraph 7, a "service fee" equal to *six* percent (*6*%) of the gross revenue earned, derived and/or received by Franchisee during the term of this Agreement from: (1) all transactions involving the purchase, sale, lease, rental, hypothecation, license, exchange or other transfer or disposition of any interest in real estate, condominiums, mobile homes, panelized housing, time share units or manufactured homes; (2) all other transactions for which a real estate license or auctioneer's license is required (which, for purposes of this Agreement, is deemed to include all fees and remuneration collected or earned by Franchisee in performing title or escrow services, or organizing, promoting, selling, managing or otherwise servicing any kind of real estate syndicate, partnership (whether general or limited) or corporation, real estate investment trust or other real estate investment organization, or finding any investors for any of the above, said service fees being payable with respect not only to any cash payments, but also to all other forms of compensation and remuneration received, including, but not limited to, promissory notes, securities, partnership interests, interests in real estate and other forms of property); (3) all transactions in which CENTURY 21 Marks or the CENTURY 21 System are used, including that portion of a transaction in which personal property is bought or sold; and (4) the sale of any products or services developed or made available by CENTURY 21 Regional, CENTURY 21 International or any affiliates of either.

(ii)  In connection with all transactions of the above described type, unless otherwise waived in writing by CENTURY 21 Regional, all gross revenue received in the operation of Franchisee's business by Franchisee's salespeople, agents, representatives, contractors, employees, partners, directors, officers, "Significant Shareholders" (as hereinafter defined at Paragraph 8D), or corporations or other entities which control, are controlled by, or are under common control with Franchisee or its other Affiliates (all of whom are hereinafter collectively referred to as "Affiliate(s) of Franchisee"), shall, to the extent not otherwise included in Franchisee's gross revenue, be included as part of Franchisee's gross revenue for the purpose of calculating service fees payable under this Agreement.  Unless waived in writing by CENTURY 21 Regional as to any specific transaction, the service fee shall be paid on all transactions in which Franchisee or any Affiliate of Franchisee is involved as a principal and the services or facilities of Franchisee or Franchisee's office are used, or in which the CENTURY 21 name is used in any manner.  The Franchisee's regularly charged brokerage commission or fee shall be imputed with respect to transactions involving any Affiliate of Franchisee acting as a principal for purposes of computing the service fee payable to CENTURY 21 Regional in connection with such transactions.

(iii)  The only transactions on which service fees shall not be required to be paid are those for which revenues are received as a result of activities dealing with leases or rentals having a nonrenewable term of not more than one (1) year and from property management services, unless more than twenty-five percent (25%) of Franchisee's annual gross revenues received from the franchised operations is derived from property management services, in which case service fees shall be paid on one hundred percent (100%) of Franchisee's gross revenues derived from property management services.  CENTURY 21 Regional reserves the right to establish procedures from time to time for verifying and processing said service fees.  Notwithstanding the foregoing, CENTURY 21 Regional, at its option, may require a periodic report of gross revenues received by Franchisee from any leasing or rental services or property management services.

B.  The service fee is fully earned by and payable to CENTURY 21 Regional immediately upon Franchisee's receipt of revenue, whether in cash or other property.  Franchisee agrees to direct the escrow company, title company, attorney or other party handling the closing or settlement of any transaction in which a commission or any other fee is to be paid, to pay the service fee directly to CENTURY 21 Regional.  In all other transactions, the service fee shall be paid promptly on receipt of commission fees and/or other payments (notwithstanding the source or nature of payment) by Franchisee or, if no such amount is received from any such transaction, on the closing of the transaction for which services are rendered by Franchisee or any Affiliate of Franchisee.  Service fees more than ten (10) days late shall bear interest from the due date until paid at the lower rate of either the highest rate allowed by law or a rate that is five (5) percentage points per annum higher than the "prime rate" then currently established by the largest bank (determined by total bank assets) headquartered in the state in which Franchisee's Approved Location is situated.

C.  Commencing with the first full calendar month beginning four (4) months after the Commencement Date of this Agreement, as set forth in Paragraph 2 hereof, there shall be a minimum service fee of *Three Hundred and 00/100 Dollars ($300.00)* per month.  In the case of an assignment or renewal of this

D.  For purposes of this Agreement, a "Significant Shareholder" of Franchisee shall mean any party who owns twenty-five percent (25%) or more of any class of stock of Franchisee or who in fact controls the management of Franchisee.  For purposes of this Paragraph the ownership of stock shall mean direct or beneficial ownership, including, without limitation, ownership by the spouse of a party or by any dependent of a party who resides in the same household as that party.

E.  **CENTURY 21 Incentive Bonus Program Definitions.**  In this Agreement, unless the context otherwise requires, the following terms shall have the following respective meanings with respect to the Century 21 Incentive Bonus Program:

(i)  "CENTURY 21 Incentive Bonus" (or "CIB") -  means the cash award to be paid by CENTURY 21 Regional to the Designated Representative of a CENTURY 21 Firm.  The CIB shall be based on the combined Annual Gross Revenue of the CENTURY 21 Firm; shall be consistent with the provisions hereof; and shall be payable no later than March 15, of the Calendar Year following the Calendar Year in which the combined Annual Gross Revenue was earned.  Calculation of the CIB by CENTURY 21 Regional shall be made pursuant to the provisions of the Table attached hereto as "Exhibit A" as it may be amended from time to time.

(ii)  "Annual Gross Revenue" -  means the combined total of Gross Revenue, as defined in this paragraph 8, earned by each franchised office in a CENTURY 21 Firm for a particular Calendar Year, on which the CENTURY 21 Firm has actually paid service fees to CENTURY 21 Regional in a timely manner.  Annual Gross Revenue shall not include any CIB award paid to Franchisee in any given year.

(iii)  "Calendar Year" -  means the one year period beginning on January 1, of a given year, and ending on December 31, of that same given year.

(iv)  "A CENTURY 21 Firm" -  means one or more CENTURY 21 franchisees, all of which:

(a)  Have a common name, and

(b)  Are located within that geographic area commonly known as CENTURY 21 Regional's territory, and

(c)  In the case of multiple franchised offices:

1.  All franchises within the firm are owned by a single individual, partnership or corporation; or,

2.  All franchises within the firm have a single individual, partnership or corporation owning at least 51% of each and every franchise member thereof.

(v)  "A Qualified CENTURY 21 Firm" -  means a CENTURY 21 Firm that is eligible to receive a CIB pursuant to the requirements of Exhibit A, as it may be amended from time to time, and has otherwise complied with all of the provisions of this Agreement.

(vi)  "Designated Representative of a CENTURY 21 Firm" -  means the party to whom CENTURY 21 Regional shall pay the CIB, if any, when due.  CENTURY 21 Regional shall issue only one check annually representing the CIB per CENTURY 21 Firm.  Franchisee hereby designates the following individual or entity as its sole and exclusive "Designated Representative" as the payee of the CIB:

Designated Representative  *Dennehy/Feldscher Ventures, Inc.*

Address  *121 Mount Vernon Street*

*Boston, MA  02108*

Taxpayer ID Number  *04 - 3298760*

*(in the event Franchisee fails to designate a Representative, then CENTURY 21 Regional shall make any CIB payment due payable to the "Franchisee" as first above written)*

F.  **Determination of CIB Payment.**  Any CIB to which a CENTURY 21 Firm is entitled shall be determined in accordance with the Table attached as "Exhibit A" hereto, which Table shall be adjusted annually, in accordance with the provisions of Subparagraph I hereof.  If a CENTURY 21 Firm consists of more than one (1) CENTURY 21 franchise, the combined Annual Gross Revenue of all franchise members of that CENTURY 21 Firm shall be used in determining the amount of CIB due.

G.  **Determination of the Number of Offices in a CENTURY 21 Firm Solely for the Purpose of CIB Calculations.**  Any CENTURY 21 franchise that has been a member of the CENTURY 21 system for a period in excess of twenty-four (24) months, as measured by the Commencement Date set forth in its CENTURY 21 franchise agreement, shall be counted as a member of a CENTURY 21 Firm for the purpose of calculating the CIB, if it otherwise meets the criteria set forth in Subparagraph E (iv) of this Paragraph 8.  On written notice to CENTURY 21 Regional, Franchisee may voluntarily elect, prior to the expiration of said twenty-four (24) month period, to add a CENTURY 21 franchise to the total number of offices within a CENTURY 21 Firm for the purpose of calculating the CIB, if that additional office meets the criteria set forth in Subparagraph E (iv) of this Paragraph 8.  For the purpose of calculating the CIB, a CENTURY 21 Information Center Franchise in a

CENTURY 21 Firm with one or more other franchises shall not be counted as a member of the CENTURY 21 Firm; however, the Annual Gross Revenue for such Information Center Franchise shall be combined with the Firm's gross revenue when calculating the CIB.

**H. Conditions Precedent to the Payment of the CIB.** As an express condition precedent to CENTURY 21 Regional's obligation to pay the CIB, each and every franchisee member of a CENTURY 21 Firm, notwithstanding its Commencement Date, shall:

(i) Remain a CENTURY 21 franchisee in good standing in the calendar year for which the CIB is calculated through the award date in the following year; and,

(ii) Be current on all payments due to CENTURY 21 Regional, CENTURY 21 International, the National Advertising Fund, and the Brokers' Council(s); and,

(iii) Be in compliance with minimum production standards set forth in this Agreement; and,

(iv) Be in compliance with the minimum standards of performance and quality established by CENTURY 21 Regional and CENTURY 21 International, as set forth in this Agreement and the Policy and Procedure Manual; and,

(v) Have fully complied with the renewal provisions of Paragraph 3 and not be operating under the month-to-month provisions of this Agreement subsequent to the Expiration Date; and,

(vi) Properly display the CENTURY 21 Marks in all contexts according to the provisions of the Policy and Procedure Manual; and,

(vii) Be in compliance with all other provisions of this Agreement, and the provisions of the CENTURY 21[®] Policy and Procedure Manual; and,

(viii) Not have been in default under the terms of this Agreement or the Policy and Procedure Manual at any time during the preceding 12 months.

If any member of a CENTURY 21 Firm has not, on the date a CIB would otherwise be payable, satisfied all of the provisions of this Subparagraph H, neither Franchisee nor any other member of the CENTURY 21 Firm of which it is a part shall have any entitlement to a CIB, and all rights thereto shall be deemed forfeited.

**I. Annual CPI Adjustment of Exhibit A.** The figures set forth in the Table attached as "Exhibit A" hereto shall remain in effect through December 31, 1992. Thereafter, "Exhibit A" will be adjusted annually according to increases in the Consumer Price Index: All Items/U.S. City Average-All Urban Consumers ("Index" - 1967 Base Year = 100) as published by the United States Department of Labor's Bureau of Labor Statistics from the reported Index level as of November, 1990, to November of each year thereafter. CENTURY 21 Regional will publish to all franchisees these annual adjustments, if any, which shall become effective on January 1 of each year (beginning January 1993) with respect to the changes in the index from November, 1990, to November of the year thirteen (13) months prior to the effective date of the adjustment (e.g. changes in the CPI between Nov.'90 and Nov. '91 would be used to adjust "Exhibit A" for the year 1993). Should the Index cease to be published or be published less frequently or in a different manner, then CENTURY 21 Regional reserves the right to adopt a substitute index or procedure that reasonably reflects and monitors changes in consumer price levels; provided however, that in no event shall the figures in the Table contained in "Exhibit A" hereof be adjusted downward, notwithstanding any decrease in the Index. CENTURY 21 Regional reserves the right in its sole discretion in any year to waive in whole or in part or postpone temporarily or indefinitely, or any combination of a waiver or postponement, any scheduled increase in "Exhibit A" because of changes in the Index level from year to year.

**J. Continuing Obligation.** Notwithstanding any of the provisions herein and the fact that the CIB will reduce CENTURY 21 Regional's service fee revenue, Franchisee shall pay to CENTURY 21 Regional the full amount of service fees specified in, and in accordance with, the provisions of this Paragraph 8 of this Agreement.

**K. Monthly Proration of Exhibit A.** A franchise(s) purchased from CENTURY 21 Regional or taken by assignment shall have Exhibit A prorated on a monthly basis according to the month of the Commencement Date set forth in the franchise agreement or the date of assignment, as the case may be, (e.g. a Commencement Date or assignment during May would result in 8/12ths of the scale in Exhibit A to be met before a CIB would be payable). A franchise which becomes included as member of a CENTURY 21 Firm for the purpose of calculating the CIB, as a result of the operation of Paragraph 8.G.(on the expiration of 24 months or on voluntary election) shall have Exhibit A prorated on a monthly basis according to the month of the Commencement Date set forth in its franchise agreement.

**L. Construction and Disputes.** CENTURY 21 Regional reserves the right to construe and interpret the Century 21 Incentive Bonus Program and, in the event of a dispute with regard to the payment of a CIB or interpretation of the CIB Program, the decision of CENTURY 21 Regional shall be final and binding on the parties.

**9. NATIONAL ADVERTISING FUND**

A. Beginning on the Commencement Date of this Agreement or on the effective date of any assignment, as the case may be, Franchisee agrees to pay in cash to CENTURY 21 Regional at its principal offices, or at such other place as CENTURY 21 Regional may designate, in addition to the "service fees," a National Advertising Fund (hereinafter called the "NAF") contribution equal to two percent (2%) of Franchisee's gross revenue, as described in Paragraph 8 hereof; provided, however, that Franchisee's NAF contribution shall be subject to the following payment formula:

Franchisee shall pay in cash to the NAF a monthly contribution. Such contribution shall be subject to minimum and maximum amount limitations, which limitations shall be adjusted annually according to increases or decreases in the Consumer Price Index: All Items/US City Average-All Urban Consumers ("Index"-1967 Base Year=100) as published by the United States Department of Labor's Bureau of Labor Statistics from the reported Index level as of January, 1977 to January of each year. CENTURY 21 International publishes to all franchisees the adjustment, if any, which becomes effective on June 1 of each year with respect to the changes in the Index from January, 1977 to January of the current year. Should the Index cease to be published or be published less frequently or in a different manner, then CENTURY 21 International reserves the right to adopt a substitute index or procedure that reasonably reflects and monitors changes in consumer price levels; provided, however, that in no case shall the NAF contribution requirements fall below a monthly minimum of One Hundred Dollars ($100.00) and a maximum of Three Hundred Dollars ($300.00). Notwithstanding the foregoing, CENTURY 21 International reserves the right in its sole discretion in any year to waive in whole or in part or postpone temporarily or indefinitely, or any combination of a waiver or postponement, any scheduled increase or decrease in the Franchisee's monthly contribution to the NAF because of changes in the Index level from year to year.

B.   Franchisee shall be billed for NAF contributions on or about the tenth (10th) day of the month following the month in which service fees were payable to CENTURY 21 Regional for transactions covered under this Agreement. Franchisee timely shall pay said NAF contributions such that they are received by CENTURY 21 Regional at its principal offices, or at such other location designated by CENTURY 21 Regional, not later than the last day of the month in which the billing for NAF contributions is sent. If said NAF contributions are not received by the last day of the appropriate month, CENTURY 21 Regional may assess a late fee equal to ten percent (10%) of the delinquent amount payable to CENTURY 21 Regional and/or accrue interest in favor of the NAF on the amount past due from the date due to the date paid at the lower rate of either the highest rate allowed by law or a rate that is five (5) percentage points per annum higher than the "prime rate" then currently established by the largest bank (determined by total bank assets) headquartered in the state in which Franchisee's Approved Location is situated.

C.   In addition to the CENTURY 21 Regional contributions required by Paragraph 6F, Franchisee's NAF contributions shall be placed in a National Advertising Fund, managed by CENTURY 21 International. CENTURY 21 International has agreed that contributions to the NAF shall be used exclusively for advertising and public relations purposes for the exclusive, collective benefit of all members of the CENTURY 21® organization, including all CENTURY 21 franchisees, CENTURY 21 Regional, other CENTURY 21 Regional Subfranchisors and CENTURY 21 International. CENTURY 21 International is obliged to spend at least eighty-five percent (85%) of contributions to the NAF on either, (1) national advertising media that in the advertising industry are regarded as "National Media" or national public relations programs or (2) local or regional advertising media or local or regional public relations programs that cover the area served by Franchisee's office. CENTURY 21 International is also obliged to spend not more than fifteen percent (15%) of contributions to the NAF to engage in test marketing, to conduct surveys of advertising effectiveness, produce new commercials and other promotional and advertising materials and programs, or other purposes deemed beneficial by CENTURY 21 International for the general recognition of the "CENTURY 21" name, other CENTURY 21 Marks and for the overall success of the various members of the CENTURY 21 organization in the United States and other countries. Said fifteen percent (15%) portion may be spent on a disproportionate basis at the discretion of CENTURY 21 International. Franchisee shall receive on at least an annual basis a report describing the activity of the NAF. CENTURY 21 International and CENTURY 21 Regional shall be entitled to reimburse themselves for reasonable accounting, collection, bookkeeping, reporting and legal expenses incurred with respect to the NAF. CENTURY 21 International and CENTURY 21 Regional shall not be liable for any act or omission with respect to the NAF which is consistent with this Agreement or done in good faith.

D.   Option to Require Flat Fee Monthly Advertising Contributions:  CENTURY 21 International shall have the right to modify from time to time the method by which the required NAF contribution shall be computed and to require the payment of either a fixed monthly contribution amount (flat fee) or a monthly contribution amount equal to two percent (2%) of Franchisee's gross revenue, pursuant to the above Paragraphs 9A, 9B and 9C. In the event that CENTURY 21 International shall require a fixed monthly contribution amount, said fixed monthly contribution shall first be established as that amount which is equal to the average monthly NAF contribution billed to all CENTURY 21 franchisees nationally in the calendar year immediately preceding the year in which the right to invoke the NAF contribution modification is exercised, plus the permissible annual adjustment in the NAF monthly contribution amount described in Paragraph 9A. Said fixed monthly contribution shall be adjusted annually according to increases or decreases in the Consumer Price Index pursuant to those procedures described in the payment formula contained in Paragraph 9A; provided however, that in no case shall the NAF fixed monthly contribution required be less than Two Hundred Dollars ($200.00). Franchisee shall pay timely such fixed monthly contribution amounts, such that a contribution for a particular month is received by CENTURY 21 Regional at its principal offices, or at such other location designated by CENTURY 21 Regional, not later than the last day of the following month, whether or not Franchisee actually receives a billing for such fixed contribution amount. Franchisee acknowledges that those provisions governing delinquent contributions and NAF contribution and expenditure guidelines, as currently are contained in Paragraphs 9B and 9C, shall remain in effect in the event CENTURY 21 International elects to require a fixed monthly contribution amount pursuant to this Paragraph 9D. In the event CENTURY 21 International shall exercise the right granted it under this Paragraph 9D, it continues to retain those rights specifically reserved and described in the payment formula contained in Paragraph 9A. Franchisee acknowledges the right of CENTURY 21 International to modify the method of contribution pursuant to this Paragraph 9D and recognizes Franchisee's continuing duty to fulfill all NAF obligations if and when such right is exercised.

10.  FRANCHISE RENEWAL FEE
     If Franchisee elects to renew the Franchise as provided in Paragraph 3 hereof, Franchisee shall pay to CENTURY 21 Regional in cash a Renewal Fee in the amount of *__Three Hundred and 00/100 Dollars__* (\$*__300.00__*). The Franchise Renewal Fee for any subsequent renewal of this Agreement, if renewal is permitted,

shall be determined by the terms of the Franchise Agreement under which Franchisee is operating at the time of the subsequent renewal.

11. **ADDITIONAL OBLIGATIONS OF FRANCHISEE**

A. **Start-Up Obligations:** Prior to opening an office under Franchisee's CENTURY 21 trade name, as set forth in Paragraph 4 hereof, Franchisee shall complete all of the following at Franchisee's expense, which obligations shall be continuing obligations throughout the term of this Agreement:

(i) **Office Appearance.** Franchisee may be required pursuant to Paragraph 11C(ix) to make reasonable alterations, modifications or upgrades to the office space in which the Franchise is to be operated ;

(ii) **Office Sign.** Franchisee shall install one or more internally lighted exterior signs displaying Franchisee's CENTURY 21 trade name, as set forth in Paragraph 4 hereof, at the Approved Location, which sign(s) must conform to the standards and specifications set forth in the P&P Manual, and which SIGN MUST BE APPROVED IN WRITING IN ADVANCE AS TO ARTWORK, LETTERING, COLOR SCHEME, SIZE, CONSTRUCTION AND OVERALL APPEARANCE BY CENTURY 21 REGIONAL. Any exception to office sign requirements because of local sign ordinances or other reasons must first be approved in writing by CENTURY 21 Regional.

(iii) **Disclaimer.** Franchisee shall place a conspicuous placard or decal on or near the door to the front entrance of Franchisee's office, which complies with the standards and specifications set forth in the P&P Manual, which has been approved in writing by CENTURY 21 Regional, and which clearly states: "EACH CENTURY 21* OFFICE IS INDEPENDENTLY OWNED AND OPERATED";

(iv) **Yard Signs.** Franchisee shall purchase or lease an adequate quantity of colonial yard signs displaying Franchisee's CENTURY 21 trade name and such other information as may be required by law and is in compliance with the standards and specifications in the P&P Manual;

(v) **Stationery Goods.** Franchisee shall purchase adequate supplies of business cards, stationery, promotional materials and related items, which display Franchisee's CENTURY 21 trade name and other information, and all of which comply with the standards and specifications of the P&P Manual;

(vi) **International Management Academy.** Franchisee, or a designee of Franchisee who shall have been approved in writing by CENTURY 21 Regional, shall attend the first available new franchisee orientation and management training program, offered by CENTURY 21 International, at the location and time designated by CENTURY 21 International (which program may occur subsequent to Franchisee's opening of the franchised office). Franchisee acknowledges that, except in the case of an assignment or a renewal, CENTURY 21 Regional shall pay for certain of Franchisee's expenses incurred in connection with attendance at this program (enrollment package), except for incidental expenses not covered or included in the enrollment package. Attendance at this program is voluntary upon a renewal of the Franchise, or purchase by Franchisee of a Franchise other than Franchisee's initial Franchise, but is mandatory for the assignee in any assignment of the Franchise. In the case of renewal, assignment, or purchase of a franchise other than the initial franchise, the Franchisee participant is responsible for all costs incurred in connection with attendance at the program, including transportation, lodging, program costs and incidental expenses; and

(vii) **Insurance.** Franchisee shall, for the entire term of this Agreement, maintain at Franchisee's expense general liability insurance: a) in an amount not less than One Million Dollars ($1,000,000.00) combined single limit coverage; or b) with primary limits plus umbrella excess liability coverage equivalent to One Million Dollars ($1,000,000.00) combined single limit coverage; or c) at such higher limits or broader coverage as CENTURY 21 Regional may require from time to time. CENTURY 21* Regional reserves the right to establish minimum standards with which underwriters providing the aforementioned insurance coverage must comply. Said policies of insurance shall insure Franchisee against any liability which may arise in connection with the operation of Franchisee's real estate brokerage business and such collateral businesses as may be approved in writing by CENTURY 21 Regional and shall be in such form as CENTURY 21 Regional approves. If required by law, Workers' Compensation Insurance shall be carried on all employees and sales associates. All insurance policies maintained by Franchisee, other than Worker's Compensation Insurance, shall contain a separate endorsement naming CENTURY 21 Regional and CENTURY 21 International as additional insureds; shall not be subject to cancellation, except on ten (10) days written notice to CENTURY 21 Regional and CENTURY 21 International; and shall contain an express waiver of any and all rights of subrogation whatsoever against CENTURY 21 Regional and CENTURY 21 International. Franchisee shall cause certificates of insurance of all such policies and endorsements, showing compliance with the above requirements, to be deposited with CENTURY 21 Regional within thirty (30) days of the execution of this Agreement and annually thereafter.

B. **Ongoing Obligations:** In addition to the above-referenced Start-Up Obligations and concurrent with the opening of the Franchised office and continuing throughout the term of this Agreement, Franchisee agrees to undertake and carry out diligently all of the following obligations:

(i) **Full Time Management.** Franchisee acknowledges that it is a material consideration to CENTURY 21 Regional in granting this Franchise, and it is the stated intent of Franchisee, that this Franchise is granted to a sole proprietor, a partnership or a corporation, as the case may be, on the basis that Franchisee and Affiliates of Franchisee whose names are designated at Paragraph 30 of this Agreement shall actively, on a full-time basis, participate in the management of the Franchise operations, as follows:

(a) If the Franchise is operated as a sole proprietorship, the proprietor agrees to engage on a full-time basis, actively and personally, in the management of the franchise operations; or

(b) If the Franchise is operated as a partnership (general or limited), Franchisee agrees that at all times during the term of this Agreement partners owning at least a majority interest in the capital and/or

8

profits of the partnership shall engage on a full-time basis, actively and personally, in the management of the Franchise operations. Additionally, Franchisee shall designate one of the partners as the "Responsible Broker," who shall be approved in writing by CENTURY 21 Regional and who shall be responsible for supervising the affairs of the Franchise operations and for assuring compliance by Franchisee and all Affiliates of Franchisee with all terms of this Agreement; or

(c) If the Franchise is operated as a corporation, Franchisee agrees that at all times during the term of this Agreement that each officer and director of the corporation and one or more shareholders who own in the aggregate at least a majority of the outstanding stock in the corporation shall engage actively and personally in the management of the Franchise operation. Additionally, Franchisee shall designate a senior officer of the corporation as the "Responsible Broker," who shall be approved in writing by CENTURY 21 Regional and who shall be responsible for supervising the affairs of the Franchise operations and for assuring compliance by Franchisee and all Affiliates of Franchisee with all terms of this Agreement; and

(d) Franchisee shall obtain written approval by CENTURY 21 Regional of any changes in the "Responsible Broker"; CENTURY 21 Regional shall not unreasonably withhold its approval of a change in the "Responsible Broker"; and

(e) At Paragraph 30 of this Agreement, Franchisee designates the names, positions with respect to Franchisee and percent of ownership in the Franchise of the partners of Franchisee or of the officers, directors and shareholders of Franchisee, as the case may be. Any change in the relationship of such designated persons as to the management of Franchisee or any change in the ownership of Franchisee resulting directly or indirectly in the transfer of twenty-five percent (25%) or more of the ownership rights in capital and/or profits of a partnership franchise or in any class of stock of a corporate franchise shall be first approved in writing by CENTURY 21 Regional, which shall not unreasonably withhold its approval. Furthermore, Franchisee agrees that it will incorporate in its organizational documents (Partnership Agreement or Articles of Incorporation, as the case may be) provisions that are expressly designed to carry out the provisions of this Paragraph, and upon request, shall provide CENTURY 21 Regional with evidence of compliance with this provision;

(ii) **Payment For Goods Or Services.**  Franchisee shall pay promptly to CENTURY 21 Regional all fees and contributions due hereunder, as well as any additional fees or charges incurred for any products, supplies, or services furnished to or to be furnished by CENTURY 21 Regional or CENTURY 21 International at Franchisee's request, which fees or charges shall be payable immediately by Franchisee. Any payments which are past due shall bear interest at the lower rate of either the highest rate allowed by law or a rate that is five (5) percentage points per annum higher than the "prime rate" then currently established by the largest bank (determined by total bank assets) headquartered in the state in which Franchisee's Approved Location is situated;

(iii) **Records.**  Franchisee agrees to maintain and keep such records and reports as are prescribed by CENTURY 21 Regional and shall mail copies of such reports and records to the address designated by CENTURY 21 Regional in accordance with schedules required by CENTURY 21 Regional. A report of each brokerage transaction in which a service fee will be payable shall be filed with the CENTURY 21[®] Regional office within seven (7) days of the execution of initial documents by the parties thereto;

(iv) **Financial Statements.**  Franchisee shall supply to CENTURY 21 Regional, at its request, a complete financial statement prepared in accordance with generally accepted accounting principles, on an annual basis within ninety (90) days of Franchisee's fiscal year end. Franchisee, Franchisee's principal shareholder (if Franchisee is a corporation), or a general partner (if Franchisee is a partnership) or Franchisee's independent accountant shall sign said financial statement certifying the truth and accuracy of the matters contained therein;

(v) **Taxes.**  Franchisee shall pay promptly when due all taxes, accounts, liabilities and indebtedness of any kind incurred by Franchisee in the conduct of its business. In the event any fees (including, without limitation, service fees and the initial franchise fee) payable by Franchisee to CENTURY 21 Regional are subject to Value Added Taxes, Gross Receipts Taxes, or similar taxes imposed by taxing authorities within the jurisdiction in which Franchisee operates, then Franchisee shall, in addition to the fees due CENTURY 21 Regional, pay to CENTURY 21 Regional an additional sum which is equal to and shall represent the amount of such tax imposed on fees due CENTURY 21 Regional.

(vi) **Indemnification.**  Franchisee shall indemnify and hold harmless CENTURY 21 Regional, CENTURY 21 International and their subsidiaries, affiliates, directors, officers and employees, and all other CENTURY 21 franchisees from all expenses, fines, suits, proceedings, claims, losses, damages, liabilities or actions of any kind or nature (including, but not limited to, costs and attorneys' fees) arising out of or in any way connected with Franchisee's operations. Franchisee further agrees that if either CENTURY 21 International or CENTURY 21 Regional is made a party to a lawsuit or other legal action in connection with the activities of Franchisee or any Affiliates of Franchisee, then at the option of each, CENTURY 21 International and/or CENTURY 21 Regional, as the case may be, either may tender the defense and/or prosecution of the case to the Franchisee who shall be responsible for diligently pursuing the case or action at Franchisee's expense, or may hire counsel directly to protect its respective interest and bill Franchisee for all costs and attorneys' fees incurred in connection therewith, in which case Franchisee shall promptly reimburse the billing party for all costs and expenses incurred;

(vii) **Conflicts of Interest.**  Franchisee, and any Affiliates of Franchisee, as defined below, shall not, during the term hereof, directly or indirectly (as an officer, director, shareholder, partner, Responsible Broker or otherwise) operate, manage, own or have more than a ten percent (10%) interest in any real estate brokerage or related business (other than another CENTURY 21 Franchise) located within a radius of seventy-five (75) miles of the Approved Location specified in this Agreement, without the prior written consent of CENTURY 21 Regional. Affiliates of Franchisee shall include each of the following, and the restrictions set forth above shall

apply to each of them: (a) each partner, Responsible Broker, officer, or director; or any shareholder who owns (directly and/or beneficially) twenty-five percent (25%) or more of any class of Franchisee's stock including corporations or other entities which control, are controlled by, or are under common control with Franchisee or its other Affiliates, (b) if Franchisee is a partnership, each of the partners thereof and each officer, director and shareholder owning (directly and/or beneficially) twenty-five percent (25%) or more of the stock of any corporate partner, and (c) the spouse, parents, siblings and children of each of the foregoing persons;

(viii) **Net Worth.** Franchisee acknowledges that a material consideration of CENTURY 21 Regional in granting this Franchise is the representation by Franchisee in Paragraph 13 hereof that Franchisee is financially responsible and has a net worth in tangible assets in excess of Twenty-Five Thousand Dollars ($25,000.00) not including the value of Franchisee's interest in this Agreement or Franchisee's principal residence. Franchisee agrees and warrants that at all times throughout the term of this Agreement Franchisee shall maintain a minimum net worth as represented herein. If Franchisee's net worth falls below the specified amount, Franchisee shall be required to procure a guarantor acceptable to CENTURY 21 Regional to the extent of the deficiency, which guarantor shall not only guarantee Franchisee's performance under this Agreement, but also Franchisee's duties to Franchisee's clients and to the public;

(ix) **Local Councils.** CENTURY 21 Regional may establish a local council of CENTURY 21 franchisees with boundaries as determined, from time to time, by CENTURY 21 Regional. Franchisee agrees to join and participate in the council established in the area designated by CENTURY 21 Regional as Franchisee's local council area. The local council may make recommendations and suggestions concerning the expenditure of council funds available for promotional purposes in the local area. Such local council may adopt its own by-laws, rules and procedures, but such by-laws, rules and/or procedures shall not restrict Franchisee's rights or obligations under this Agreement. Except as otherwise provided herein, and subject to the approval of CENTURY 21 Regional, any lawful action of such council at a meeting attended by two-thirds (2/3) of the members, including reasonable assessments for local promotional and advertising purposes, shall be binding upon Franchisee if approved by two-thirds (2/3) of the member franchisees present, with each member office having one (1) vote, provided that no franchisee (or controlled group of franchisees) shall have more than twenty-five percent (25%) of the vote in a local council regardless of the number of offices owned; and,

(x) **Other Councils.** CENTURY 21 Regional may establish a regional council of CENTURY 21 franchisees in each regional area as determined by CENTURY 21 Regional. CENTURY 21 International may establish a national and international council of CENTURY 21 franchisees with boundaries established by CENTURY 21 International. Each regional council, national council and international council shall establish its own reasonable bylaws and procedures. Actions of the regional, national and international councils shall be binding upon Franchisee; provided, however, that no council action shall modify the terms and conditions of this Agreement. Regional, national and international councils shall be composed of CENTURY 21 franchisees who are elected or appointed on a representative basis by members of local or regional councils or CENTURY 21 Regional. Representatives to regional, national and international councils shall have voting power in proportion to the number of CENTURY 21 franchisees in the area or region they represent. Neither CENTURY 21 International nor CENTURY 21 Regional shall have a vote in any franchisee council.

C. **Obligations Related to Quality of Service and Goodwill:** In addition to the above-referenced "Start-Up Obligations" and "On Going Obligations" Franchisee acknowledges that it is of utmost importance that the services provided by Franchisee to the consuming public adhere to the minimum standards associated with the CENTURY 21 system and serve to enhance the reputation and goodwill associated with the service mark "CENTURY 21". Franchisee acknowledges that the requirements set forth in this Paragraph are necessary to assure continuing public acceptance and patronage of the CENTURY 21[*] franchise system and to avoid deterioration or obsolescence in the operation of Franchisee's CENTURY 21 office. Franchisee, therefore, agrees to undertake and carry out diligently all the following obligations:

(i) **Use of Service Mark.** Franchisee agrees that throughout the term of this Agreement it will operate exclusively under Franchisee's CENTURY 21 trade name with respect to all advertising, promotion and communications, including, but not limited to, telephone answering, office sign(s), yard signs, business cards, bank accounts, stationery, promotional and advertising materials, real estate documents, and all other materials used in any medium by Franchisee. Franchisee agrees to supervise all persons working with or under Franchisee in the franchised operation to assure compliance by such persons with all the terms of this Agreement and the P&P Manual;

(ii) **Regular Business Hours.** During the term of this Agreement, Franchisee shall diligently, faithfully and continuously conduct a CENTURY 21 Franchise at the Approved Location, which shall be open during regular business hours at least six (6) days per week. Franchisee also agrees to give prompt, courteous and efficient service to the public, and generally to operate the Franchise in compliance with the P&P Manual and professional standards so as to preserve, maintain and enhance the value of the CENTURY 21 Marks and the CENTURY 21 System and the reputation and goodwill built up by CENTURY 21 International and CENTURY 21 Regional and its franchisees. Also, Franchisee agrees to maintain throughout the term of this Agreement all office facilities, equipment, office sign(s), yard signs and all other materials in first-class condition, and to keep them in strict compliance with the P&P Manual;

(iii) **Disclaimer.** Franchisee specifically agrees to include conspicuously the slogan "EACH OFFICE IS INDEPENDENTLY OWNED AND OPERATED" on all business cards, stationery, promotional and advertising materials, real estate documents, and all other materials used by Franchisee, unless specifically provided otherwise in the P&P Manual or waived in writing by CENTURY 21 Regional;

(iv) **Audit Rights.** Franchisee shall allow CENTURY 21 Regional to make inspections of Franchisee's business and premises at any reasonable time, and will make Franchisee's books, tax returns and records available for inspection and audit by CENTURY 21 Regional during normal working hours. CENTURY

21 Regional's right to audit shall include the right to examine books, tax returns and records of other real estate related businesses owned, in whole or in part, or operated by Franchisee or Franchisee's Affiliates, to determine whether all revenue received by Franchisee has been properly reported by Franchisee, that appropriate fees and contributions have been paid, and that the obligations of Franchisee under this Agreement have been complied with. Whenever CENTURY 21 Regional exercises its right to audit, Franchisee shall, upon reasonable notice from CENTURY 21 Regional, provide a comfortable working space for CENTURY 21 Regional's representative(s) and ensure that all relevant books, tax returns and records are available at Franchisee's Approved Location. CENTURY 21 Regional reserves the right to establish a uniform list of accounts and/or a uniform bookkeeping system for all of its franchisees, and in such event, Franchisee agrees to maintain its books and records in the manner required by CENTURY 21 Regional. In the event an audit of Franchisee's books discloses that service fees or NAF contributions have been underpaid by more than five percent (5%) in any consecutive three (3) month period, CENTURY 21 Regional may, in addition to any other remedy available under this Agreement or by law, require Franchisee to pay the audit fees and any expenses, including attorneys' fees, incurred by CENTURY 21 Regional in collecting the past due service fees and/or NAF contributions. Furthermore, the audit costs and related charges shall be in addition to the interest and/or late charges that would be owing for delinquent service fees, NAF contributions and related charges, which are accrued from the date they should have been paid had the Franchisee properly and timely reported the relevant transactions and otherwise complied with this Agreement to the date said amounts are paid, at the rates specified in this Agreement.

(v) **Ethics.** Franchisee agrees to conduct its business (and likewise to supervise all Affiliates of Franchisee) in a manner that complies with the terms and intent of this Agreement; with national, state and local laws, regulations and ordinances; with the Code of Ethics of the National Association of REALTORS; and with the CENTURY 21 Code of Ethics (if and when adopted and published by CENTURY 21 International). Franchisee hereby authorizes any federal, local or state body regulating or supervising real estate broker practices and Franchisee's Board of REALTORS[®] (if any) to release to CENTURY 21 Regional information related to complaints and to any disciplinary actions taken based upon Franchisee's practices or the practices of Franchisee's Affiliates. Franchisee agrees to notify CENTURY 21 Regional within five (5) business days of any such complaints or disciplinary actions. Franchisee also agrees to maintain all permits, certificates and licenses (necessary for its Franchise operation) in good standing and in accordance with applicable laws and regulations;

(vi) **Policy and Procedure Manual.** Franchisee agrees to abide by the terms of the P&P Manual and to supervise Affiliates of Franchisee to assure their compliance with the P&P Manual. Franchisee acknowledges that CENTURY 21 International has reserved the right, pursuant to Paragraph 15 of this Agreement, to make reasonable changes in the P&P Manual that CENTURY 21 International determines are important for the continued success and development of the CENTURY 21 franchise organization and its members. Accordingly, Franchisee agrees that from time to time CENTURY 21 International may reasonably change or modify the CENTURY 21 Marks and the CENTURY 21 System as well as the standards and specifications set forth in the P&P Manual, including, but not limited to, the modification or adoption of new or modified trade names, trademarks, service marks, sign and logo requirements, or copyrighted materials. Franchisee also agrees, at Franchisee's own expense, to adopt on a timely basis (but in no case later than ninety (90) days after notice) any such modifications as if they were a part of the CENTURY 21 System at the time of the execution of this Agreement. CENTURY 21 International or CENTURY 21 Regional shall notify Franchisee in writing as to changes in the P&P Manual or other changes in the operational structure of the Franchise;

(vii) **Ownership of Marks.** Franchisee acknowledges that the CENTURY 21 Marks and the CENTURY 21 System and other products and items delivered to Franchisee pursuant to this Agreement are the sole and exclusive property of CENTURY 21 International and that Franchisee's right to use the same solely in connection with the operation of its franchised real estate business is contingent upon Franchisee's continued full and timely performance under this Agreement. Franchisee shall be responsible for, and supervise all of its Affiliates in order to assure, the proper use of the CENTURY 21 Marks and the CENTURY 21 system in compliance with this Agreement. Franchisee acquires no rights in any of said property, except for the Franchisee's right to use the same under this Agreement. Franchisee agrees that at no time during this Agreement or at any time after the expiration or termination of this Agreement shall Franchisee contest in the United States or any other country the sole and exclusive rights of CENTURY 21 International in said CENTURY 21[®] Marks and CENTURY 21 System and other products and items delivered under this Agreement, nor shall Franchisee claim any interest therein that is contrary to this Paragraph or at any time dispute, disparage or impugn the validity of the CENTURY 21 Marks and/or the CENTURY 21 System. Franchisee agrees that neither during the term of this Agreement nor at any time after its expiration or termination shall Franchisee adopt or employ, or seek to register, any names, marks, insignias, colors, trade dress, or symbols in the franchise operations or any other business that are confusingly similar to the CENTURY 21 Marks licensed under this Agreement. Furthermore, Franchisee agrees to cooperate with and assist CENTURY 21 International and/or CENTURY 21 Regional in connection with any legal action brought by or against either regarding the protection and preservation of said CENTURY 21 Marks and CENTURY 21 System and other products and items delivered under this Agreement. Also, Franchisee acknowledges that all information delivered to Franchisee pursuant to this Agreement, unless the information is otherwise publicly available, constitutes trade secrets and proprietary information of CENTURY 21 International and/or CENTURY 21 Regional, as the case may be. Franchisee agrees to keep said information confidential and further agrees to use diligent efforts to protect it from disclosure without prior written approval of CENTURY 21 International and/or CENTURY 21 Regional, as the case may be, and to protect it from misappropriation by Affiliates of Franchisee or by any other persons under the control of Franchisee;

(viii) **Review of Advertising.** Franchisee acknowledges that the CENTURY 21 Marks and the CENTURY 21 System are the sole and exclusive property of CENTURY 21 International in the United States and throughout the world, and that any advertising or promotional materials produced by Franchisee will reflect and have an impact upon the CENTURY 21 system. Accordingly, Franchisee agrees to submit, upon the written request of CENTURY 21 Regional, all advertising or promotional material produced by Franchisee to CENTURY 21 Regional at least five (5) days prior to the planned publication or airing thereof. CENTURY 21 Regional shall

thereupon approve or disapprove the use of the CENTURY 21 Marks in said advertising, which approval shall not be unreasonably withheld.

(ix)   **Office Size and Appearance.**   Franchisee acknowledges and recognizes that all CENTURY 21 franchised real estate brokerage offices must meet certain minimum standards of professionalism as regards office location, office size, exterior attractiveness, and interior attractiveness and decor, and general appearance and cleanliness. Franchisee further acknowledges that these minimum standards, and the office requirements hereinafter set forth have not appeared in previous forms of CENTURY 21 Real Estate Franchise Agreements, and that certain CENTURY 21 franchisees who have become members of the CENTURY 21 System prior to the adoption of this form of CENTURY 21 Real Estate Franchise Agreement may not presently be bound by these requirements. CENTURY 21 Regional has inspected Franchisee's present office location, the size of Franchisee's office, the exterior appearance of said office and the interior appearance, design and decor of said office. In accordance with the result of said inspection and the provisions hereof, Franchisee agrees to comply with those Subparagraphs of this Paragraph 11C(ix), hereinafter set forth, which have been checked and initialled by both Franchisee and a Corporate Officer of CENTURY 21 Regional:

[   ]   (a)   **Office Is Acceptable.** - Franchisee's office is acceptable to CENTURY 21 Regional as regards its location, size, exterior appearance, interior appearance, design and decor. Accordingly, no changes or alterations to Franchisee's office shall be necessary during the term of this Agreement subject to the provisions of Paragraph 11 C (ix) (f) hereof.

_____        _____        _____
      initials                          initials                          initials

*check here and initial below only if applicable*
[ ✓ ]   (b)   **New Office Location.** - On or before   *JUNE   30*
19 *96*  , Franchisee will relocate its CENTURY 21 franchised real estate office from its present location at  *121 MT VERNON ST   BOSTON, MA 02108*  , to a location ("the new office") approved by CENTURY 21 Regional. The new office shall contain a minimum of _____ square feet of useable office space. Prior to entering into a contract to purchase or lease with respect to the new office, Franchisee will obtain written approval of the proposed new office location from CENTURY 21 Regional, which will not unreasonably withhold its approval. In the event CENTURY 21 Regional withholds its approval or notifies Franchisee, in writing, of its disapproval of Franchisee's proposed new office location, stating the reasons therefor, Franchisee may resubmit to CENTURY 21 Regional other proposed locations for the new office as often as may be required to obtain CENTURY 21 Regional's approval. CENTURY 21 Regional shall have fifteen (15) days from receipt of any new office location proposals to respond to Franchisee, in writing.  If written approval is not received by Franchisee within fifteen (15) days from the date of receipt by CENTURY 21 Regional of such new office location proposal, then CENTURY 21 Regional shall be deemed to have withheld its approval of such proposal.   In the event that Franchisee has not moved into a new office location, approved by CENTURY 21 Regional, by the date set forth above in this Paragraph 11C(ix)(b), CENTURY 21 Regional may, at its option, terminate this Agreement at any time upon ten (10) days written notice to Franchisee. Notwithstanding CENTURY 21 Regional's approval of Franchisee's new office location, Franchisee acknowledges that it may be required, pursuant to the provisions of Paragraphs 11C(ix)(d) and (e) hereof, to make substantial alterations to the exterior and interior of said new office.

_____        _____        _____
      initials                          initials                          initials

*check here and initial below only if applicable*
[   ]   (c)   **Present Office Size.** - On or before _____ , 19_____ . Franchisee will expand the size of its present CENTURY 21 franchised real estate office, located at _____ , from its present _____ square feet of useable office space, to a minimum of _____ square feet of useable office space. Prior to entering into a contract to purchase or lease additional office space to so expand Franchisee's present office size, Franchisee will obtain written approval of the proposed additional office space from CENTURY 21 Regional, which will not unreasonably withhold its approval. In the event CENTURY 21 Regional withholds its approval or notifies Franchisee, in writing, of its disapproval of Franchisee's proposed additional office space, stating reasons therefor, Franchisee may resubmit to CENTURY 21 Regional plans for other additional office space as often as may be required to obtain CENTURY 21 Regional's approval. CENTURY 21 Regional shall have fifteen (15) days from receipt of any additional office space plans to respond to Franchisee, in writing.  If written approval is not received by Franchisee within fifteen (15) days from the date of receipt by CENTURY 21 ⃰ Regional of such new office space proposal, then CENTURY 21 Regional shall be deemed to have withheld its approval of such proposal.   In the event Franchisee has not expanded its present office location, as approved by CENTURY 21 Regional, by the date set forth above in this Paragraph 11C(ix)(c), CENTURY 21 Regional may, at its option, terminate this Agreement at any time upon ten (10) days written notice to Franchisee. Notwithstanding CENTURY 21 Regional's approval of Franchisee's present office expansion, Franchisee acknowledges that it may be required pursuant to the provisions of Paragraphs 11C(ix)(d) and (e) hereof, to make substantial alterations to the exterior and interior of said expanded office.

_____        _____        _____
      initials                          initials                          initials

*check here and initial below only if applicable*
[   ]   (d)   **Office Exterior.** - On or before _____ , 19_____ , Franchisee will remodel or renovate the exterior of Franchisee's present real estate office, or of Franchisee's new

office if Franchisee has been required pursuant to the provisions of Subparagraph 11C(ix)(b) hereof to move its office to a new location. Prior to remodeling the exterior of its office, Franchisee will obtain written approval of its exterior plans from CENTURY 21 Regional, who which will not unreasonably withhold its approval. In the event CENTURY 21 Regional withholds its approval or disapproves of Franchisee's exterior plans, it will advise Franchisee, in writing, of its disapproval, stating reasons therefor. Franchisee may resubmit to CENTURY 21 Regional revised exterior plans as often as may be required to obtain CENTURY 21 Regional's approval. CENTURY 21 Regional shall have fifteen (15) days from receipt of any such office exterior plans to respond to Franchisee, in writing. If written approval is not received by Franchisee within fifteen (15) days from the date of receipt by CENTURY 21 Regional of such new office exterior design proposal, then CENTURY 21 Regional shall be deemed to have withheld its approval of such proposal. In the event that Franchisee has not remodeled or renovated the exterior of Franchisee's office, as approved by CENTURY 21 Regional, by the date set forth above in this Paragraph 11C(ix)(d), CENTURY 21 Regional may, at its option, terminate this Agreement at any time upon ten (10) days written notice to Franchisee.

———————    ———————    ———————
initials         initials         initials

*check here and initial below only if applicable*

[   ]    (e)  **Office Interior**. - Franchisee acknowledges that CENTURY 21 Regional has developed (and has so advised Franchisee of) certain standards designed to assure that CENTURY 21 franchised real estate brokerage offices maintain a level of interior furnishings, design and decor which are as professional and tasteful in appearance as those of successful real estate brokerage offices (in terms of gross revenues) which are located in Franchisee's market area. These minimum standards require that Franchisee's office be tastefully and attractively furnished, that Franchisee's office contain a reception area with adequate seating, that Franchisee's office contain at least one conference room adequate for the conducting of meetings, closings, etc., and that Franchisee's office be maintained in a clean, orderly and tidy manner. Accordingly, on or before ————————————————, 19————, Franchisee will redecorate, refurbish, and/or renovate the interior of Franchisee's present real estate office, or of Franchisee's new office if Franchisee has been required pursuant to the provisions of Paragraph 11C(ix)(b) hereof to move its office to a new location. Prior to redecorating, refurbishing or renovating the interior of its office, Franchisee will obtain written approval of its interior plans from CENTURY 21 Regional, which will not unreasonably withhold its approval. In the event CENTURY 21 Regional withholds its approval or disapproves of Franchisee's interior plans, it will advise Franchisee, in writing, of its disapproval, stating reasons therefor, Franchisee may resubmit to CENTURY 21 Regional revised interior plans as often as may be required to obtain CENTURY 21 Regional's approval. CENTURY 21 Regional shall have fifteen (15) days from receipt of any such plans to respond to Franchisee, in writing. If written approval is not received by Franchisee within fifteen (15) days from the date of receipt by CENTURY 21 Regional of such new office interior proposal, then CENTURY 21 Regional shall be deemed to have withheld its approval of such proposal. In the event that Franchisee has not redecorated, refurbished or renovated the interior of Franchisee's office, as approved by CENTURY 21 Regional, by the date set forth above in this Paragraph 11C(ix)(e), CENTURY 21 Regional may, at its option, terminate this Agreement at any time upon ten (10) days written notice to Franchisee.

———————    ———————    ———————
initials         initials         initials

FRANCHISEE SHALL BE BOUND BY THE FOLLOWING TWO SUBPARAGRAPHS, NOTWITHSTANDING THE FACT THAT ONE OR MORE OF THE ABOVE SUBPARAGRAPHS IN THIS PARAGRAPH 11C(IX) SHALL HAVE BEEN CHECKED AND INITIALLED.

(f)  **Continuing Obligation Of Franchisee**. - Franchisee shall have a continuing obligation, throughout the term of this Agreement, to maintain both the exterior and interior of Franchisee's office so that it remains the same or better in appearance and condition as when said office was originally approved by CENTURY 21 Regional. In the event Franchisee does not comply with the provisions of this Paragraph 11C(ix)(f), CENTURY 21 Regional may, at its option, terminate this Agreement.

(g)  **Modifications Of Office Size And Design Requirements**. Franchisee acknowledges and agrees that because of changing market conditions CENTURY 21 Regional reserves and shall have the right to change, increase, or eliminate office size and exterior and interior appearance and decor requirements from time to time, and that as a condition to an assignment or renewal of Franchisee's franchise, Franchisee or Franchisee's assignee, may be required to make modifications to its office space according to CENTURY 21 Regional's then current office size and exterior and interior appearance and decor policies.

(x)  **Model Office Plans**. Franchisee acknowledges and agrees that if Franchisee is provided plans or specifications for any CENTURY 21 model office concepts to be used in conjunction with the Franchise, Franchisee's use of said plans and specifications shall be the subject of a separate agreement, which shall specifically address Franchisee's rights and obligations in connection with the use of said plans and specifications.

(xi)  **Consumer Relations and Protection of Goodwill**. The parties recognize that from time to time disputes may arise between Franchisee, or Affiliates or agents of Franchisee, and a client, customer or other individual or entity involved in a real estate related transaction, and that it is in the best interest of all parties, when possible, to quickly resolve such disputes. Accordingly, Franchisee agrees to promptly respond to all complaints received from its customers or clients or other individuals, in an attempt to resolve said dispute in a reasonable business manner. When CENTURY 21[®] Regional is contacted by any party with a complaint regarding the handling of a particular transaction by Franchisee, CENTURY 21 Regional may investigate the matter and attempt to obtain from Franchisee, from the complaining party and from available witnesses, their respective versions of the relevant facts. Franchisee agrees to cooperate fully with CENTURY 21 Regional in any investigation. CENTURY 21 Regional will attempt to complete any investigation within thirty (30) days of its receipt of a

complaint. Upon completion of said investigation (and in the absence of Franchisee's independent resolution of the matter), if CENTURY 21 Regional has obtained facts sufficient to make a determination that, in CENTURY 21 Regional's reasonable business judgment, Franchisee has provided substandard service or acted in a materially improper fashion in said transaction, CENTURY 21 Regional will so advise Franchisee of such determination, in writing, and provide Franchisee with guidelines prepared pursuant to CENTURY 21 Regional's reasonable business judgment, setting forth the method by which Franchisee may correct the situation (e.g. cancellation of a listing agreement; refund of deposit or other funds, etc.). In the event that CENTURY 21 Regional: 1) is contacted by a complaining party or becomes aware of a complaint regarding a particular transaction in which Franchisee was involved; and, 2) makes a reasonable determination pursuant to this Paragraph that Franchisee, or its agents or Affiliates, has acted in a materially improper fashion in said transaction; and, 3) determines that the complaint has not been resolved with the complaining party to the satisfaction of CENTURY 21 Regional within a period of thirty (30) days from CENTURY 21 Regional's determination that Franchisee acted in a materially improper fashion, then CENTURY 21 Regional may, at its option, terminate this Agreement at any time upon ten (10) days written notice to Franchisee.

(xii) **Quality Survey.** Upon the closing (settlement) of each transaction which Franchisee has handled for either a buyer or seller (hereinafter collectively referred to as "client"), and subsequent receipt by CENTURY 21 Regional of a Commission Disbursement Authorization (CDA) regarding that transaction, CENTURY 21 Regional and/or CENTURY 21 International may, and Franchisee so authorizes CENTURY 21 Regional and/or CENTURY 21 International to send to Franchisee's client (or a sampling of Franchisee's clients) in said transaction a questionnaire which will request the client to rate the service and performance of Franchisee and Franchisee's sales associates in said transaction. (The procedures and standards of quality and performance of this rating system shall be set forth in the P & P Manual, as it may be revised and/or supplemented from time to time by CENTURY 21 International. Franchisee acknowledges the business necessity for said standards and the inherent difficulty in establishing scientifically precise quality standards within the context of a service industry. Therefore, Franchisee agrees to be bound by said standards and the terms of this Subparagraph notwithstanding the fact that said standards may not result in a statistically accurate evaluation of Franchisee's service quality. In establishing said standards CENTURY 21 International shall exercise reasonable business judgment in a good faith attempt to maintain and improve the quality of service provided under the service mark CENTURY 21.) In the event that Franchisee's overall average standard of performance during each twelve (12) month measurement period established from time to time by CENTURY 21 Regional does not meet the minimum standards of performance and quality as established by CENTURY 21 International for that twelve (12) month period, Franchisee may be placed on probation for a period to be established by CENTURY 21 Regional of not less than twelve (12) months. If said deficiencies in the quality of Franchisee's service and performance are not corrected within said probationary period, as evidenced by returned client questionnaires received during the probationary period, so as to equal or exceed the minimum standards of quality and performance, CENTURY 21 Regional may, at its option, terminate this Agreement at any time upon ten (10) days written notice to Franchisee.

## 12. REPRESENTATIONS BY CENTURY 21 REGIONAL

CENTURY 21 Regional represents that the following statements are true and accurate:

A. CENTURY 21 International is, and CENTURY 21 Regional acknowledges that, CENTURY 21 International is the true and rightful owner of those CENTURY 21 Marks and the CENTURY 21 System licensed to Franchisee pursuant to this Agreement, subject to certain rights and claims as may be stated otherwise herein and/or explained in the Franchise Disclosure Documents Franchisee received prior to the execution of this Agreement, and except as to those rights and claims not known to CENTURY 21 International and as to those pending claims CENTURY 21 International considers as not representing a material challenge to its rights;

B. CENTURY 21 Regional has been authorized and licensed by CENTURY 21 International to offer this Franchise on the terms stated herein at the Approved Location specified in Paragraph 5 hereof;

C. CENTURY 21 Regional is a corporation duly incorporated, which corporation is licensed and is currently qualified to do business in the state in which Franchisee's Approved Location is situated;

D. The execution of this Agreement by CENTURY 21 Regional will not violate or constitute a breach of any other agreement or commitment to which CENTURY 21 Regional is a party; and

E. The individual executing this Agreement is an officer of CENTURY 21 Regional authorized to enter into this Agreement on behalf of CENTURY 21 Regional, which Agreement upon its execution shall represent a valid and binding obligation of CENTURY 21 Regional to the extent performance by it is specifically required hereunder; provided, however, that this Agreement shall not be effective until signed by a corporate officer from CENTURY 21 Regional's home office. NO FIELD REPRESENTATIVE IS AUTHORIZED TO EXECUTE THIS AGREEMENT ON BEHALF OF CENTURY 21 REGIONAL. THEREFORE, FRANCHISEE IS ADVISED NOT TO INCUR ANY EXPENSES WITH RESPECT TO OPENING THE FRANCHISED OFFICE UNTIL FRANCHISEE HAS RECEIVED A FINAL, EXECUTED COPY OF THIS AGREEMENT FROM CENTURY 21 REGIONAL'S HOME OFFICE.

## 13. REPRESENTATIONS BY FRANCHISEE

Franchisee represents that the following statements are true and accurate:

A. Franchisee is a licensed real estate broker under the laws of the state in which Franchisee's Approved Location is to be situated. If Franchisee is a partnership or a corporation, the Responsible Broker designated at Paragraph 30 hereof is a licensed real estate broker under the laws of the state in which Franchisee's Approved Location is to be situated.

B. Franchisee is not obtaining this Franchise for speculative or investment purposes and has no present intention to sell or transfer or attempt to sell or transfer the Franchise in whole or in part.

14

C.  Franchisee understands and acknowledges the importance of the high and uniform standards of quality, appearance and service imposed by CENTURY 21 International and CENTURY 21* Regional in order to maintain the value of the CENTURY 21 name and the necessity of operating the Franchised office in compliance with CENTURY 21 standards.  Franchisee represents that Franchisee has the present capability and intention to meet those standards.

D.  If Franchisee is a corporation, Franchisee is duly incorporated, licensed and currently qualified to do business in the state in which Franchisee's Approved Location is to be situated and in any other states in which Franchisee proposes to do business.

E.  Franchisee has procured such certificates, licenses and permits, in addition to appropriate real estate licenses, necessary for Franchisee to carry on the business contemplated by this Agreement.

F.  The execution of this Agreement by Franchisee will not violate or constitute a breach of the terms of any other agreement or commitment to which Franchisee is a party.

G.  The individual executing this Agreement on behalf of Franchisee is duly authorized to do so; upon its execution, the Agreement shall constitute a valid and binding obligation of Franchisee, and all of its partners, if Franchisee is a partnership.

H.  Franchisee acknowledges that no representations, promises, guarantees or warranties of any kind are made or have been made by either CENTURY 21 International or CENTURY 21 Regional or by any person representing himself or herself as an authorized agent or representative of either to induce Franchisee to execute this Agreement, except as specifically set forth in the Franchise Disclosure Documents delivered to Franchisee. Franchisor disclaims the making of any representations, promises, guaranties or warranties of any kind by either CENTURY 21 International or CENTURY 21 Regional or by any person representing himself or herself as an authorized agent or representative of either to induce Franchisee to execute this Agreement, except as specifically set forth in the Franchise Disclosure Documents delivered to Franchisee.  Franchisee acknowledges that the success of the Franchise is dependent upon the personal efforts of Franchisee; or Franchisee's partners, if Franchisee is a partnership; or the officers, directors and Significant Shareholders of Franchisee, if Franchisee is a corporation. Franchisee and the parties listed in Paragraph 30 of this Agreement represent that they intend to devote their full time to the management of the CENTURY 21 Franchise.  Neither Franchisor, CENTURY 21 Regional, nor any other person has guaranteed or warranted that Franchisee will succeed in the operation of the franchise, or has provided any sales or income projections of any kind to Franchisee.

I.  Franchisee, each of the partners of Franchisee (if Franchisee is a partnership), and each of the officers, directors and Significant Shareholders of Franchisee (if Franchisee is a corporation) who will be involved personally and actively in the management of the Franchise (and whose names are set forth in Paragraph 30 hereof), have read fully this Agreement, the P&P Manual and the CENTURY 21 Franchise Disclosure Documents, and fully understand the terms and the import of same, and represent that each is capable of complying and will comply therewith.

J.  Franchisee has a net worth in tangible assets in excess of Twenty-five Thousand Dollars ($25,000.00), not including the value of Franchisee's interest in this Agreement or Franchisee's principal residence, as of said Commencement Date of this Agreement, as represented by Franchisee's financial statement, which has been prepared in accordance with generally accepted accounting principles.  This representation shall not be construed in any manner that would in any way restrict or limit the responsibility or degree of obligation of Franchisee and its partners, or its officers, directors and shareholders, as the case may be, as may otherwise be set forth herein, or otherwise be required by law.

14.  RELATIONSHIP OF PARTIES

A.  Franchisee is and shall be an independent contractor and nothing herein contained shall be construed so as to create an agency relationship, a partnership or joint venture, either between CENTURY 21 Regional and Franchisee or between CENTURY 21 International and Franchisee.  Neither CENTURY 21 Regional, CENTURY 21 International nor Franchisee shall act as agent or representative of the other.  Neither CENTURY 21 Regional, CENTURY 21 International nor Franchisee shall guarantee the obligations of the other or in any way become obligated for the debts or expenses of the other unless specifically agreed upon in writing.  Neither CENTURY 21 Regional nor CENTURY 21 International shall be entitled to share in any of the profits of Franchisee or be required to share in Franchisee's losses; furthermore, neither CENTURY 21 Regional nor CENTURY 21 International shall have any ownership or equity interest in Franchisee.  All employees or sales associates, as the case may be, hired or engaged by or working for Franchisee shall be the employees or sales associates of Franchisee and shall not by virtue of this Agreement be deemed employees, sales associates, agents or representatives of CENTURY 21 Regional or of CENTURY 21 International.

B.  Neither CENTURY 21 Regional nor CENTURY 21 International shall regulate the hiring or firing of Franchisee's salespeople, the parties from whom Franchisee may accept listings or for whom Franchisee may sell property, the commission rates charged by Franchisee, the commission splits between Franchisee and Franchisee's salespeople, the details of the work performed by Franchisee or its sales associates, the manner in which Franchisee obtains listings or sells property, the working conditions of Franchisee's salespeople, or Franchisee's contracts with clients or customers, except to the extent necessary to protect the CENTURY 21 Marks, trade names and goodwill associated therewith.  The conduct of Franchisee's business shall be determined by its own judgment and discretion, subject only to the provisions of this Franchise Agreement and the P&P Manual as it shall be adopted or revised from time to time.

## 15. RIGHTS RESERVED BY CENTURY 21 INTERNATIONAL

A. Franchisee expressly understands and agrees that CENTURY 21 International retains the ownership of all right, title and interest in and to the CENTURY 21 Marks and the CENTURY 21 System, goodwill, trade secrets and proprietary information licensed to Franchisee pursuant to this Agreement.

B. Franchisee further understands and agrees that CENTURY 21 International retains the right to modify the CENTURY 21 Marks, logos, color scheme and/or other trade dress of the system, as well as the CENTURY 21 System and other products and items delivered pursuant to this Agreement and to modify the standards, specifications and other requirements set forth in the P&P Manual. Franchisee is required to comply with any such changes at Franchisee's expense, as provided in this Agreement.

C. CENTURY 21 International has reserved all rights in the CENTURY 21* Marks not expressly granted to CENTURY 21 Regional and Franchisee, and has further reserved the right to use and license the CENTURY 21 Marks to others for uses that may not be related to the operation of a licensed real estate brokerage office.

## 16. ASSIGNMENT OF FRANCHISE

A. This Agreement is personal, being entered into in reliance upon and in consideration of the skill, qualifications and representations of, and trust and confidence reposed in, Franchisee, the Responsible Broker, Franchisee's present partners, if Franchisee is a partnership; and Franchisee's present officers, directors and Significant Shareholders, if Franchisee is a corporation, who have represented that they will actively and personally participate in the ownership and operation of the Franchise. Therefore, neither this Agreement nor any of its rights or privileges shall be assigned, transferred, shared or divided, by operation of law or otherwise, in any manner, without the prior written consent of CENTURY 21 Regional; any such purported transfer, assignment, sharing or division without the prior written approval of CENTURY 21 Regional shall be void. Said consent shall not be unreasonably withheld, but may be subject to certain conditions, including, but not limited to: (i) qualification of any proposed assignee in accordance with the standards CENTURY 21 Regional then applies in evaluating prospective purchasers of new franchises; (ii) payment of all outstanding debts by Franchisee including all payments owing to CENTURY 21 International and CENTURY 21 Regional, including, but not limited to, service fees payable, NAF contributions, Broker Council assessments, and any other obligation incurred pursuant to the operation of the CENTURY 21 Franchise; (iii) the curing of all defaults and noncompliance under the Franchise Agreement and the then current CENTURY 21 P&P Manual; and the curing of all defaults under any other agreement Franchisee may have with CENTURY 21 International and/or CENTURY 21 Regional, such as other CENTURY 21 Franchise Agreements, including but not limited to, all obligations to pay service fees, NAF contributions, Broker Council assessments, interest and late charges, audit fees and other properly chargeable amounts; responsibilities to comply with the P&P Manual then in effect, including trade name and logo guidelines; and obligations to comply with minimum performance standards as set forth in Paragraphs 11C or 17F hereof; (iv) execution of a general release of claims by Franchisee, and any guarantors of Franchisee's obligations, in a form approved by CENTURY 21 Regional; (v) execution of the then current form of franchise agreement by the proposed assignee(s) and by any continuing co-owners in the Franchise (including the Responsible Broker; all partners, if Franchisee is a partnership; and all officers, directors and Significant Shareholders, if Franchisee is a corporation), which form of agreement may contain materially different terms than those contained in this Agreement; and if requested by CENTURY 21 Regional, execution by any guarantors of this Agreement of a reaffirmation of their guarantee of Franchisee's obligations; (vi) payment by assignee(s) of a transfer fee to CENTURY 21 Regional in the sum of _Two Thousand and 00/100 Dollars_ ($2,000.00); (vii) attendance by the proposed assignee at the next available "new franchisee training program" at the proposed assignee's expense (if two or more assignees attendance by only one is required); (viii) execution of an Acknowledgement of Receipt by proposed assignee(s) as to receipt by assignee(s) of a current copy of Franchise Disclosure Documents at least ten (10) business days prior to any such proposed assignment or the payment of any consideration therefor; and (ix) if Franchisee's proposed assignee intends to conduct business at a location other than the Approved Location specified herein, qualification of the proposed new location (which shall be in the same general vicinity as the Approved Location) and qualification of the proposed new office in accordance with the standards CENTURY 21 Regional then applies in evaluating new franchisees. All such conditions also apply to any consent given pursuant to Paragraphs 16B and 16C hereof.

B. If Franchisee or any other party whose interest is subject to this Paragraph shall desire to assign rights in the Franchise (whether directly or indirectly), Franchisee or the party involved shall serve upon CENTURY 21 Regional a written notice setting forth all of the terms and conditions of the proposed assignment, a current financial statement regarding the proposed assignee, and all other information requested by CENTURY 21 Regional concerning the proposed assignee. Said notice shall provide CENTURY 21 Regional with sufficient time to enable CENTURY 21 Regional to comply with all Franchise Disclosure and Registration requirements with respect to any intended assignee. Within twenty (20) days after receipt of such notice (or, if CENTURY 21 Regional requests additional information, within fifteen (15) days after receipt of such additional information), CENTURY 21 Regional may either consent or refuse to consent to the assignment or, at its option, accept the assignment to itself upon the same terms and conditions specified in the notice; provided, however, that CENTURY 21 Regional shall have the option either to accept the assignment of the Franchise and the underlying real estate brokerage business or to accept only the assignment of the Franchise, in which case an allocation of the total purchase price shall be made to reflect the value of the Franchise Agreement itself, which in no case shall exceed the initial franchise fee then being charged by CENTURY 21 Regional for new franchises. If CENTURY 21 Regional fails to exercise any of its rights or options or otherwise to respond, then consent to the proposed assignment shall be deemed withheld. Consent to an assignment upon the specified terms and conditions shall not be deemed to be a consent to an assignment upon any other terms or conditions, or to any other person, or to any other or subsequent assignment.

C. If Franchisee is a sole proprietorship or partnership, CENTURY 21 Regional expressly consents to the assignment of this Agreement, without payment of a transfer fee, to a corporation formed, owned and controlled solely by Franchisee to operate the Franchise business, provided that such assignment shall not relieve the original Franchisee of the obligations of this Agreement nor shall it affect in any manner any obligations to guarantee this

16

Agreement; and further provided that there is no change in the Responsible Broker for the office, unless approved in writing by CENTURY 21 Regional, which approval shall not be unreasonably withheld. Franchisee agrees to notify in writing CENTURY 21 Regional of such transfer of assets to a corporation within ten (10) days of such a transfer and shall supply CENTURY 21 Regional with such documents as it may request including, but not limited to, assignment forms, Articles of Incorporation and Bylaws. If Franchisee is a corporation, any merger or reorganization thereof, or sale or transfer of twenty-five percent (25%) or more of any class of stock, or any series of sales or transfers (whether related or unrelated) totaling in the aggregate twenty-five percent (25%) or more of any class of stock in such corporate Franchisee or the corporate parent of such Franchisee, whether by operation of law or otherwise, shall be deemed an attempted assignment of this Agreement, requiring the prior written consent of CENTURY 21 Regional. If Franchisee is a partnership, the sale or transfer of any general partner's interest, or the sale or series of sales or transfers of limited partnership interests (whether related or unrelated) totaling in the aggregate twenty-five percent (25%) or more of such interests, whether by operation of law or otherwise, shall be deemed an attempted assignment of this Agreement, requiring the prior written consent of CENTURY 21 Regional. For purposes of determining whether twenty-five percent (25%) or more of the interests of any class of shares of a corporation or limited partnership interests in a limited partnership have been transferred, all transfers (whether related or unrelated) shall be aggregated. Any proposed transfer involving less than twenty-five percent (25%) shall be reported by Franchisee to CENTURY 21 Regional at least twenty (20) days in advance but shall not be subject to the approval of CENTURY 21* Regional so long as there is to be no change in the Responsible Broker and the aforementioned aggregate limits are not involved. Furthermore, if the Franchise is owned by either a partnership or a corporation, which in turn is owned in whole or part by another limited partnership or corporation, this Paragraph shall be construed to apply to these entities as well. It is the intention of the parties that any transfers of ownership in any entity ultimately owning part or all of the Franchise (directly or indirectly) shall be subject to the restrictions imposed by this Paragraph.

D. Any assignment of this Franchise is expressly conditioned upon Franchisee, or Franchisee's proposed assignee agreeing with CENTURY 21 Regional prior to said assignment, to make, at Franchisee's sole expense, or at Franchisee's proposed assignee's sole expense, such reasonable expenditures as are necessary to conform the proposed assignee's office with CENTURY 21 Regional's then current standards for interior and exterior office size, decor, overall attractiveness, and cleanliness.

E. Any change in the Responsible Broker for the franchised office shall require the prior written consent of CENTURY 21 Regional. The Responsible Broker shall be the individual holding a real estate broker's license whose license is to be used for the franchise granted hereby and who is named as the Responsible Broker in Paragraph 30 hereof.

17. TERMINATION

This Agreement may not be terminated except as provided in this Agreement. Termination of this Agreement shall not relieve Franchisee of any unfulfilled obligations created hereunder unless agreed to in writing by CENTURY 21 Regional.

In addition to and without limiting any other provisions herein relating to termination, this Agreement may be terminated as follows:

A. Upon mutual written consent of the parties hereto.

B. At the option of CENTURY 21 Regional, if Franchisee breaches any of Franchisee's representations or warranties or fails to perform any of Franchisee's obligations under this Agreement or under any other agreement Franchisee may have with CENTURY 21 Regional or CENTURY 21 International (such as, by way of example but not by way of limitation, other CENTURY 21 franchise agreements), including, but not limited to, obligations to pay service fees, National Advertising Fund contributions, Broker Council assessments, interest and late charges, audit fees and other properly chargeable amounts, responsibilities to comply with the P&P Manual, including trade name and logo guidelines; obligations to comply with office size and decor requirements; obligations to comply with the resolution of disputes requirements and obligations to comply with minimum performance standards as set forth in Paragraphs 11C and 17F of this Agreement.

C. At the option of CENTURY 21 Regional, if the real estate brokerage license of Franchisee or the Responsible Broker is suspended or revoked or otherwise is not maintained continuously and actively in full force and effect, and in good standing.

D. At the option of CENTURY 21 Regional, at any time more than: (i) nine (9) months after the death or incapacity of Franchisee, or the appointment of a conservator or guardian for the person or estate of Franchisee, if Franchisee is an individual; (ii) nine (9) months after the death or incapacity of any of the general partners, or the appointment of a conservator or guardian for the person or estate of any of the general partners, if Franchisee is a partnership; or (iii) nine (9) months after the death or incapacity of the Responsible Broker, or the appointment of a conservator or guardian for the person or estate of the Responsible Broker, if Franchisee is a corporation; provided, however, that this Agreement shall not terminate if within said nine (9) months (a) this Agreement or the general partner's interest herein is assigned in accordance with the provisions of Paragraph 16 of this Agreement to a licensed real estate broker approved by CENTURY 21 Regional, or (b) if Franchisee is a partnership or corporation, a licensed real estate broker approved by CENTURY 21 Regional shall become the partner or the Responsible Broker holding a real estate broker's license.

E. At the option of CENTURY 21 Regional, if Franchisee fails to conduct and govern the Franchised business according to the Code of Ethics of the National Association of REALTORS, the CENTURY 21 Code of Ethics, or the laws, ordinances and regulations of the federal, state, provincial, district, county or city government.

F. In the event performance of Franchisee falls below the minimum operating standards set forth in this Subparagraph F, Franchisee will be notified in writing setting forth such deficiency and at the option of CENTURY 21 Regional, Franchisee may be placed on probation for a period of not less than three (3) months nor more than six

(6) months. If such deficiency is not corrected within said probationary period, CENTURY 21 Regional may, at its option, terminate this Agreement. The minimum operating standard requires that Franchisee shall, in every six (6) month period, beginning with a starting point established by CENTURY 21 Regional, maintain a volume of closed business on which service fees have been paid sufficient to produce revenue (for purposes of determining service fees) over such period equal to not less than fifty percent (50%) of the average revenue (for purposes of determining service fees) generated by all franchisees over such six (6) month period in the same local council or in such other geographic area as CENTURY 21 Regional may reasonably establish from time to time.

G. At the option of CENTURY 21 Regional: (i) if Franchisee becomes insolvent; or (ii) if a receiver is appointed to take possession of Franchisee's business or property or any part thereof; or (iii) if Franchisee shall make a general assignment for the benefit of creditors; or (iv) if a judgment is obtained against Franchisee which remains unsatisfied for a period of more than thirty (30) days after all rights of appeal have been exhausted.

H. At the option of CENTURY 21 Regional, if Franchisee's office shall have been moved without the prior written consent of CENTURY 21 Regional or shall have become vacant, abandoned or deserted, or shall fail to remain open for business as required hereby or by the P&P Manual.

I. At the option of CENTURY 21 Regional, if Franchisee, within ninety (90) days of the signing of this Agreement, has not opened a conforming CENTURY 21 franchised office or has not completed converting an existing office to a conforming CENTURY 21 franchised office, which in either case includes, but is not limited to, compliance with all CENTURY 21 Regional standards regarding office size, decor and quality; compliance with all sign and logo requirements; and such other requirements as are specified in this Agreement and the P&P Manual.

J. At the option of CENTURY 21[®] Regional, if Franchisee fails at any time to meet the minimum continuing net worth requirements set forth in this Agreement.

K. At the option of CENTURY 21 Regional, if any of the parties who have given personal guarantees of Franchisee's performance under this Agreement cancel, renounce or alter such guarantee, or attempt to do any of the foregoing without the prior written consent of CENTURY 21 Regional, unless Franchisee procures a replacement personal guarantor satisfactory to CENTURY 21 Regional in its sole discretion.

L. At the option of CENTURY 21 Regional, if the Franchisee shall become bankrupt, or shall become subject to any chapter of the United States Bankruptcy Code, unless Franchisee shall: (i) timely undertake to reaffirm the obligations under this Franchise Agreement; (ii) timely comply with all conditions as legally may be imposed by CENTURY 21 Regional upon such an undertaking to reaffirm this Franchise Agreement; and (iii) timely comply with such other conditions and provide such assurances as may be required in relevant provisions of the United States Bankruptcy Code; provided, however, that the parties acknowledge that this Franchise Agreement constitutes a personal service contract and that CENTURY 21 Regional has relied to a degree and in a manner material to this Agreement upon the personal promises of Franchisee, and/or its directors, officers, shareholders or partners, as the case may be, to participate personally on a full-time basis in the management and operation of the Franchise, and, consequently, the parties agree that any attempt by any other party, including the trustee in bankruptcy or any third party, to assume or to accept an assignment of this Franchise Agreement shall be void.

M. In the event CENTURY 21 Regional shall elect to terminate this Agreement pursuant to any provision of this Agreement, CENTURY 21 Regional shall give Franchisee ten (10) days notice, or such notice as may be required by the laws of the state or province in which Franchisee's office is located, setting forth the reason or reasons for termination. Franchisee may cure the default within the ten (10) day notice period and thereby avoid termination. Notwithstanding the aforesaid, CENTURY 21 Regional shall have the right to terminate this Agreement upon ten (10) days notice to the Franchisee, if the right to terminate arises from any of the following reasons, in which case the Franchisee shall not have the opportunity to cure the default and this Agreement shall automatically be terminated; (i) the default arises under C or G of this Paragraph 17; or (ii) the default complained of is a result of intentional action or gross misconduct by the Franchisee; or (iii) the default is a default for which CENTURY 21 Regional has given Franchisee a prior notice of default within the previous twelve months; or (iv) the default is a default under Paragraph 11C (xii) or 17F hereof, for which Franchisee has been put on probation within the previous twelve months; or (v) the default is under Paragraph 11C(xii) hereof.

N. In no event shall this Agreement be assumed by, or transferred to, any individual who or entity which does not comply with all requirements for assignment specified in this Agreement.

18. **PROCEDURES AFTER TERMINATION**
Upon termination, (including expiration, assignment, or transfer) of this Agreement for any reason, Franchisee shall cease to be an authorized CENTURY 21 Franchisee and shall do all of the following acts and things, each of which shall survive the termination of this Agreement and shall remain an ongoing obligation of Franchisee:

A. Promptly pay CENTURY 21 Regional all sums then owing from Franchisee to CENTURY 21 Regional, the NAF and to Franchisee's Broker Council, if any. Promptly pay CENTURY 21 International all sums then owing from Franchisee to CENTURY 21 International, if any.

B. Pay to CENTURY 21 Regional the _six_ percent (_6_%) service fee, plus the two percent (2%) NAF contribution, based upon the gross revenue ultimately received from any transaction in process as of the date of termination and the _six_ percent (_6_%) service fee, plus the two percent (2%) NAF contribution, based upon the gross revenue ultimately received from any referral sent to or received from any other CENTURY 21 office prior to the date of termination, said sum to be paid promptly upon receipt of such revenue by Franchisee. Additionally, Franchisee shall pay CENTURY 21 Regional the _six_ percent (_6_%) service fee, plus the two percent (2%) NAF contribution based upon the gross revenues ultimately received from the closing of any transaction occurring after

termination hereof, but the listing for which was initially procured by Franchisee during the time Franchisee was operating the Franchise under this Agreement.

In the event that CENTURY 21 International shall exercise its right under Paragraph 9D of this Agreement to require a fixed monthly NAF contribution payment, Franchisee shall pay to CENTURY 21 Regional a pro-rata portion of its NAF contribution obligation for the month in which Franchisee is terminated, in addition to any service fees to be paid pursuant to this Paragraph 18.

C. Immediately and permanently discontinue the use of all CENTURY 21 Marks, including, but not limited to, the proprietary mark "CENTURY 21", all similar names and marks, and any name or mark containing the designation" CENTURY 21," "CENTURY", "21" or any other name, designation or mark, or similar colors or lettering indicating or tending to indicate that Franchisee is or ever was an authorized CENTURY 21 franchisee. If Franchisee is a corporation or partnership and "CENTURY 21" is a part of Franchisee's corporate or partnership name, or if Franchisee adopted an assumed or fictitious name (or its equivalent) containing "CENTURY 21" Franchisee agrees to immediately cause its governing documents, and/or its assumed or fictitious name documents, and/or registration, to be amended to delete both the word "CENTURY " and the numerals "21" and to provide CENTURY 21 Regional with documentation that such changes have been made. Furthermore, Franchisee shall not promote or advertise the fact that the firm was formerly a franchisee or affiliate of the CENTURY 21 organization.

D. Promptly destroy, or surrender to CENTURY 21 Regional, all stationery, letterheads, forms, manuals, printed matter, films, books, cassettes, videotapes, licensed software and advertising containing CENTURY 21 Marks, including, but not limited to, the proprietary mark "CENTURY 21," or any similar names or marks or designation or mark indicating or tending to indicate that Franchisee is or was an authorized CENTURY 21 franchisee and promptly return to CENTURY 21 Regional or CENTURY 21 International any equipment leased or lent to Franchisee.

E. Immediately and permanently discontinue all advertising as a CENTURY 21 franchisee, including, but not limited to, the immediate removal of all signs from Franchisee's office which contain the CENTURY 21 Marks or other identifying marks, and the immediate removal from any property then listed for sale or lease of all signs or sign posts using CENTURY 21* Marks or other identifying marks or colors, including, but not limited to, the yard sign post and cross arm, and any yard sign or other sign using colors and/or a configuration similar to any CENTURY 21 yard sign, all of which Franchisee acknowledges constitute proprietary trade dress items of CENTURY 21 International and which Franchisee has not used at any time in the past in business prior to Franchisee's affiliation with the CENTURY 21 organization. If Franchisee fails to remove the office signs within ten (10) days after the effective date of the termination of this Agreement, Franchisee hereby grants CENTURY 21 Regional the right to enter upon Franchisee's premises and remove all "CENTURY 21" signs and all other indicia of any affiliation by Franchisee with the CENTURY 21 organization. Franchisee shall be obligated to reimburse CENTURY 21 Regional for the cost of removal, storage and disposition of said signs and other materials. If Franchisee fails to claim said signs and related materials removed by CENTURY 21 Regional within five (5) days after their removal, CENTURY 21 Regional shall have the right to sell or otherwise dispose of said signs and related materials, in its sole discretion, and CENTURY 21 Regional may retain the proceeds, if any, from any sale or other disposal, to the extent necessary to offset the costs of removal, storage and disposition of said signs and related materials and to offset any other amounts or obligations that Franchisee may then owe CENTURY 21 Regional, CENTURY 21 International or any of their subsidiaries or affiliates.

F. Immediately and forever cease and desist from using the CENTURY 21 System, including, but not limited to, operating manuals, training manuals, sales manuals and aids, listing films and books, advertising and promotional materials, and all trade secret and confidential and proprietary material delivered to Franchisee pursuant to this Agreement.

G. At the option of CENTURY 21 Regional, return the P&P Manual and operating manuals and sell all or part of the training manuals, listing books, listing films, sales training cassettes, forms or brochures on hand which contain CENTURY 21 Marks or which are part of the CENTURY 21 System to CENTURY 21 Regional at cost.

H. Refrain from doing anything which would indicate that Franchisee is or ever was an authorized CENTURY 21 franchisee.

I. Maintain all books, records and reports required by CENTURY 21 Regional pursuant to Paragraph 11 hereof for a period of not less than three (3) years after the termination of this Agreement and allow CENTURY 21 Regional to make final inspection and audit of Franchisee's books and records during normal business hours within said three (3) year period for the purpose of verifying that all service fees, NAF contributions and other appropriate amounts have been paid as required herein.

J. Promptly cancel and discontinue use of the telephone number(s) which served Franchisee's Approved Location at the time of termination and delete Franchisee's CENTURY 21 listing in the Yellow Pages and any other directory. Franchisee shall be deemed to have granted to CENTURY 21 Regional, pursuant to the terms of this Agreement, a power of attorney with full authority for CENTURY 21 Regional to cancel, terminate, assign, discontinue or take any and all lawful action with respect to the telephone number(s) which serves Franchisee's Approved Location, including, without limitation, the power to take such steps as in the opinion of CENTURY 21 Regional may be necessary to delete Franchisee's CENTURY 21 listing or advertising in the Yellow Pages and any other directories and to terminate any other listing which indicates that Franchisee is or was affiliated with the CENTURY 21 organization. Franchisee shall indemnify and hold harmless each such telephone company, directory publisher and other person or entity against all costs, damages, attorneys' fees, expenses and liabilities which may be incurred or sustained in connection with or as a result of any action taken in reliance on the foregoing power of attorney.

K.  Immediately and permanently cause all officers, employees, and other Affiliates (as defined in Paragraph 8A (ii)) to discontinue the wearing of career apparel in the distinctive CENTURY 21 gold color or any apparel indicating or tending to indicate that the Franchisee is or was an authorized CENTURY 21 Franchisee, and promptly to destroy or surrender to CENTURY 21 Regional all such career apparel.

L.  Franchisee acknowledges that during the term of this Agreement and after its termination,  (which shall include expiration, where there has been no subsequent renewal, assignment or transfer), CENTURY 21 Regional and CENTURY 21 International shall, as is hereinafter specified, have the right to access and use (i) all information provided by Franchisee to CENTURY 21 Regional pursuant to that section of the CENTURY 21 P &P Manual, Code of Conduct, entitled "Reporting", which specifically includes all items therein included under the categories entitled "Reporting", "Real Estate Transaction Information", and "Listing Information," as well as any other Reporting item or category which may hereinafter be adopted in the P & P Manual; (ii) all information provided by Franchisee to CENTURY 21 Regional contained in those forms or reports known as Commission Disbursement Authorizations ("CDA's"), and in such other operational reports as CENTURY 21 Regional may from time to time request from Franchisee; and (iii) all information provided by Franchisee to CENTURY 21 Regional and/or CENTURY 21 International regarding enrollment of Franchisee's customers or clients in the CENTURY 21 Preferred Client Club (which, for purposes of this Subparagraph 18L, shall include such other client/customer contact program(s) as may hereafter be adopted by CENTURY 21 Regional and/or CENTURY 21 International).  The information referred to in (i), (ii) and (iii), above, shall hereinafter be referred to, collectively, as "the Client Information".  The Client Information may be used by CENTURY 21 Regional and CENTURY 21 International during the term of this Agreement and any renewal term for business purposes which shall include, but shall not be limited to, public relations, advertising and statistical compilations, investigations and resolutions of customer or client complaints, and quality survey.  In addition, CENTURY 21 Regional and CENTURY 21 International shall have the right, upon termination, to continue to use the Client Information as hereinabove specified, and to make the Client Information available to other CENTURY 21 franchisees for such purposes as CENTURY 21 Regional and/or CENTURY 21 International, in their sole and absolute discretion, deem appropriate.  In addition, and not in limitation of the above, upon termination, Franchisee shall be deemed to have assigned all of its CENTURY 21 Preferred Client Club enrollments to CENTURY 21 Regional, which is hereby authorized to deal with said enrollments in such manner as it deems appropriate.  Upon termination, the names of Franchisee and Franchisee's sales associates will be deleted from Preferred Client Club mailings.

### 19.  ADDITIONAL REMEDIES FOR BREACH

Franchisee acknowledges that if Franchisee breaches this Agreement and/or continues to utilize the CENTURY 21 System or CENTURY 21 Marks at such times when Franchisee is not legally entitled to use them, CENTURY 21 Regional shall have no adequate remedy at law.  Therefore, Franchisee expressly consents and agrees that CENTURY 21 Regional may, in addition to any other available remedies, obtain an injunction and/or temporary restraining order to terminate or prevent the continuation of any existing default or violation, and to prevent the occurrence of any threatened default or violation, by Franchisee of this Agreement.

### 20.  ATTORNEYS' FEES

Should either party incur attorneys' fees in order to enforce the terms and conditions of this Agreement, including post-term covenants, whether or not a legal action is instituted, the party not in default shall be entitled to reimbursement of such attorneys' fees and costs, in addition to any other remedies either party may have at law or in equity.  Should any legal action be instituted, the prevailing party shall be entitled to recover all litigation costs, including attorneys' fees.

### 21.  INTEGRATION

A.  Except as expressly provided in Paragraph 21B hereof, this Agreement contains all agreements, understandings, conditions, warranties and representations of any kind, oral or written, between the parties hereto, and constitutes the entire and final agreement between them with respect to the subject matter addressed herein.  Accordingly, all prior and contemporaneous agreements, understandings, conditions, warranties and representations of any kind, oral or written, are hereby superceded and cancelled by this Agreement - except as to any monies due and unpaid between the parties to this Agreement at the time of the execution hereof.  There are no implied agreements, understandings, conditions, warranties or representations of any kind.  No officer, employee or agent of CENTURY 21 International or CENTURY 21 Regional has any authority to make any representation or promise not contained in this Agreement.

B.  Notwithstanding the provisions of Paragraph 21A hereof, this Agreement shall not supercede or cancel the following:  (i) information and representations submitted by Franchisee to CENTURY 21 Regional in Franchisee's application for the grant of this Franchise, including, but not limited to, financial statements and references which accompanied Franchisee's application; and (ii) information and representations in the Franchise Disclosure Documents which Franchisee has received in connection with the Franchise which is the subject of this Agreement.

### 22.  AMENDMENT

Any modification or change in this Agreement must be in writing, executed by an officer of CENTURY 21 Regional, by an officer of CENTURY 21 International and by Franchisee.  NO FIELD REPRESENTATIVE OF CENTURY 21 REGIONAL HAS THE RIGHT OR AUTHORITY TO MAKE ORAL OR WRITTEN MODIFICATIONS OF THIS AGREEMENT, AND ANY SUCH ATTEMPTED MODIFICATIONS SHALL NOT BE BINDING UPON EITHER PARTY HERETO.

### 23. WAIVER

No waiver of any breach of any condition, covenant or agreement herein shall constitute a continuing waiver of any waiver of any subsequent breach of the same or any other condition, covenant or agreement. Any waiver of any provision of this Agreement to be enforceable must be in writing and signed by the waiving party.

### 24. APPROVALS

Except as otherwise provided, CENTURY 21® Regional may withhold any consent or approval provided for herein at its discretion. Furthermore, except as specifically noted otherwise, any consent or approval Franchisee is required to obtain from CENTURY 21 Regional shall be deemed withheld unless given in writing.

### 25. CONSTRUCTION AND VENUE

This Agreement shall be construed according to the laws of the State of _**New York**_ without regard to its choice of law or conflict of law requirements. Captions or paragraph headings included herein are for reference purposes only and shall not in any way modify or limit the statements contained in any paragraph or provision of this Agreement. All words in this Agreement shall be deemed to include any number or gender as the context or sense of this Agreement requires. In the event of any conflict between this Agreement and the P&P Manual or any other document, this Agreement shall control. The parties agree that any action brought by either party against the other party in connection with any rights or obligations arising out of this Agreement shall be instituted properly in a federal or state court of competent jurisdiction, with venue only in the county of _**New York**_, State of _**New York**_, or in the federal district for _**New York**_; either party to this Agreement named as a defendant in an action brought in connection with this Agreement in any other court outside the above-designated county or district shall have the right to have the venue of said action changed to the above-designated county or district, or, if necessary, have the case dismissed, requiring the other party to refile said action in an appropriate court in the above-designated county or federal district. If either party is not a resident of, or does not maintain a presence in, the above-designated State in which the designated county of venue is situated, then such party hereby agrees to submit personally to the jurisdiction of a court of competent subject matter jurisdiction located in the above-designated State and county or federal district. The parties acknowledge that this Agreement is executed in, and that a material portion of Franchisee's obligations under this Agreement are to be performed in, the above-designated State and county and federal district.

### 26. SEVERABILITY

In case any one or more of the provisions of this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and any other application thereof shall not in any way be affected or impaired thereby.

### 27. NOTICES

Any notices to be given hereunder shall be in writing and may be delivered personally, or by certified or registered mail, with postage fully prepaid.

Any notice to be delivered to CENTURY 21 Regional shall be addressed to CENTURY 21 _**Corporate**_ at _**P.O. Box 278, 339 Jefferson Road, Parsippany, NJ 07054-0278.**_ Any notice to Franchisee shall be delivered to the address of the Approved Location set forth in Paragraph 5 hereof.

The addresses specified herein for service of notices may be changed at any time by the party making the change giving written notice to the other party. Any notice delivered by mail in the manner herein specified shall be deemed delivered five (5) days after mailing if sent Certified, Return Receipt Requested or, if received earlier, upon actual receipt.

### 28. BINDING ON SUCCESSORS

This Agreement is binding upon and shall inure to the benefit of the parties hereto, their heirs, successors and assigns, except as may be otherwise restricted pursuant to other Paragraphs contained herein. CENTURY 21 Regional reserves the right to assign, pledge, hypothecate or transfer this Agreement, provided that such assignment, pledge, hypothecation or transfer shall not affect materially the rights and privileges granted to Franchisee herein. In the event of the termination of CENTURY 21 Regional's rights to franchise the CENTURY 21 System, this Agreement shall, at the option of CENTURY 21 International, be automatically and immediately assigned to CENTURY 21 International upon written notice to Franchisee by CENTURY 21 International of its election to exercise said option.

### 29. EXCLUSIVE PROPERTY

The form and content of this Agreement and the P&P Manual are the exclusive property of CENTURY 21 International and may not be reproduced in whole or in part by Franchisee or others, without the prior written consent of CENTURY 21 International.

### 30. ADDITIONAL REPRESENTATIONS

Franchisee makes the following additional warranties and representations:

A. Franchisee is a _**corporation**_ (partnership, corporation or sole proprietorship).

B. If Franchisee is a corporation or partnership, there is set forth below the name and address of each general partner and each limited partner holding an interest of ten percent (10%) or more of the capital and/or profits of the partnership or of each shareholder in the Franchisee holding a ten percent (10%) or greater interest in the corporation:

| Name | Address | Shares | Interest |
|---|---|---|---|
| *Barbara Feldscher* | *121 Mt. Vernon St., Boston, MA 02108* | | 50% |
| *John S. Dennehy, Jr.* | *121 Mt. Vernon St., Boston, MA 02108* | | 50% |

*As to a corporation, this figure shall indicate the percent owned of any class of outstanding stock of the corporation. As to a partnership, this figure shall indicate the percent owned in the capital and/or profits of the partnership.

C. The address where Franchisee's records are to be maintained is: *121 Mt. Vernon St., Boston, MA 02108*

D. The full name and business address of Franchisee's Responsible Broker is: *Barbara Feldscher 121 Mt. Vernon St., Boston, MA 02108*

Franchisee shall not substitute a new Responsible Broker without the prior written consent of CENTURY 21[®] Regional.

E. If Franchisee is a partnership or corporation, the names and addresses of the partners, officers, directors and shareholders who will be devoting their full time to the business of the Franchisee are:

| Name and Title | Address |
|---|---|
| *Barbara Feldscher, President* | *121 Mt. Vernon St., Boston, MA 02108* |
| *John S. Dennehy, Jr., Vice President* | *121 Mt. Vernon St., Boston, MA 02108* |

F. Franchisee acknowledges receipt of a Franchise Disclosure Document dated *August 25*, 19*95* from CENTURY 21 Regional on *November 14*, 19*95*, which describes the Franchise to be operated pursuant to the terms of this Agreement. Franchisee acknowledges receipt of a complete copy of this Agreement at least five (5) business days prior to its execution.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on this *18th* day of *DECEMBER*, 19*95*.

"FRANCHISEE" *Dennehy/Feldscher Ventures, Inc.*

By _Barbara Feldscher_
        **Barbara Feldscher, President**

By _John S. Dennehy_
        **John S. Dennehy, Jr., Vice President**

(If Franchisee is a corporation, this Agreement must be signed by each person owning twenty-five percent (25%) or more of the total outstanding shares of any class of stock.)

ACCEPTED ON THIS _17th_ DAY OF _January_, 19_96_.
(ACCEPTANCE BY CENTURY 21 REGIONAL CAN ONLY BE MADE BY A CORPORATE OFFICER AT THE CENTURY 21 REGIONAL HOME OFFICE.)

"CENTURY 21 REGIONAL"

By _____

By _____

ADDENDUM TO FRANCHISE AGREEMENT DATED *February 1, 1996* BETWEEN CENTURY 21 *Northeast, Inc.* and *Dennehy/Feldscher Venturers, Inc.*. It is understood and agreed that the undersigned individually and personally guarantees the payment of all Franchise Fees, National Advertising Fund Fees, Minimum Service Fees, and any other fees pursuant to this agreement; notwithstanding any other clause within.

By _____

*Barbara Feldscher, individually*

By _____

*John S. Dennehy, Jr., individually*

## ADDENDUM TO FRANCHISE AGREEMENT
Addendum A
"Location Change"

The special conditions that are listed below are to be included as part of the CENTURY 21 Real Estate Franchise Agreement between **Century 21 Real Estate Corporation** and **Dennehy/Barnes Ventures, Inc.** ("Franchisee"), Franchise # **9505**, dated **February 1, 1996.**

THIS ADDENDUM "A" MODIFIES SECTIONS 5.a, 30.C AND 30.D OF THE FRANCHISE AGREEMENT AS FOLLOWS:

> "Franchisee shall operate the Franchise exclusively from the following location ONLY (hereinafter called "Approved Location"):

ADDRESS:    **12 Temple Street, Boston, MA  02108**

PHONE:    **(617) 720-2199**

These terms and conditions are hereby acknowledged, agreed to and approved by the parties whose signatures appear below and shall become effective on _____.


FRANCHISEE: **Dennehy/Barnes Ventures, Inc.**

BY: _____    DATED: _5/24/97_
    John S. Dennehy
BY: _____    DATED: _5/24/97_
    Thomas J. Barnes
BY: _____    DATED: _____


FRANCHISOR:  **Century 21 Real Estate Corporation**

BY: _____    DATED: _6.6.97_
    **John Kornfeind**
    **Vice President**
    **Franchise Sales and Administration**

ADDENDUM TO FRANCHISE AGREEMENT
Addendum C
"Ownership Change"

The Special Conditions that are listed below are to be included as part of the CENTURY 21 Real Estate Franchise Agreement between **Century 21 Real Estate Corporation** and Franchise #**121-022-9505**, dated **February 1**, 1996.

THIS ADDENDUM "C" MODIFIES SECTIONS 30.A, 30.B AND 30.E OF THE FRANCHISE AGREEMENT AS FOLLOWS:

Additional Representations:
Franchisee is a **corporation**
(Sole Proprietorship, Partnership or Corporation)

| NAME | ADDRESS | # OF SHARES |
|------|---------|-------------|
| **John S. Dennehy** | **121 Mt. Vernon St., Boston, MA 02108** | **50%** |
| **Thomas J. Barnes** | **121 Mt. Vernon St., Boston, MA 02108** | **50%** |

These terms and conditions are hereby acknowledged, agreed to and approved by the parties whose signatures appear below and shall become effective on **February 1**, 1996.

FRANCHISEE: **Dennehy/Barnes Ventures, Inc.**

BY: _John S. Dennehy, ~~President~~ Sec/Tres_    DATED: _1/16/96_

BY: _Thomas J. Barnes, ~~Secretary/Treasurer~~ President_    DATED: _1/16/96_

FRANCHISOR: Century 21 Real Estate Corporation, Inc.

BY: _____    DATED: _1/22/96_

# ADDENDUM TO FRANCHISE AGREEMENT
## Addendum C
## "Ownership Change"

The Special Conditions that are listed below are to be included as part of the CENTURY 21 Real Estate Franchise Agreement between **Century 21 Real Estate Corporation** and Franchise #**121-022-9505**, dated **February 1**, 19**96**.

THIS ADDENDUM "C" MODIFIES SECTIONS 30.A, 30.B AND 30.E OF THE FRANCHISE AGREEMENT AS FOLLOWS:

Additional Representations:
Franchisee is a **corporation**
_____(Sole Proprietorship, Partnership or Corporation)

| NAME | ADDRESS | # OF SHARES |
|------|---------|-------------|
| **John S. Dennehy** | **121 Mt. Vernon St., Boston, MA  02108** | **50%** |
| **Thomas J. Barnes** | **121 Mt. Vernon St., Boston, MA  02108** | **50%** |

These terms and conditions are hereby acknowledged, agreed to and approved by the parties whose signatures appear below and shall become effective on **February 1**, 19**96**.

FRANCHISEE: **Dennehy/Barnes Ventures, Inc.**

BY: _____       DATED: _1 / 16 / 96_
John S. Dennehy, ~~President~~ / Sec / Tres

BY: _____       DATED: _1 / 16 / 96_
Thomas J. Barnes, ~~Secretary/Treasurer~~ President

FRANCHISOR: Century 21 Real Estate Corporation, Inc.

BY: _____       DATED: _1/22/96_

## ADDENDUM TO FRANCHISE AGREEMENT
Addendum D
"Responsible Broker Change"

The Special Conditions that are listed below are to be included as part of the CENTURY 21® real estate Franchise Agreement between Century 21 Real Estate Corporation, Inc. and Franchisee: ***Dennehy/Barnes Ventures, Inc.***, Franchise # ***121-022-9505*** dated ***February 1***, 19***96***.

THIS ADDENDUM "D" MODIFIES SECTION 30.D OF THE FRANCHISE AGREEMENT AS FOLLOWS:

"The name and business address of Franchisee's Responsible Broker is":

NAME: ***Thomas J. Barnes***

ADDRESS: ***121 Mt. Vernon St.***

***Boston, MA  02108***

These terms and conditions are hereby acknowledged, agreed to and approved by the parties whose signatures appear below and shall become effective on ***February 1***, 19***96***.

FRANCHISEE: ***Dennehy/Barnes Ventures, Inc.***

BY: _____     DATED: ___1/16/96___
John S. Dennehy, ~~President~~ Sec/Tres.

BY: _____     DATED: ___1/16/96___
Thomas J. Barnes, ~~Secretary/Treasurer~~
President

FRANCHISOR:  Century 21 Real Estate Corporation, Inc.

BY: _____     DATED: ___1/22/96___

## ADDENDUM TO FRANCHISE AGREEMENT
### Addendum D
### "Responsible Broker Change"

The Special Conditions that are listed below are to be included as part of the CENTURY 21® real estate Franchise Agreement between Century 21 Real Estate Corporation, Inc. and Franchisee: ***Dennehy/Barnes Ventures, Inc.***, Franchise # ***121-022-9505*** dated ***February 1***, 19***96***.

THIS ADDENDUM "D" MODIFIES SECTION 30.D OF THE FRANCHISE AGREEMENT AS FOLLOWS:

> "The name and business address of Franchisee's Responsible Broker is":
>
> NAME: ***Thomas J. Barnes***
>
> ADDRESS: ***121 Mt. Vernon St.***
>
> ***Boston, MA  02108***

These terms and conditions are hereby acknowledged, agreed to and approved by the parties whose signatures appear below and shall become effective on ***February 1***, 19***96***.

FRANCHISEE: ***Dennehy/Barnes Ventures, Inc.***

BY: _____     DATED: __1/16/96____
John S. Dennehy, President

BY: _____     DATED: __1/16/96____
Thomas J. Barnes, Secretary/Treasurer

FRANCHISOR:  Century 21 Real Estate Corporation, Inc.

BY: _____     DATED: __1/22/96____

ADDENDUM TO FRANCHISE AGREEMENT
Addendum F
"Entity Name Change"

The Special conditions that are listed below are to be included as part of the CENTURY 21® Real Estate Franchise Agreement between Century 21 Real Estate Corporation ("Franchisor"), and **Dennehy/Feldscher Ventures, Inc.** ("Franchisee") Franchise #**9505**, dated **February 1,** 19**96** (the "Franchise Agreement").

THIS Addendum "F" modifies page one of the franchise agreement as follows:

Franchisee's new corporate name will be: **Dennehy/Barnes Ventures, Inc.**

These terms and conditions are hereby acknowledged, agreed to and approved by the parties whose signatures appear below and shall become effective on the date Franchisee has legally completed the change of its corporate name. Franchisee agrees to file and amendment to its certificate of incorporation or other appropriate documents in states where required by law and will provide Franchisor with a copy.

Nothing in this Addendum F shall in any way affect the substantive obligations of the parties under the Franchise Agreement and is intended only to acknowledge a change in the Franchisee's legal corporate name. Except as affected by this Addendum, the Franchise Agreement continues in full force and effect in accordance with its terms.

FRANCHISEE:        **Dennehy/Feldscher Ventures, Inc.**

BY: _____        DATED: _5/29/97_
        John S. Dennehy

BY: _____        DATED: _5/24/97_
        Thomas J. Barnes

FRANCHISOR:        **Century 21 Real Estate Corporation**

BY: _____        DATED: _6.6.97_
        **John Kornfeind**
        **Vice President**
        **Franchise Sales and Administration**

ADDENDUM TO CENTURY 21 REAL ESTATE FRANCHISE AGREEMENT, dated *February 1*, 199*6* ("Franchise Agreement"), by and between Century 21 of the Northeast, Inc. ("CENTURY 21") and *Dennehy/Barnes Ventures, Inc.* ("Franchisee"). The parties hereto wish to supplement the Franchise Agreement by adding the following to the Franchise Agreement:

<u>INITIAL FRANCHISE FEE PROMISSORY NOTE</u>

$*14,000.00*

*Parsippany, NJ*
(City and State)
*January 11, 1996*, 199_

FOR VALUE RECEIVED, the undersigned, jointly and severally, promise to pay to the order of Century 21 of the Northeast, Inc., at One World Trade Center, Suite 8735, New York, New York 10048, the sum of *Fourteen Thousand* and *oo*/100 Dollars ($*14,000.*) payable in *sixty* (*60*) equal monthly principal and interest (eight percent (8%) per annum) installments as follows: *Two Hundred Eighty Three*, and *88*/100 Dollars ($*283.88*) per month for *sixty* (*60*) months. Payment begins on *February 1*, 199*6* and said payments are due on the *1st* day of each month thereafter until the amount stipulated herein, plus interest, is paid in full on *January 1*, *2001*. Any payments which are past due shall bear interest at the lower rate of either the highest rate allowed by law or a rate that is five (5) percentage points per annum higher than the "prime rate" then currently established by the largest bank (determined by total bank assets) headquartered in New York State.

If default is made on any payment required under this note, then in that case the entire principal sum and accrued interest shall, at the option of the holder, become immediately due and payable if said default is not cured within ten (10) days after written notice of default. After written notice of default has once been given and cured, the undersigned waives all rights to notice and to cure in the future. Notwithstanding the lack of service of any written notice of default or cure period, the undersigned will be in default hereunder without any ability to cure if any payment is thirty (30) or more days past due. In the event of default, the undersigned shall pay all costs of collection and court costs. If this note is referred to an attorney for collection, the undersigned shall pay the holder's attorneys' fees. Franchisee acknowledges that any default hereunder will constitute grounds for immediate termination of the Franchise Agreement.

The principal amount of this note may be cancelled in whole or in part depending upon Franchisee's actual business production for a prescribed period. More specifically, beginning 90 days after Franchisee's Commencement Date defined in Paragraph 2 of the Franchise Agreement, Franchisee's business production will be measured for a 12-month period ("Measurement Period"). Based on that production and providing Franchisee is then current and has been throughout the Measurement Period in full compliance with all of the terms of each of Franchisee's Franchise Agreements, this note will be modified as follows:

    i.    If during the Measurement Period, Franchisee earns and pays service fees to CENTURY 21 on $400,000 to $749,999 in total Gross Closed Commissions, Franchisee will receive a Production Discount of 50 percent of the initial franchise fee. Cancellation of this note and receipt of such discount is contingent upon Franchisee's execution of a revised note for any initial franchise fee

H-7

balance (remaining initial franchise fee less Production Discount) in form acceptable to CENTURY 21. If the Production Discount exceeds the remaining initial franchise fee amount payable to CENTURY 21, this note will be cancelled and Franchisee will receive from CENTURY 21 a credit for the Production Discount excess, which credit will be applied to reduce any other notes owing to CENTURY 21 and/or be applied toward payment of service fees, at CENTURY 21's discretion.

ii. If during the Measurement Period, Franchisee earns and pays service fees to CENTURY 21 on $750,000 or more in total Gross Closed Commissions, Franchisee will receive a Production Discount of 100 percent of the initial franchise fee. This note will be cancelled in its entirety and Franchisee will receive from CENTURY 21 a credit for the Production Discount excess, which credit will be applied to reduce any other notes owing to CENTURY 21 and/or be applied toward payment of service fees, at CENTURY 21's discretion.

Privilege is reserved to prepay this note at any time in whole or in part without penalty.

The entire principal sum and accrued interest shall become due and payable in the event that the franchise which is the subject of this note, or any interest therein, is assigned, transferred, terminated or not renewed; or if a default occurs with respect to any note or franchise agreement with CENTURY 21 to which Franchisee is a party.

This note is to be construed, interpreted and enforced under the laws of the State of New York.

CENTURY 21 *Sentinel*

By: _____

By: _____  *S#9/Tees*

Title: _____

Doc. No. 0895_____

By: _____
Individually and Personally
John S. Dannehy

By: _____
Individually and Personally
Thomas J. Barnes

H-8