# CENTURY 21® REAL ESTATE FRANCHISE AGREEMENT

This Agreement is made by and between Century 21 Real Estate Corporation, a Delaware corporation and a licensed real estate broker, with principal offices in the State of New Jersey (hereinafter called "Franchisor"), and **Dennehy, Barnes, Ventures, Inc.** (hereinafter called "Franchisee").

Franchise # 121-022-9536

## RECITALS

**A.** Franchisor, a Delaware Corporation has the exclusive right to use and sublicense certain tradenames, trademarks and service marks, including the name "CENTURY 21," which have been registered on the Principal Register in the United States Patent and Trademark Office, with other appropriate state agencies in the United States, and with governmental agencies of foreign countries (which marks, together with certain other trademarks and service marks which are not registered or which are pending registration, are hereinafter collectively called "CENTURY 21 Marks");

**B.** Franchisor has developed a system for the promotion and assistance of independently owned and operated real estate brokerage offices, including policies, procedures and techniques designed to enable such offices to compete more effectively in the real estate sales market (which system is hereinafter called the "CENTURY 21 System"). The CENTURY 21 System includes, but is not limited to, common use and promotion of certain CENTURY 21 Marks, copyrights, trade secrets, centralized advertising programs, recruiting programs, referral programs and sales and management training programs. Franchisor has from time to time revised and updated the CENTURY 21 System and plans to continue to do so as required in its best judgment;

**C.** Franchisee desires to obtain a franchise to operate a real estate brokerage office under the terms and conditions hereinafter set forth.

## TERMS OF AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises, and for other good and valuable consideration, the delivery, receipt and sufficiency of which are hereby acknowledged; and further, in accordance with and pursuant to all terms, conditions, covenants, agreements, representations and warranties contained herein, the parties hereby mutually agree as follows:

## 1. GRANT OF FRANCHISE

Franchisor hereby grants to Franchisee, and Franchisee hereby accepts, the non-exclusive right to use the CENTURY 21 System and certain CENTURY 21 Marks, as they are set forth in the CENTURY 21 Policy and Procedure Manual (hereinafter called the "P&P Manual"), as it may be revised and/or supplemented from time to time by Franchisor, for the operation of a licensed real estate brokerage office upon the terms and conditions set forth in this Agreement (hereinafter called the "Franchise"). The grant of this Franchise shall not be construed as granting Franchisee any right to purchase any additional franchises from Franchisor, or any right or priority as to the location of any additional franchise which may be granted by Franchisor. If Franchisor subsequently

grants Franchisee any franchise, said grant shall be on such terms as Franchisor shall establish.

### 2. TERM OF FRANCHISE

The term of this Franchise shall be for a period of ten (10) years. The Commencement Date of this Franchise is **December 1**, 19**98**, and the Expiration Date of this Franchise shall be the date ten years from the Commencement Date, unless this Agreement is terminated at an earlier date as otherwise provided herein. THIS AGREEMENT SHALL NOT BECOME EFFECTIVE UNTIL IT IS EXECUTED BY AN AUTHORIZED CORPORATE OFFICER OF FRANCHISOR.

### 3. NONRENEWABILITY OF FRANCHISE

The term of this Agreement is set forth in Paragraph 2 hereof, and as is provided herein, certain of Franchisee's duties and obligations hereunder shall survive the expiration or termination of this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS.

### 4. NAME OF FRANCHISE

**A.** Franchisee shall operate under the trade name "CENTURY 21 **Fidelity**", (hereinafter called "Franchisee's CENTURY 21 trade name") and shall use no other name in connection with any operations conducted at or from the location specified in Paragraph 5 hereof or on computer communication services such as the Internet without the prior written approval of Franchisor. In every visual display in which the CENTURY 21 modern building logo is used the portion of Franchisee's CENTURY 21 trade name immediately following the words "CENTURY 21," or other approved words, shall be in a five-to-one size relationship with the CENTURY 21 name and logo, as required in the P&P Manual, and the total appearance of Franchisee's CENTURY 21 trade name and other identifying words must be approved in advance in writing by Franchisor. Franchisor reserves the right to review and require corrections and modifications to any display by Franchisee of the CENTURY 21 name or marks. Franchisor's failure to promptly require corrections of or modifications to Franchisee's improper use of the name or marks shall not be deemed a waiver of Franchisor's right to do so.

**B.** Franchisee shall display the aforementioned trade name for all purposes, including but not limited to, office signs, yard signs, stationery, business cards and advertising materials, in strict compliance with the requirements set forth in the P&P Manual.

**C.** Franchisee shall file and keep current, in the county and/or state in which Franchisee's Approved Location is situated and at such other places as may be required by law, a "Fictitious Name Certificate," or comparable instrument, with respect to Franchisee's CENTURY 21 trade name under which Franchisee has been approved to operate by Franchisor. If Franchisee is a corporation, Franchisee shall not, without the prior written consent of Franchisor, include the words "CENTURY 21" as part of Franchisee's corporate name. Prior to opening an office under said trade name, Franchisee shall supply evidence satisfactory to Franchisor that Franchisee has complied with all relevant laws regarding the use of fictitious or assumed names.

**D.** Franchisee shall use Franchisee's CENTURY 21 trade name and such other CENTURY 21 Marks as Franchisee may be authorized to use from time to time, exclusively for the purpose of promoting and operating a licensed real estate brokerage office, and for such other lawful

C21EXHC 7/98

business activities as may have been authorized previously in writing by Franchisor; provided, however, that Franchisor has no obligation to authorize any such additional business activities.

**E.** Franchisee shall comply, at all times throughout the term of this Agreement, with all guidelines instituted by Franchisor concerning authorized use and/or presentation by Franchisee of the CENTURY 21 Marks (including derivative marks such as "CENTURY,", "C-21," "C21") and the CENTURY 21 System on the Internet or other communication systems.

### 5. LOCATION OF FRANCHISE

**A.** Franchisee shall operate the Franchise exclusively from the following location only (herein called "Approved Location"): **477 Harvard Street, Brookline, MA  02446**. Franchisee may not operate the franchised business from any other location or any additional locations without the prior written approval of Franchisor. In the event that Franchisee seeks to change its Approved Location, it shall submit, no later than thirty (30) days before the date upon which it desires to change location, a written request to Franchisor specifying: (1) the requested new location; (2) the reason(s) Franchisee seeks a new approved location; and (3) any other factors which it believes are relevant to Franchisor's decision to approve or disapprove the new location. Franchisor shall not unreasonably withhold its approval of an application by Franchisee to relocate the office to another location which is in the general vicinity of the Approved Location subject to Franchisor's then current policy and procedure or office relocation. The Approved Location set forth herein is subject to the terms and conditions, if any, set forth in Paragraph 11C(ix) of this Agreement.

**B.** Franchisee shall operate a real estate brokerage business and Franchisee shall not operate any other business and shall not engage in any other activity at or from the Approved Location, either under Franchisee's CENTURY 21 trade name or under any other name, without the prior written consent of Franchisor, which consent if granted may be subject to various conditions for each respective approval, including, but not limited to, requirements designed to apprise the public that the products or services offered are not associated with or endorsed by Franchisor, or any of its affiliates or CENTURY 21 franchisees.

**C.** During the term of this Agreement Franchisor shall not grant another franchised CENTURY 21 office at a location which is within one quarter (.25) mile (measured in a straight line, "as the crow flies", between exterior office walls) of Franchisee's Approved Location. Franchisee acknowledges that the franchise granted by this Agreement covers only the Approved Location described in this Paragraph 5 and does not in any way convey or imply any area, market, territorial rights, or protected area proprietary to Franchisee.

### 6.    SERVICES AND OBLIGATIONS TO FRANCHISEE

**A.** Franchisor will impart to Franchisee its real estate brokerage, selling, promotional and merchandising methods and techniques associated with the CENTURY 21 System, and shall maintain a staff to give assistance and service to Franchisee.

**B.** Franchisor will publish and distribute from time to time a supply manual suggesting sources of supply for forms, signs, cards, stationery and other items necessary to operate a modern real estate

C21EXHC 7/98

brokerage business. The suggested source of supply for items may be Franchisor, or an affiliate of Franchisor, or an independent supplier. Franchisee may purchase supplies either from a source of supply suggested by Franchisor or from any other supplier which can first demonstrate to the satisfaction of Franchisor that its products or services meet the specifications established from time to time by Franchisor.

      **C.**  Franchisor will make available sample referral forms for use in referring business between CENTURY 21 franchisees. Franchisor also will establish procedures for referrals between Franchisee and other CENTURY 21 franchisees; provided, however, that all referral commissions shall be subject to negotiation directly between the franchisees participating in the referral transaction.

      **D.**  Franchisor will operate a sales training program on a periodic basis for CENTURY 21 franchisees and their sales personnel at a location or locations selected by Franchisor. This program will include seminars and conferences of special interest to be held as Franchisor deems necessary or advisable, relating to such topics as market conditions, sales motivation, sales aids, advertising and financing. Franchisor may charge a registration fee or other fee for such programs, seminars and conferences.

      **E.**  Franchisor shall pay certain of Franchisee's costs (unless this Agreement is executed pursuant to an assignment of an existing CENTURY 21 franchise) for attendance by Franchisee or by Franchisee's designee (as approved by Franchisor) at the first available franchisee orientation and management training program sponsored by CENTURY 21 Franchisor, including certain meals, lodging and transportation ("enrollment package"), but not including incidental expenses not covered or included in the enrollment package. It is understood that Franchisor's obligation shall be to pay for only one (1) enrollment package, notwithstanding the fact that the Franchise may be owned by more than one individual or that an individual may control more than one Franchise.

      **F.**  Franchisor agrees to contribute timely to the National Advertising Fund, as further described in Paragraph 9 hereof, an amount of its own funds equal to ten percent (10%) of the royalty fees it receives from Franchisee. Notwithstanding the foregoing, Franchisor will make no such contributions to the National Advertising Fund if annual royalty fees payable by Franchisee to Franchisor, net of Franchisee's CIB calculated in accordance with Paragraph 8, are less than 5% of Franchisee's gross revenue for such period.

      **G.**  Franchisor reserves the right to introduce and make available to Franchisee and others real estate related services and products, including but not limited to those related to mortgage origination, insurance, home warranties, and communications systems. Franchisor will give Franchisee written notice that such product or service is available. The written notice will also provide that said service or product may be utilized by Franchisee in the operation of its CENTURY 21 franchised real estate brokerage business. If Franchisor advises Franchisee that such product or service is an essential element of the Franchise, as determined by Franchisor, and accordingly must be utilized, Franchisee will, at its sole expense: (i) obtain all necessary equipment, products or services which Franchisor advises Franchisee is necessary for the utilization of such product or service, including, but not limited to, computer hardware and software; and (ii) begin using such product or service within ninety (90)

C21EXHC 7/98

days after Franchisee's receipt of said written notice. In the event Franchisor advises Franchisee that such product or service may be utilized, and Franchisee elects to so utilize said product or service, Franchisee will, at its sole expense, obtain all necessary equipment, products or services which Franchisor advises Franchisee is necessary for the utilization of such product or service, including, but not limited to, computer hardware and software. Nothing in this Paragraph shall create any obligation on the part of Franchisor to introduce or make any such services or products available to Franchisee.

### 7. INITIAL FRANCHISE FEE

Concurrently with the execution of this Agreement, Franchisee shall pay Franchisor at its principal offices, or at such other place as Franchisor may designate, in cash, unless otherwise permitted in writing by Franchisor, an initial franchise fee in the amount of **Seventeen Thousand Five Hundred and 00/100 Dollars** (**$17,500.00**)due and payable as follows: **$8,750** due upon execution of this Agreement and the balance of **$8,750** due and payable as evidenced by delivery of the Promissory Note attached hereto.. This initial franchise fee is fully earned by Franchisor upon execution of this Agreement and is nonrefundable; provided, however, if Franchisee is not accepted by Franchisor within thirty (30) days of Franchisee's deposit of the initial franchise fee with Franchisor, Franchisee shall be entitled to a full refund of amounts so deposited and this Agreement shall be deemed rejected by Franchisor and of no force or effect.

### 8. FRANCHISE ROYALTY FEES

**A. (i)** Franchisee agrees to pay in cash to Franchisor at its principal offices, or at such other place as Franchisor may designate, in addition to the initial franchise fee set forth above in Paragraph 7, a "royalty fee" equal to six percent (6 %) of the gross revenue earned, derived and/or received by Franchisee and its Affiliates described in subparagraph 8A(ii) below, during the term of this Agreement from: (1) all transactions involving the purchase, sale, lease, rental, hypothecation, license, exchange or other transfer or disposition of any interest in real estate, condominiums, mobile homes, panelized housing, time share units or manufactured homes; (2) all other transactions for which a real estate license or auctioneer's license is required (which, for purposes of this Agreement, is deemed to include all fees and remuneration collected or earned by Franchisee in performing title or escrow services, or organizing, promoting, selling, managing or otherwise servicing any kind of real estate syndicate, partnership (whether general or limited) or corporation, real estate investment trust or other real estate investment organization, or finding any investors for any of the above, said royalty fees being payable with respect not only to any cash payments, but also to the value of all other forms of compensation and remuneration received, including, but not limited to, promissory notes, securities, partnership interests, interests in real estate and other forms of property); (3) all transactions in which CENTURY 21 Marks or the CENTURY 21 System are used, including that portion of a transaction in which personal property is bought or sold; and (4) the sale or provision by Franchisee or by any third party of any products or services developed or made available by Franchisor or any of its affiliates.

**(ii)** In connection with all transactions of the above described type, unless otherwise waived in writing by Franchisor, all gross revenue received in the operation of Franchisee's business by Franchisee's affiliates, including salespeople, agents, representatives, contractors, employees, partners, directors, officers, "Significant Shareholders" (as hereinafter defined at Paragraph 8D), or corporations or other entities which control, are controlled by, or are under common control with Franchisee or its other Affiliates (all of whom are hereinafter collectively referred to as "Affiliate(s) of Franchisee"),

C21EXHC 7/98

shall, to the extent not otherwise included in Franchisee's gross revenue, be included as part of Franchisee's gross revenue for the purpose of calculating royalty fees payable under this Agreement. In addition to the foregoing, and unless waived in writing by Franchisor as to any specific transaction, the royalty fees shall be paid on all transactions in which Franchisee or any Affiliate of Franchisee is involved on Franchisee's own behalf or account (that is on transactions for properties owned by Franchisee), and for which the services or facilities of Franchisee or Franchisee's office are used, or in which the CENTURY 21 name or mark is used in any manner. The Franchisee's regularly charged brokerage commission or fee shall be imputed with respect to transactions involving any Affiliate of Franchisee acting as a principal for purposes of computing the royalty fee payable to Franchisor in connection with such transactions.

**(iii)** The only transactions on which royalty fees shall not be required to be paid are those for which revenues are received as a result of activities dealing with leases or rentals having a nonrenewable term of not more than one (1) year and from property management services, unless more than twenty-five percent (25%) of Franchisee's annual gross revenues received from the franchised operations is derived from property management services, in which case royalty fees shall be paid on one hundred percent (100%) of gross revenues received by Franchisee from property management services. Notwithstanding the foregoing, Franchisor, at its option, may require a periodic report of Franchisee's gross revenues derived from property management services. Franchisor reserves the right to establish procedures from time to time for verifying and processing said royalty fees.

**B.** The royalty fee is fully earned by and payable to Franchisor immediately upon Franchisee's receipt of revenue, whether in cash or other property. Franchisee agrees to direct the escrow company, title company, attorney or other party handling the closing or settlement of any transaction in which a commission or any other fee is to be paid, to pay the royalty fee directly to Franchisor. In all other transactions, the royalty fee shall be paid promptly on receipt of commission fees and/or other payments (notwithstanding the source or nature of payment) by Franchisee or, if no such amount is received from any such transaction, on the closing of the transaction for which services are rendered by Franchisee or any Affiliate of Franchisee. Royalty fees more than ten (10) days late shall bear interest from the due date until paid at the lower rate of either the highest rate allowed by law or a rate that is five (5) percentage points per annum higher than the "prime rate" then currently established by Mellon Bank, N.A. Pittsburgh, PA.

**C.** Commencing with the first full calendar month beginning four (4) months after the Commencement Date of this Agreement or the first full calendar month after the Commencement Date of this Agreement if Franchisee executes this Agreement in connection with an assignment of the franchise (which shall be referred to herein as the "Base Month") and which Commencement Date is set forth in Paragraph 2 hereof, there shall be a minimum royalty fee of Five Hundred Dollars ($500) per month. The minimum royalty fee will be adjusted annually, on each anniversary of the Base Month, based upon the greater of: (i) the increase in the Consumer Price Index: All Items/U.S. City Average - All Urban Consumers ("Index" - 1967 Base Year = 100) as published by the U. S. Department of Labor's Bureau of Labor Statistics, from the reported Index level as of January 1996 to the reported Index level as of January of each year thereafter (accordingly, this annual adjustment will

C21EXHC 7/98

reflect the increase in the Index as of the January 1 prior to each Base Month anniversary date) and (ii) the yield to maturity on United States Treasury Bonds with maturity of 30 years as listed in The Wall Street Journal as of the last business day of October in the year preceding the effective date of such change. Franchisor will publish to all franchisees these annual adjustments, if any. Should the Index referred to in (i) above cease to be published or be published less frequently or in a different manner, Franchisor reserves the right to adopt a substitute index or procedure that reasonably reflects and monitors changes in consumer price levels; provided, however, that in no event shall the minimum royalty fee be adjusted downward, notwithstanding any decrease in the Index. Notwithstanding the foregoing, Franchisor reserves the right, in its sole discretion, in any year, to waive any scheduled increase in Franchisee's minimum royalty fee. In case of a transfer or assignment of this Agreement, the obligation to pay royalty fees, including the monthly minimum royalty fees, shall commence on the effective date of such transfer or assignment with the transferee or assignee's minimum royalty fee being the minimum royalty fee for which Franchisee was responsible at the date of the transfer or assignment. For purposes of annual adjustments, Franchisee's Base Month shall be the month in which the transfer or assignment was approved by Franchisor.

**D.** For purposes of this Agreement, a "Significant Shareholder" of Franchisee shall mean any party who beneficially owns twenty-five percent (25%) or more of any class of stock of Franchisee or who in fact controls the management and/or supervises the business of Franchisee. For purposes of this Paragraph the beneficial ownership of stock shall mean direct or indirect ownership, including, without limitation, ownership by the spouse of a party or by any dependent of a party who resides in the same household as that party.

**E.** CENTURY 21 Incentive Bonus Program Definitions. In this Agreement, unless the context otherwise requires, the following terms shall have the following respective meanings with respect to the CENTURY 21 Incentive Bonus Program:

    **(i)** "CENTURY 21 Incentive Bonus" (or "CIB") - means the cash award to be paid by Franchisor to the Designated Representative of a CENTURY 21 Firm. The CIB shall be based on the combined Annual Gross Revenue of the CENTURY 21 Firm; shall be consistent with the provisions hereof; and shall be payable no later than March 15, of the Calendar Year following the Calendar Year in which the combined Annual Gross Revenue was earned. Calculation of the CIB by Franchisor shall be made pursuant to the provisions of the Table attached hereto as "Exhibit A" as it may be amended from time to time.

    **(ii)** "Annual Gross Revenue" - means the combined total of Gross Revenue, as defined in this Paragraph 8, earned by each franchised office in a CENTURY 21® Firm for a particular Calendar Year, on which the CENTURY 21 Firm has actually paid royalty fees to Franchisor in a timely manner. Annual Gross Revenue shall not include any CIB award paid to Franchisee in any given year.

    **(iii)** "Calendar Year" - means the one year period beginning on January 1, of a given year, and ending on December 31, of that same given year.

C21EXHC 7/98

   **(iv)** "A CENTURY 21 Firm" - means one or more CENTURY 21 franchisees, each of which is located within the geographic territory of any of Franchisor's owned corporate divisions.

  In the case of multiple franchised offices:

    **(a)** All franchises within the firm shall be owned by a single individual, partnership or corporation; or,

    **(b)** All franchises within the firm shall have a single individual, partnership or corporation owning at least 51% of each and every franchise member thereof.

   **(v)** "A Qualified CENTURY 21 Firm" - means a CENTURY 21 Firm that is eligible to receive a CIB pursuant to the requirements of Exhibit A, as it may be amended from time to time, and has otherwise complied with all of the provisions of this Agreement.

   **(vi)** "Designated Representative of a CENTURY 21 Firm" - means the party to whom Franchisor shall pay the CIB, if any, when due. Franchisor shall issue only one check annually representing the CIB per CENTURY 21 Firm. Franchisee hereby designates the following individual or entity as its sole and exclusive "Designated Representative" as the payee of the CIB:

| | |
|---|---|
| Designated Representative: | **Dennehy, Barnes, Ventures, Inc.** |
| Address: | **477 Harvard Street** |
| | **Brookline, MA 02446** |
| Federal Taxpayer ID Number: | **04-3298760** |

  *(in the event Franchisee fails to designate a Representative, then Franchisor shall make any CIB payment due payable to the "Franchisee" as first above written)*

  **F. Determination of CIB Payment.** Any CIB to which a CENTURY 21 Firm is entitled shall be determined in accordance with the Table attached as "Exhibit A" hereto, which Table shall be adjusted annually, in accordance with the provisions of Subparagraph I hereof. If a CENTURY 21 Firm consists of more than one (1) CENTURY 21 franchise, the combined Annual Gross Revenue of all franchise members of that CENTURY 21 Firm shall be used in determining the amount of CIB due, provided however, in no event shall the aggregate annual CIB payable to the Franchisee calculated in accordance with the Table attached as Exhibit A, exceed 2% of Franchisee's Annual Gross Revenue for such year.

  **G. Determination of the Number of Offices in a CENTURY 21 Firm Solely for the Purpose of CIB Calculations.** Any CENTURY 21 franchise that has been a member of the CENTURY 21 System for a period in excess of twenty-four (24) months, as measured by the Commencement Date set forth in its CENTURY 21 Franchise Agreement, shall be counted as a member of a CENTURY 21 Firm for the purpose of calculating the CIB, if it otherwise meets the criteria set forth in Subparagraph E(iv) of this Paragraph 8. On written notice to Franchisor, Franchisee may voluntarily elect, prior to the

C21EXHC 7/98

expiration of said twenty-four (24) month period, to add a CENTURY 21 franchise to the total number of offices within a CENTURY 21 Firm for the purpose of calculating the CIB, if that additional office meets the criteria set forth in Subparagraph E(iv) of this Paragraph 8. For the purpose of calculating the CIB, neither a CENTURY 21 Information Center franchise, a CENTURY 21 Seasonal Office, a CENTURY 21 Satellite Office, a CENTURY 21 Annex Office nor a CENTURY 21 Temporary Tract Office, (referred to collectively as "non-CIB qualifying offices") in a CENTURY 21 Firm with one or more other franchises shall be counted as a member of the CENTURY 21 Firm; however, the Annual Gross Revenue, if any, for such non-CIB qualifying offices shall be combined with the Firm's gross revenue when calculating the CIB.

**H.** Conditions Precedent to the Payment of the CIB. As an express condition precedent to Franchisor's obligation to pay the CIB, each and every franchisee member of a CENTURY 21 Firm, notwithstanding its Commencement Date, shall:

(i) Remain a CENTURY 21 franchisee in good standing in the calendar year for which the CIB is calculated through the award date in the following year;

(ii) Be current on all payments due to Franchisor, the National Advertising Fund, and the Brokers' Council(s);

(iii) Be in compliance with minimum production standards set forth in this Agreement;

(iv) Be in compliance with the minimum standards of performance and quality established by Franchisor and as set forth in this Agreement and the Policy and Procedure Manual;

(v) Properly display the CENTURY 21 Marks in all contexts according to the provisions of the Policy and Procedure Manual;

(vi) Be in compliance with all other provisions of this Agreement, and the provisions of the CENTURY 21® Policy and Procedure Manual;

(vii) Not have been in default under the terms of this Agreement or the Policy and Procedure Manual at any time during the preceding 12 months;

(viii) Not be in default under the terms of any promissory note or other evidence of indebtedness held by Franchisor or its Affiliates; and

(ix) Be party to a fully-executed CENTURY 21 Real Estate Franchise Agreement and shall not be on a month-to-month agreement or other interim franchise agreement term.

If any member of a CENTURY 21 Firm has not, on the date a CIB would otherwise be payable, satisfied all of the provisions of this Subparagraph H, neither Franchisee nor any other member of the CENTURY 21 Firm of which it is a part shall have any entitlement to a CIB, and all rights thereto shall

C21EXHC 7/98

be deemed forfeited.

**I.** Annual Adjustment of Exhibit A. The figures set forth in the Table attached as "Exhibit A" hereto will be adjusted annually based upon the greater of: (i) the increase in the Consumer Price Index: All Items/U.S. City Average-All Urban Consumers ("Index" - 1967 Base Year = 100) as published by the United States Department of Labor's Bureau of Labor Statistics from the reported Index level as of November, 1990, to November of each year thereafter and (ii) the yield to maturity on United States Treasury Bonds with maturity of 30 years as listed in The Wall Street Journal as of the last business day of October in the year preceding the effective date of such changes. Franchisor will publish to all franchisees these annual adjustments, if any, which shall become effective on January 1 of each year. In the case of changes in the Index as provided in (i) above such adjustment will be from November, 1990, to November of the year thirteen (13) months prior to the effective date of the adjustment (e.g. changes in the CPI between Nov. '90 and Nov. '91 will be used to adjust "Exhibit A" for the year 1993). Should the Index cease to be published or be published less frequently or in a different manner, then Franchisor reserves the right to adopt a substitute alternate index or procedure that reasonably reflects and monitors changes in consumer price levels; provided however, that in no event shall the figures in the Table contained in "Exhibit A" hereof be adjusted downward. Franchisor reserves the right in its sole discretion in any year to waive in whole or in part or postpone temporarily or indefinitely, or any combination of a waiver or postponement, any scheduled increase in "Exhibit A".

**J.** Continuing Obligation. Notwithstanding any of the provisions herein and the fact that the CIB will reduce Franchisor's royalty fee revenue, Franchisee shall pay to Franchisor the full amount of royalty fees specified in, and in accordance with, the provisions of this Paragraph 8 of this Agreement.

**K.** Monthly Proration of CIB. A franchise(s) purchased from Franchisor or taken by transfer or assignment shall have Exhibit A prorated on a monthly basis according to the month of the Commencement Date set forth in the franchise agreement or the date of transfer or assignment, as the case may be, (e.g. a Commencement Date or a transfer or assignment on May 1, would result in 8/12ths of the scale in Exhibit A to be met before a CIB would be payable). A franchise which becomes included as member of a CENTURY 21 Firm for the purpose of calculating the CIB, as a result of the operation of Paragraph 8G (on the expiration of 24 months or on voluntary election) shall have Exhibit A prorated on a monthly basis according to the month of the Commencement Date set forth in its franchise agreement.

**L.** Construction and Disputes. Franchisor reserves the right to construe and interpret the CENTURY 21 Incentive Bonus Program and, in the event of a dispute with regard to the payment of a CIB or interpretation of the CIB Program, the decision of Franchisor shall be final and binding on the parties.

## 9. NATIONAL ADVERTISING FUND
**A.** Beginning on the Commencement Date of this Agreement or on the effective date of any assignment, as the case may be, Franchisee agrees to pay in cash to Franchisor at its principal offices,

C21EXHC 7/98

or at such other place as Franchisor may designate, in addition to the "royalty fees," a National Advertising Fund (hereinafter called the "NAF") contribution equal to two percent (2%) of Franchisee's gross revenue, as described in Paragraph 8 hereof, provided, however, that Franchisee's NAF contribution shall be subject to the following payment formula:

Franchisee shall pay in cash to the NAF a monthly contribution. Such contribution shall be subject to minimum and maximum amount limitations. Franchisee's initial minimum and maximum monthly contribution amount limitations currently are Two Hundred Seventy-Two Dollars ($272.00) and Eight Hundred Seventeen Dollars ($817.00). These limitations shall be adjusted annually based upon the greater of: (i) the increase in the Consumer Price Index: All Items/US City Average-All Urban Consumers ("Index"-1967 Base Year=100) as published by the United States Department of Labor's Bureau of Labor Statistics from the reported Index level as of January, 1977 to January of each year; and (ii) the yield to maturity on United States Treasury Bonds with maturity of 30 years as listed in The Wall Street Journal as of the last business day of October in the year preceding the effective date of such change. Franchisor publishes to all franchisees the adjustment, if any, which becomes effective on June 1 of each year. In the case of changes to the Index as provided in (i) above, such adjustment shall be with respect to the changes in the Index from January, 1977 to January of the current year. Should the Index cease to be published or be published less frequently or in a different manner, then Franchisor reserves the right to adopt a substitute index or procedure that reasonably reflects and monitors changes in consumer price levels. Notwithstanding the foregoing, Franchisor reserves the right in its sole discretion in any year to waive in whole or in part or postpone temporarily or indefinitely, or any combination of a waiver or postponement, any scheduled increase or decrease in the Franchisee's monthly contribution to the NAF.

**B.** Franchisee shall be billed for NAF contributions on or about the tenth (10th) day of the month following the month in which royalty fees were payable to Franchisor for transactions covered under this Agreement. Franchisee shall timely pay said NAF contributions such that they are received by Franchisor at its principal offices, or at such other location designated by Franchisor, not later than the last day of the month in which the billing for NAF contributions is sent. If said NAF contributions are not received by the last day of the appropriate month, Franchisor may assess a late fee equal to ten percent (10%) of the delinquent amount payable to Franchisor and/or accrue interest in favor of the NAF on the amount past due from the date due to the date paid at the lower rate of either the highest rate allowed by law or a rate that is five (5) percentage points per annum higher than the "prime rate" then currently established by Mellon Bank, N.A., Pittsburgh, PA.

**C.** In addition to the Franchisor contributions required by Paragraph 6F and 9E, Franchisee's NAF contributions shall be placed in a National Advertising Fund, managed by Franchisor. Such funds will be held by Franchisor in a National Advertising Fund account. Franchisor will administer such funds in accordance with this Paragraph 8. Franchisor has agreed that contributions to the NAF shall be used exclusively for advertising and public relations purposes for the exclusive, collective benefit of all members of the CENTURY 21® organization, including all CENTURY 21 franchisees, Franchisor, and CENTURY 21 Regional Subfranchisors. With respect to franchises in the company-owned regions, Franchisor will spend at least eighty-five percent (85%) of contributions to the NAF on either,

(1) national advertising, media, promotion or marketing or national public relations programs or (2) local or regional advertising, media, promotion or marketing or local or regional public relations programs or (3) other activities connected to the promotion and marketing of the CENTURY 21 Marks or the CENTURY 21 organization. Franchisor will spend not more than fifteen percent (15%) of contributions to the NAF to engage in test marketing, to conduct research, surveys of advertising effectiveness, produce new commercials and other promotional and advertising materials and programs, or other purposes deemed beneficial by Franchisor for the general recognition of the "CENTURY 21" name, other CENTURY 21 Marks and for the overall success of the various members of the CENTURY 21 organization in the United States and other countries. Said fifteen percent (15%) portion may be spent on a disproportionate basis at the discretion of Franchisor. Franchisee shall receive on at least an annual basis a report describing the activity of the NAF. Franchisor shall be entitled to reimburse itself for reasonable accounting, collection, bookkeeping, reporting and legal expenses incurred with respect to the NAF. Franchisor shall not be liable for any act or omission with respect to the NAF which is consistent with this Agreement or done in good faith.

**D.** Option to Require Flat Fee Monthly Advertising Contributions: Franchisor shall have the right to modify from time to time the method by which the required NAF contribution shall be computed and to require the payment of either a fixed monthly contribution amount (flat fee) or a monthly contribution amount equal to two percent (2%) of Franchisee's gross revenue, pursuant to the above Paragraphs 9A, 9B and 9C. In the event that Franchisor shall require a fixed monthly contribution amount, said fixed monthly contribution shall first be established as that amount which is equal to the average monthly NAF contribution billed to all CENTURY 21 franchisees nationally in the calendar year immediately preceding the year in which the right to invoke the NAF contribution modification is exercised, plus the permissible annual adjustment in the NAF monthly contribution amount described in Paragraph 9A. Said fixed monthly contribution shall be adjusted annually according to increases or decreases in the Consumer Price Index pursuant to those procedures described in the payment formula contained in Paragraph 9A; provided however, that in no case shall the NAF fixed monthly contribution required be less than Two Hundred Dollars ($200.00). Franchisee shall pay timely such fixed monthly contribution amounts, such that a contribution for a particular month is received by Franchisor at its principal offices, or at such other location designated by Franchisor, not later than the last day of the following month, whether or not Franchisee actually receives a billing for such fixed contribution amount. Franchisee acknowledges that those provisions governing delinquent contributions and NAF collection and expenditure guidelines, as currently are contained in Paragraphs 9B and 9C, shall remain in effect in the event Franchisor elects to require a fixed monthly contribution amount pursuant to this Paragraph 9D. In the event Franchisor shall exercise the right granted it under this Paragraph 9D, it continues to retain those rights specifically reserved and described in the payment formula contained in Paragraph 9A. Franchisee acknowledges the right of Franchisor to modify the method of contribution pursuant to this Paragraph 9D and recognizes Franchisee's continuing duty to fulfill all NAF obligations if and when such right is exercised.

**E.** As provided in Paragraph 6F hereof, Franchisor agrees to contribute timely to the NAF, an amount of its own funds equal to ten percent (10%) of the royalty fees it receives from Franchisee. Notwithstanding the foregoing, Franchisor will make no such contribution to the NAF under this

Agreement if annual royalty fees payable by Franchisee to Franchisor, net of Franchisee's CIB in accordance with Paragraph 8, are less than 5% of Franchisee's gross revenue for such period.

**F.** Franchisor reserves the right to account for, charge and collect the minimum and maximum NAF contributions referred to in Paragraph 9A on an annual rather than a monthly basis.

### 10. TEMPORARY TRACT OFFICES

With the prior written consent of Franchisor, and upon payment of a One Thousand Dollar ($1,000.00) fee to Franchisor, Franchisee may open a temporary tract sales office within or immediately adjacent to a new subdivision or development for the sole purpose of selling property in the subdivision or development. Franchisor may impose such conditions as it deems necessary to assure that such temporary tract sales offices are, in fact, temporary and are used only in conjunction with the initial sales program for a particular subdivision or development. The term of said temporary tract sales office shall be for a period of one year. Franchisor may, in its sole and absolute discretion, agree at the end of the one year term to extend the term for an additional year, and may, on each anniversary thereafter, in its sole and absolute discretion agree to further one year extensions.

### 11. ADDITIONAL OBLIGATIONS OF FRANCHISEE

**A. Start-Up Obligations:** Prior to opening an office under Franchisee's CENTURY 21 trade name, as set forth in Paragraph 4 hereof, Franchisee shall complete all of the following at Franchisee's expense, which obligations shall be continuing obligations throughout the term of this Agreement:

**(i) Office Appearance.** Franchisee may be required pursuant to Paragraph 11C (ix) to make reasonable alterations, modifications or upgrades to the office space in which the Franchise is to be operated;

**(ii) Office Sign.** Franchisee shall install one or more internally lighted exterior signs displaying Franchisee's CENTURY 21 trade name, as set forth in Paragraph 4 hereof, at the Approved Location, which sign(s) must conform to the standards and specifications set forth in the P&P Manual, and which SIGN MUST BE APPROVED IN WRITING IN ADVANCE AS TO ARTWORK, LETTERING, COLOR SCHEME, SIZE, CONSTRUCTION AND OVERALL APPEARANCE BY FRANCHISOR. Any exception to office sign requirements because of local sign ordinances or other reasons must first be approved in writing by Franchisor.

**(iii) Disclaimer.** Franchisee shall place a conspicuous placard or decal on or near the door to the front entrance of Franchisee's office, which complies with the standards and specifications set forth in the P&P Manual, which has been approved in writing by Franchisor, and which clearly states: "EACH CENTURY 21® OFFICE IS INDEPENDENTLY OWNED AND OPERATED";

**(iv) Yard Signs.** Franchisee shall purchase or lease an adequate quantity of colonial yard signs displaying Franchisee's CENTURY 21 trade name and such other information as may be required by law and is in compliance with the standards and specifications in the P&P Manual;

**(v) Stationery Goods.** Franchisee shall purchase adequate supplies of business cards,

stationery, promotional materials and related items, which display Franchisee's CENTURY 21 trade name and other information, and all of which comply with the standards and specifications of the P&P Manual;

      **(vi) International Management Academy.** Franchisee, or a designee of Franchisee who shall have been approved in writing by Franchisor, shall attend the first available new franchisee orientation and management training program, offered by Franchisor, at the location and time designated by Franchisor (which program may occur subsequent to Franchisee's opening of the franchised office). If an office manager will operate the office for Franchisee, the office manager must also attend orientation. Franchisee acknowledges that, except in the case of an assignment, Franchisor shall pay for certain of Franchisee's expenses incurred in connection with attendance at this program (enrollment package), except for incidental expenses not covered or included in the enrollment package. Attendance at this program is voluntary upon a renewal of the Franchise, or purchase by Franchisee of a Franchise other than Franchisee's initial Franchise, but is mandatory for the assignee in any assignment of the Franchise. In the case of renewal, assignment, or purchase of a franchise other than the initial franchise, the Franchisee participant is responsible for all costs incurred in connection with attendance at the program, including transportation, lodging, program costs and incidental expenses; and

      **(vii) Insurance.** Franchisee shall, for the entire term of this Agreement, maintain at Franchisee's expense (i) commercial general liability insurance: a) in an amount not less than One Million Dollars ($1,000,000.00) combined single limit coverage per occurrence; or b) with primary limits plus umbrella excess liability coverage equivalent to One Million Dollars ($1,000,000.00) combined single limit coverage per occurrence; or c) at such higher limits or broader coverage as Franchisor may require from time to time and (ii) professional liability (real estate errors and omissions) insurance: a) in the amount of at least One Million Dollars ($1,000,000) per occurrence; or b) at such higher limits or broader coverages as Franchisor may require from time to time. Franchisor reserves the right to establish minimum standards with which underwriters providing the aforementioned insurance coverage must comply. Said policies of insurance shall insure Franchisee against any liability which may arise in connection with the operation of Franchisee's real estate brokerage business and such collateral businesses as may be approved in writing by Franchisor and shall be in such form as Franchisor approves. If required by law, Workers' Compensation Insurance shall be carried on all employees and sales associates. All insurance policies maintained by Franchisee, other than Worker's Compensation Insurance, shall contain a separate endorsement naming Franchisor, Cendant Finance Holding Corporation and Cendant Corporation as additional insureds; shall not be subject to cancellation, except on ten (10) days written notice to Franchisor; and shall contain an express waiver of any and all rights of subrogation whatsoever against Franchisor. Franchisee shall cause certificates of insurance of all such policies and endorsements, showing compliance with the above requirements, to be deposited with Franchisor within thirty (30) days of the execution of this Agreement and annually thereafter.

      **B. Ongoing Obligations:** In addition to the above-referenced Start-Up Obligations and concurrent with the opening of the franchise office and continuing throughout the term of this Agreement, Franchisee agrees to undertake and carry out diligently all of the following obligations:

C21EXHC 7/98

      **(i)  Management.**  Franchisee acknowledges that it is a material consideration to Franchisor in granting this Franchise, and it is the stated intent of Franchisee, that this Franchise is granted to a sole proprietor, a partnership or a corporation, as the case may be, on the basis that Franchisee and Affiliates of Franchisee whose names are designated at Paragraph 30 of this Agreement shall actively, participate in the management and/or supervision of the Franchise operations, as follows:

      **(a)**  If the Franchise is operated as a sole proprietorship, the proprietor agrees to engage, in the management and/or supervision of the franchise operations; or

      **(b)**  If the Franchise is operated as a partnership (general or limited), Franchisee agrees that at all times during the term of this Agreement partners owning at least a majority interest in the capital and/or profits of the partnership shall engage, in the management and/or supervision of the Franchise operations.  Additionally, Franchisee shall designate one of the partners or another party as the "Responsible Broker", who shall be approved in writing by Franchisor and who shall be responsible for supervising the affairs of the Franchise operations and for assuring compliance by Franchisee and all Affiliates of Franchisee with all terms of this Agreement; or

      **(c)**  If the Franchise is operated as a corporation, Franchisee agrees that at all times during the term of this Agreement that each officer and director of the corporation and one or more shareholders who own in the aggregate at least a majority of the outstanding stock in the corporation shall engage in the management and/or supervision of the Franchise operation. Additionally, Franchisee shall designate a senior officer of the corporation as the "Responsible Broker", who shall be approved in writing by Franchisor and who shall be responsible for supervising the affairs of the Franchise operations and for assuring compliance by Franchisee and all Affiliates of Franchisee with all terms of this Agreement; and

      **(d)**  Franchisee shall obtain written approval by Franchisor of any changes in the "Responsible Broker"; Franchisor shall not unreasonably withhold its approval of a change in the "Responsible Broker"; and

      **(e)**  At Paragraph 30 of this Agreement, Franchisee designates the names, positions with respect to Franchisee and percent of ownership in the Franchise of the partners of Franchisee or of the officers, directors and shareholders of Franchisee, as the case may be.  Any change in the relationship of such designated persons as to the management of Franchisee or any change in the ownership of Franchisee resulting directly or indirectly in the transfer of fifty (50%) or more of the ownership rights in capital and/or profits of a partnership franchise or in any class of stock of a corporate franchise shall be first approved in writing by Franchisor, provided such change or transfer of ownership is in compliance with the provisions of Paragraph 16C of this Agreement.  Furthermore, Franchisee agrees that it will incorporate in its organizational documents (Partnership Agreement or Articles of Incorporation, as the case may be) provisions that are expressly designed to carry out the provisions of this Paragraph, and upon request, shall provide Franchisor with evidence of compliance with this provision;

C21EXHC 7/98

**(ii) Payment For Goods Or Services.** Franchisee shall pay promptly to Franchisor all fees and contributions due hereunder, as well as any additional fees or charges incurred for any products, supplies, or services furnished or to be furnished by Franchisor at Franchisee's request, which fees or charges shall be payable immediately by Franchisee. Any payments which are past due shall bear interest at the lower rate of either the highest rate allowed by law or a rate that is five (5) percentage points per annum higher than the "prime rate" then currently established by the largest bank (determined by total bank assets) headquartered in the state in which Franchisee's Approved Location is situated;

**(iii) Records.** Franchisee agrees to maintain and keep such records and reports as are prescribed by Franchisor and shall mail copies of such reports and records to the address designated by Franchisor in accordance with schedules required by Franchisor. A report of each brokerage transaction in which a royalty fee will be payable shall be filed with the Franchisor office within seven (7) days of the execution of initial documents by the parties thereto;

**(iv) Financial Statements.** Franchisee shall supply to Franchisor, at its request, a complete financial statement prepared in accordance with generally accepted accounting principles, on an annual basis within ninety (90) days of Franchisee's fiscal year end. Franchisee, Franchisee's principal shareholder (if Franchisee is a corporation), or a general partner (if Franchisee is a partnership) or Franchisee's independent accountant shall sign said financial statement certifying the truth and accuracy of the matters contained therein;

**(v) Taxes.** Franchisee shall pay promptly when due all taxes, accounts, liabilities and indebtedness of any kind incurred by Franchisee in the conduct of its business. In the event any fees (including, without limitation, royalty fees and the initial franchise fee) payable by Franchisee to Franchisor are subject to Value Added Taxes, Gross Receipts Taxes, or similar taxes imposed by taxing authorities within the jurisdiction in which Franchisee operates, then Franchisee shall, in addition to the fees due Franchisor, pay to Franchisor an additional sum which is equal to and shall represent the amount of such tax imposed on fees due Franchisor.

**(vi) Indemnification.** Franchisee shall indemnify and hold harmless Franchisor, and it's subsidiaries, affiliates, and it's parent, and the directors, officers and employees of each, and all other CENTURY 21 franchisees from all expenses, fines, suits, proceedings, claims, losses, damages, liabilities or actions of any kind or nature (including, but not limited to, costs and attorneys' fees) arising out of or in any way connected with Franchisee's operations. Franchisee further agrees that if Franchisor is made a party to a lawsuit or other legal action in connection with the activities of Franchisee or any Affiliates of Franchisee, then it may tender the defense and/or prosecution of the case to Franchisee who shall be responsible for diligently pursuing the case or action at Franchisee's expense, or may hire counsel directly to protect its interests and bill Franchisee for all costs and attorneys' fees incurred in connection therewith, in which case Franchisee shall promptly reimburse for Franchisor all costs and expenses which Franchisor incurred. This indemnity shall apply to claims that Franchisor was negligent or failed to train, supervise or discipline Franchisee, and to claims that Franchisee or its agents is the agent of Franchisor or part of a common enterprise with Franchisor. The obligations of Franchisee pursuant to this Paragraph shall survive the expiration or termination of this

C21EXHC 7/98

Agreement.

(vii) **Conflicts of Interest.** Franchisee, and any Affiliates of Franchisee, as defined below, shall not, during the term hereof, directly or indirectly (as an officer, director, shareholder, partner, Responsible Broker or otherwise) operate, manage, own or have more than a ten percent (10%) interest in any real estate brokerage or related business (other than another CENTURY 21 Franchise) located within a radius of seventy-five (75) miles of the Approved Location specified in this Agreement, without the prior written consent of Franchisor. Affiliates of Franchisee shall include each of the following, and the restrictions set forth above shall apply to each of them: (a) each partner, Responsible Broker, officer, or director; or any shareholder who owns (directly and/or beneficially) twenty-five percent (25%) or more of any class of Franchisee's stock including corporations or other entities which control, are controlled by, or are under common control with Franchisee or its other Affiliates, (b) if Franchisee is a partnership, each of the partners thereof and each officer, director and shareholder owning (directly and/or beneficially) twenty-five percent (25%) or more of the stock of any corporate partner, and (c) the spouse, parents, siblings and children of each of the foregoing persons;

(viii) **Net Worth.** Franchisee acknowledges that a material consideration of Franchisor in granting this Franchise is the representation by Franchisee in Paragraph 13 hereof that Franchisee is financially responsible and has a net worth in tangible assets in excess of Twenty-Five Thousand Dollars ($25,000.00) not including the value of Franchisee's interest in this Agreement or Franchisee's principal residence. Franchisee agrees and warrants that at all times throughout the term of this Agreement Franchisee shall maintain a minimum net worth as represented herein. If Franchisee's net worth falls below the specified amount, Franchisee shall be required to procure a guarantor acceptable to Franchisor to the extent of the deficiency, which guarantor shall not only guarantee Franchisee's performance under this Agreement, but also Franchisee's duties to Franchisee's clients and to the public;

(ix) **Local Councils.** Franchisor may establish a local council of CENTURY 21 franchisees with boundaries as determined, from time to time, by Franchisor. Franchisee agrees to join and participate in the council established in the area designated by Franchisor as Franchisee's local council area. The local council may make recommendations and suggestions concerning the expenditure of council funds available for promotional purposes in the local area. Such local council may adopt its own by-laws, rules and procedures, but such by-laws, rules and/or procedures shall not restrict Franchisee's rights or obligations under this Agreement. Except as otherwise provided herein, and subject to the approval of Franchisor, any lawful action of such council at a meeting attended by two-thirds (2/3) of the members, including reasonable assessments for local promotional and advertising purposes, shall be binding upon Franchisee if approved by two-thirds (2/3) of the member franchisees present, with each member office having one (1) vote, provided that no franchisee (or controlled group of franchisees) shall have more than twenty-five percent (25%) of the vote in a local council regardless of the number of offices owned; and,

(x) **Other Councils.** Franchisor may establish a regional council of CENTURY 21 franchisees in each regional area as determined by Franchisor. Franchisor may establish a national and international council of CENTURY 21 franchisees with boundaries established by Franchisor. Each

regional council, national council and international council shall establish its own reasonable bylaws and procedures. Actions of the regional, national and international councils shall be binding upon Franchisee; provided, however, that no council action shall modify the terms and conditions of this Agreement. Regional, national and international councils shall be composed of CENTURY 21 franchisees who are elected or appointed on a representative basis by members of local or regional councils or Franchisor. Representatives to regional, national and international councils shall have voting power in proportion to the number of CENTURY 21 franchisees in the area or region they represent. Franchisor shall not have a vote in any franchisee council.

**C. Obligations Related to Quality of Service and Goodwill:** In addition to the above-referenced "Start-Up Obligations" and "On Going Obligations" Franchisee acknowledges that it is of utmost importance that the services provided by Franchisee to the consuming public adhere to the minimum standards associated with the CENTURY 21 system and serve to enhance the reputation and goodwill associated with the service mark "CENTURY 21". Franchisee acknowledges that the requirements set forth in this Paragraph are necessary to assure continuing public acceptance and patronage of the CENTURY 21® franchise system and to avoid deterioration or obsolescence in the operation of Franchisee's CENTURY 21 office. Franchisee, therefore, agrees to undertake and carry out diligently all the following obligations:

**(i) Use of Service Mark.** Franchisee agrees that throughout the term of this Agreement it will operate exclusively under Franchisee's CENTURY 21 trade name with respect to all advertising, promotion and communications, including, but not limited to, telephone answering, office sign(s), yard signs, business cards, bank accounts, stationery, promotional and advertising materials, real estate documents, and all other materials used in any medium by Franchisee. Franchisee agrees to supervise all persons working with or under Franchisee in the franchised operation to assure compliance by such persons with all the terms of this Agreement and the P&P Manual;

**(ii) Regular Business Hours.** During the term of this Agreement, Franchisee shall diligently, faithfully and continuously conduct a CENTURY 21 Franchise at the Approved Location, which shall be open during regular business hours at least six (6) days per week. Franchisee also agrees to give prompt, courteous and efficient service to the public, and generally tooperate the Franchise in compliance with the P&P Manual and professional standards so as to preserve, maintain and enhance the value of the CENTURY 21 Marks and the CENTURY 21 System and the reputation and goodwill built up by Franchisor and by CENTURY 21 franchisees. Also, Franchisee agrees to maintain throughout the term of this Agreement all office facilities, equipment, office sign(s), yard signs and all other materials in first-class condition, and to keep them in strict compliance with the P&P Manual;

**(iii) Disclaimer.** Franchisee specifically agrees to include conspicuously the slogan "EACH OFFICE IS INDEPENDENTLY OWNED AND OPERATED" on all business cards, stationery, promotional and advertising materials, real estate documents, and all other materials used by Franchisee, unless specifically provided otherwise in the P&P Manual or waived in writing by Franchisor;

C21EXHC 7/98

(iv) **Audit Rights.**  Franchisee shall allow Franchisor to make inspections of Franchisee's business and premises at any reasonable time, and will make Franchisee's books, tax returns and records available for inspection and audit by Franchisor during normal working hours. Franchisor's right to audit shall include the right to examine books, tax returns and records of other real estate related businesses owned, in whole or in part, or operated by Franchisee or Franchisee's Affiliates, to determine whether all revenue received by Franchisee has been properly reported by Franchisee, that appropriate fees and contributions have been paid, and that the obligations of Franchisee under this Agreement have been complied with.  Whenever Franchisor exercises its right to audit, Franchisee shall, upon reasonable notice from Franchisor, provide a comfortable working space for Franchisor's representative(s) and ensure that all relevant books, tax returns and records are available at Franchisee's Approved Location.  Franchisor reserves the right to establish a uniform list of accounts and/or a uniform bookkeeping system for all of its franchisees, and in such event, Franchisee agrees to maintain its books and records in the manner required by Franchisor.  In the event an audit of Franchisee's books disclose that royalty fees or NAF contributions have been underpaid by more than five percent (5%) in any consecutive three (3) month period, Franchisor may, in addition to any other remedy available under this Agreement or by law, require Franchisee to pay the audit fees and any expenses, including attorneys' fees, incurred by Franchisor in collecting the past due royalty fees and/or NAF contributions. Furthermore, the audit costs and related charges shall be in addition to the interest and/or late charges that would be owing for delinquent royalty fees, NAF contributions and related charges, which are accrued from the date they should have been paid had the Franchisee properly and timely reported the relevant transactions and otherwise complied with this Agreement to the date said amounts are paid, at the rates specified in this Agreement.

(v) **Ethics.**  Franchisee agrees to conduct its business (and likewise to supervise all Affiliates of Franchisee) in a manner that complies with the terms and intent of this Agreement; with national, state and local laws, regulations and ordinances; with the Code of Ethics of the National Association of REALTORS; and with the CENTURY 21 Code of Ethics (if and when adopted and published by Franchisor).  Franchisee hereby authorizes any federal, local or state body regulating or supervising real estate broker practices and Franchisee's Board of REALTORS® (if any) to release to Franchisor information related to complaints and to any disciplinary actions taken based upon Franchisee's practices or the practices of Franchisee's Affiliates.  Franchisee agrees to notify Franchisor within five (5) business days of any such complaints or disciplinary actions.  Franchisee also agrees to maintain all permits, certificates and licenses (necessary for its Franchise operation) in good standing and in accordance with applicable laws and regulations;

(vi) **Policy and Procedure Manual.**  Franchisee agrees to abide by the terms of the P&P Manual and to supervise Affiliates of Franchisee to assure their compliance with the P&P Manual. Franchisee acknowledges that Franchisor has reserved the right, pursuant to Paragraph 15 of this Agreement, to make reasonable changes in the P&P Manual that Franchisor determines are important for the continued success and development of the CENTURY 21 franchise organization and its members.  Accordingly, Franchisee agrees that from time to time Franchisor may reasonably change or modify the CENTURY 21 Marks and the CENTURY 21 System as well as the standards and specifications set forth in the P&P Manual, including, but not limited to, the modification or adoption of new or modified trade names, trademarks, service marks, sign and logo requirements, or

C21EXHC 7/98

copyrighted materials. Franchisee also agrees, at Franchisee's own expense, to adopt on a timely basis (but in no case later than ninety (90) days after notice) any such modifications as if they were a part of the CENTURY 21 System at the time of the execution of this Agreement. Franchisor shall notify Franchisee in writing delivered via facsimile or regular mail as to changes in the P&P Manual or other changes in the operational structure of the Franchise;

(vii)   **CENTURY 21 Marks.** Franchisee acknowledges that Franchisor has the exclusive right to use and sublicense the CENTURY 21 Marks, and that the CENTURY 21 System and other products and items delivered to Franchisee pursuant to this Agreement are the sole and exclusive property of Franchisor and that Franchisee's right to use the same solely in connection with the operation of its franchised real estate business is contingent upon Franchisee's continued full and timely performance under this Agreement. Franchisee shall be responsible for, and supervise all of its Affiliates in order to assure, the proper use of the CENTURY 21 Marks and the CENTURY 21 System in compliance with this Agreement. Franchisee acquires no rights in any of said property, except for the Franchisee's right to use the same under this Agreement. Franchisee agrees that at no time during this Agreement or at any time after the expiration or termination of this Agreement shall Franchisee contest in the United States or any other country the sole and exclusive rights of Franchisor in said CENTURY 21® Marks and CENTURY 21 System and other products and items delivered under this Agreement, nor shall Franchisee claim any interest therein that is contrary to this Paragraph or at any time dispute, disparage or impugn the validity of the CENTURY 21 Marks and/or the CENTURY 21 System. In addition, Franchisee acknowledges and agrees that it shall be required to comply throughout the term of this Agreement with all guidelines instituted by Franchisor concerning authorized use and/or presentation by Franchisee of the CENTURY 21 Marks and the CENTURY 21 System on the Internet or other communication systems. Franchisee acknowledges that such guidelines will prohibit use by Franchisee of the "CENTURY 21," "CENTURY," "C-21," "C21" or any other derivative word or mark on the Internet or other computer communications service in connection with identification of Franchisee and the operation of its business other than in compliance with its CENTURY 21 Tradename and in compliance with the P&P Manual. Franchisee agrees that neither during the term of this Agreement nor at any time after its expiration or termination shall Franchisee adopt or employ, or seek to register, any names, marks, insignias, colors, trade dress, or symbols in the franchise operations or any other business that are confusingly similar to the CENTURY 21 Marks licensed under this Agreement. Furthermore, Franchisee agrees to cooperate with and assist Franchisor in connection with any legal action brought by or against either regarding the protection and preservation of said CENTURY 21 Marks and CENTURY 21 System and other products and items delivered under this Agreement. Also, Franchisee acknowledges that all information delivered to Franchisee pursuant to this Agreement, unless the information is otherwise publicly available, constitutes trade secrets and proprietary information of Franchisor. Franchisee agrees to keep said information confidential and further agrees to use diligent efforts to protect it from disclosure without prior written approval of Franchisor, and to protect it from misappropriation by Affiliates of Franchisee or by any other persons under the control of Franchisee;

(viii)   **Review of Advertising.** Franchisee acknowledges that Franchisor has the exclusive right to use and sublicense the CENTURY 21 Marks in the United States and throughout the world and that the CENTURY 21 System is the sole and exclusive property of Franchisor in the

C21EXHC 7/98

United States and throughout the world, and that any advertising or promotional materials produced by Franchisee will reflect and have an impact upon the CENTURY 21 System. Accordingly, Franchisee agrees to submit, upon the written request of Franchisor, all advertising or promotional material produced by Franchisee to Franchisor at least five (5) days prior to the planned publication or airing thereof. Franchisor shall thereupon approve or disapprove the use of the CENTURY 21 Marks in said advertising, which approval shall not be unreasonably withheld.

**(ix)    Office Size and Appearance.**  Franchisee acknowledges and recognizes that all CENTURY 21 franchised real estate brokerage offices must meet certain minimum standards of professionalism as regards office location, office size, exterior attractiveness, and interior attractiveness and decor, and general appearance and cleanliness. Franchisee further acknowledges that these minimum standards, and the office requirements hereinafter set forth have not appeared in previous forms of CENTURY 21 Real Estate Franchise Agreements, and that certain CENTURY 21 franchisees who have become members of the CENTURY 21 System prior to the adoption of this form of CENTURY 21 Real Estate Franchise Agreement may not presently be bound by these requirements. Franchisor has inspected Franchisee's present office location, the size of Franchisee's office, the exterior appearance of said office and the interior appearance, design and decor of said office. In accordance with the result of said inspection and the provisions hereof, Franchisee agrees to comply with those Subparagraphs of this Paragraph 11C(ix), hereinafter set forth, which have been checked and initialed by both Franchisee and a Corporate Officer of Franchisor:

*check here and initial below only if applicable*

☐ **(a)    Office Is Acceptable.** - Franchisee's office is acceptable to Franchisor as regards its location, size, exterior appearance, interior appearance, design and decor. Accordingly, no changes or alterations to Franchisee's office shall be necessary during the term of this Agreement subject to the provisions of Paragraph 11C(ix)(f) hereof.

‾‾‾‾‾‾    ‾‾‾‾‾‾    ‾‾‾‾‾‾
initials    initials    initials

*check here and initial below only if applicable*

☐ **(b)    New Office Location.** - On or before ____, 19____, Franchisee will relocate its CENTURY 21 franchised real estate office from its present location at ____, to a location ("the new office") approved by Franchisor. The new office shall contain a minimum of ____ square feet of usable office space. Prior to entering into a contract to purchase or lease with respect to the new office, Franchisee will obtain written approval of the proposed new office location from Franchisor, which will not unreasonably withhold its approval. In the event Franchisor withholds its approval or notifies Franchisee, in writing, of its disapproval of Franchisee's proposed new office location, stating the reasons therefor, Franchisee may resubmit to Franchisor other proposed locations for the new office as often as may be required to obtain Franchisor's approval. Franchisor shall have fifteen (15) days from receipt of any new office location proposals to respond to Franchisee, in writing. If written approval is not received by Franchisee within fifteen (15) days from the date of receipt by Franchisor of such new office location proposal, then Franchisor shall be deemed to have withheld its approval of such proposal. In the event that Franchisee has not moved into a new office location, approved by

Franchisor, by the date set forth above in this Paragraph 11C(ix)(b), Franchisor may, at its option, terminate this Agreement at any time upon ten (10) days written notice to Franchisee. Notwithstanding Franchisor's approval of Franchisee's new office location, Franchisee acknowledges that it may be required, pursuant to the provisions of Paragraphs 11C(ix)(d) and (e) hereof, to make substantial alterations to the exterior and interior of said new office.

| | | |
|---|---|---|
| _____ | _____ | _____ |
| initials | initials | initials |

*check here and initial below only if applicable*
☐ **(c) Present Office Size.** - On or before _____, 19_____, Franchisee will expand the size of its present CENTURY 21 franchised real estate office, located at _____, from its present ____ square feet of usable office space, to a minimum of _____ square feet of usable office space. Prior to entering into a contract to purchase or lease additional office space to so expand Franchisee's present office size, Franchisee will obtain written approval of the proposed additional office space from Franchisor, which will not unreasonably withhold its approval. In the event Franchisor withholds its approval or notifies Franchisee, in writing, of its disapproval of Franchisee's proposed additional office space, stating reasons therefor, Franchisee may resubmit to Franchisor plans for other additional office space as often as may be required to obtain Franchisor's approval.  Franchisor shall have fifteen (15) days from receipt of any additional office space plans to respond to Franchisee, in writing.  If written approval is not received by Franchisee within fifteen (15) days from the date of receipt by Franchisor of such new office space proposal, then Franchisor shall be deemed to have withheld its approval of such proposal.  In the event Franchisee has not expanded its present office location, as approved by Franchisor, by the date set forth above in this Paragraph 11C(ix)(c), Franchisor may, at its option, terminate this Agreement at any time upon ten (10) days written notice to Franchisee. Notwithstanding Franchisor's approval of Franchisee's present office expansion, Franchisee acknowledges that it may be required pursuant to the provisions of Paragraphs 11C(ix)(d) and (e) hereof, to make substantial alterations to the exterior and interior of said expanded office.

| | | |
|---|---|---|
| _____ | _____ | _____ |
| initials | initials | initials |

*check here and initial below only if applicable*
☐ **(d) Office Exterior.** - On or before _____, 19_____, Franchisee will remodel or renovate the exterior of Franchisee's present real estate office, or of Franchisee's new office if Franchisee has been required pursuant to the provisions of Subparagraph 11C(ix)(b) hereof to move its office to a new location. Prior to remodeling the exterior of its office, Franchisee will obtain written approval of its exterior plans from Franchisor, which will not unreasonably withhold its approval.  In the event Franchisor withholds its approval or disapproves of Franchisee's exterior plans, it will advise Franchisee, in writing, of its disapproval, stating reasons therefor. Franchisee may resubmit to Franchisor revised exterior plans as often as may be required to obtain Franchisor's approval. Franchisor shall have fifteen (15) days from receipt of any such office exterior plans to respond to Franchisee, in writing.  If written approval is not received by Franchisee within fifteen (15) days from the date of receipt by Franchisor of such new office exterior design proposal, then Franchisor shall be

C21EXHC 7/98

deemed to have withheld its approval of such proposal. In the event that Franchisee has not remodeled or renovated the exterior of Franchisee's office, as approved by Franchisor, by the date set forth above in this Paragraph 11C(ix)(d), Franchisor may, at its option, terminate this Agreement at any time upon ten (10) days written notice to Franchisee.

    _____    _____    _____
    initials    initials    initials

*check here and initial below only if applicable*

☐ **(e) Office Interior**. - Franchisee acknowledges that Franchisor has developed (and has so advised Franchisee of) certain standards designed to assure that CENTURY 21 franchised real estate brokerage offices maintain a level of interior furnishings, design and decor which are as professional and tasteful in appearance as those of successful real estate brokerage offices (in terms of gross revenues) which are located in Franchisee's market area. These minimum standards require that Franchisee's office be tastefully and attractively furnished, that Franchisee's office contain a reception area with adequate seating, that Franchisee's office contain at least one conference room adequate for the conducting of meetings, closings, etc., and that Franchisee's office be maintained in a clean, orderly and tidy manner. Accordingly, on or before _____, 19_____; Franchisee will redecorate, refurbish, and/or renovate the interior of Franchisee's present real estate office, or of Franchisee's new office if Franchisee has been required pursuant to the provisions of Paragraph 11C(ix)(b) hereof to move its office to a new location. Prior to redecorating, refurbishing or renovating the interior of its office, Franchisee will obtain written approval of its interior plans from Franchisor, which will not unreasonably withhold its approval. In the event Franchisor withholds its approval or disapproves of Franchisee's interior plans, it will advise Franchisee, in writing, of its disapproval, stating reasons therefor, Franchisee may resubmit to Franchisor revised interior plans as often as may be required to obtain Franchisor's approval. Franchisor shall have fifteen (15) days from receipt of any such plans to respond to Franchisee, in writing. If written approval is not received by Franchisee within fifteen (15) days from the date of receipt by Franchisor of such new office interior proposal, then Franchisor shall be deemed to have withheld its approval of such proposal. In the event that Franchisee has not redecorated, refurbished or renovated the interior of Franchisee's office, as approved by Franchisor, by the date set forth above in this Paragraph 11C(ix)(e), Franchisor may, at its option, terminate this Agreement at any time upon ten (10) days written notice to Franchisee.

    _____    _____    _____
    initials    initials    initials

FRANCHISEE SHALL BE BOUND BY THE FOLLOWING TWO SUBPARAGRAPHS, NOT-WITHSTANDING THE FACT THAT ONE OR MORE OF THE ABOVE SUBPARAGRAPHS IN THIS PARAGRAPH 11C(IX) SHALL HAVE BEEN CHECKED AND INITIALED:

    **(f)  Continuing Obligation Of Franchisee**. Franchisee shall have a continuing obligation, throughout the term of this Agreement, to maintain both the exterior and interior of Franchisee's office so that it remains the same or better in appearance and condition as when said office was originally

C21EXHC 7/98

approved by Franchisor. In the event Franchisee does not comply with the provisions of this Paragraph 11C(ix)(f), Franchisor may, at its option, terminate this Agreement.

(g)    **Modifications Of Office Size And Design Requirements.**  Franchisee acknowledges and agrees that because of changing market conditions Franchisor reserves and shall have the right to change, increase, or eliminate office size and exterior and interior appearance and decor requirements from time to time, and that as a condition to an assignment of Franchisee's franchise, Franchisee or Franchisee's assignee, may be required to make modifications to its office space according to Franchisor's then current office size and exterior and interior appearance and decor policies.

(x)    Consumer Relations and Protection of Goodwill.  The parties recognize that from time to time disputes may arise between Franchisee, or Affiliates or agents of Franchisee, and a client, customer or other individual or entity involved in a real estate related transaction, and that it is in the best interest of all parties, when possible, to quickly resolve such disputes. Accordingly, Franchisee agrees to promptly respond to all complaints received from its customers or clients or other individuals, in an attempt to resolve said dispute in a reasonable business manner.  When Franchisor is contacted by any party with a complaint regarding the handling of a particular transaction by Franchisee, Franchisor may investigate the matter and attempt to obtain from Franchisee, from the complaining party and from available witnesses, their respective versions of the relevant facts. Franchisee agrees to cooperate fully with Franchisor in any investigation.  Franchisor will attempt to complete any investigation within thirty (30) days of its receipt of a complaint. Upon completion of said investigation (and in the absence of Franchisee's independent resolution of the matter), if Franchisor has obtained facts sufficient to make a determination that, in Franchisor's reasonable business judgment, Franchisee has provided substandard service or acted in a materially improper fashion in said transaction, Franchisor will so advise Franchisee of such determination, in writing, and provide Franchisee with guidelines prepared pursuant to Franchisor's reasonable business judgment, setting forth the method by which Franchisee may correct the situation (e.g. cancellation of a listing agreement; refund of deposit or other funds, etc.).  In the event that Franchisor: 1) is contacted by a complaining party or becomes aware of a complaint regarding a particular transaction in which Franchisee was involved; and, 2) makes a reasonable determination pursuant to this Paragraph that Franchisee, or its agents or Affiliates, has acted in a materially improper fashion in said transaction; and, 3) determines that the complaint has not been resolved with the complaining party to the satisfaction of Franchisor within a period of thirty (30) days from Franchisor's determination that Franchisee acted in a materially improper fashion, then Franchisor may, at its option, terminate this Agreement at any time upon ten (10) days written notice to Franchisee.

(xi)    Quality Survey.  Upon the closing (settlement) of each transaction which Franchisee has handled for either a buyer or seller (hereinafter collectively referred to as "client"), and subsequent receipt by Franchisor of a Commission Disbursement Authorization (CDA) or Sales Report (SR) regarding that transaction, Franchisor may, and Franchisee so authorizes Franchisor to, send to Franchisee's client (or a sampling of Franchisee's clients) in said transaction a questionnaire which will request the client to rate the service and performance of Franchisee and Franchisee's sales associates in said transaction.  The procedures and standards of quality and performance of this rating system, or any other rating system that Franchisor chooses to implement in addition to or in substitution of such

C21EXHC 7/98

questionnaire rating system, shall be set forth in the P&P Manual, as it may be revised and/or supplemented from time to time by Franchisor. In establishing any such standards, Franchisor shall exercise reasonable business judgment in a good faith attempt to maintain and improve the quality of service provided under the service mark, CENTURY 21.

In the event that Franchisee's standard of performance during any measurement period established from time to time by Franchisor does not meet the then-current minimum standard of performance and quality, Franchisee may be placed on probation for a period to be established by Franchisor. If deficiencies identified by Franchisor in the quality of Franchisee's service and performance are not corrected within said probationary period, as evidenced by returned client questionnaires received during the probationary period or such other measure as Franchisor may adopt or rely upon from time to time, then Franchisor may, at its option, terminate this Agreement at any time upon ten (10) days written notice to Franchisee.

## 12. REPRESENTATIONS BY FRANCHISOR

Franchisor represents that the following statements are true and accurate:

**A.** Franchisor acknowledges that it has the exclusive right to use and sublicense those CENTURY 21 Marks and the CENTURY 21 System licensed to Franchisee pursuant to this Agreement, subject to certain rights and claims as may be stated otherwise herein and/or explained in the Franchise Disclosure Documents Franchisee received prior to the execution of this Agreement, and except as to those rights and claims not known to Franchisor and as to those pending claims Franchisor considers as not representing a material challenge to its rights;

**B.** Franchisor is authorized to offer this Franchise on the terms stated herein at the Approved Location specified in Paragraph 5 hereof;

**C.** Franchisor is a corporation duly incorporated in the state of Delaware, and currently qualified to do business in the state in which Franchisee's Approved Location is situated;

**D.** The execution of this Agreement by Franchisor will not violate or constitute a breach of any other agreement or commitment to which Franchisor is a party; and

**E.** The Corporate Officer of Franchisor executing this Agreement is authorized to enter into this Agreement on behalf of Franchisor. This Agreement upon its execution shall represent a valid and binding obligation of Franchisor to the extent performance by it is specifically required hereunder. NO FIELD REPRESENTATIVE IS AUTHORIZED TO EXECUTE THIS AGREEMENT ON BEHALF OF FRANCHISOR; THEREFORE, FRANCHISEE IS ADVISED NOT TO INCUR ANY EXPENSES WITH RESPECT TO OPENING THE FRANCHISED OFFICE UNTIL FRANCHISEE HAS RECEIVED A FINAL, EXECUTED COPY OF THIS AGREEMENT FROM FRANCHISOR EXECUTED BY AN AUTHORIZED CORPORATE OFFICER OF FRANCHISOR.

## 13. REPRESENTATIONS BY FRANCHISEE

C21EXHC 7/98

Franchisee represents that the following statements are true and accurate:

**A.** Franchisee is a licensed real estate broker under the laws of the state in which Franchisee's Approved Location is to be situated. If Franchisee is a partnership or a corporation, the Responsible Broker designated at Paragraph 30 hereof is a licensed real estate broker under the laws of the state in which Franchisee's Approved Location is to be situated.

**B.** Franchisee is not obtaining this Franchise for speculative purposes and has no present intention to sell or transfer or attempt to sell or transfer the Franchise in whole or in part.

**C.** Franchisee understands and acknowledges the importance of the high and uniform standards of quality, appearance and service imposed by Franchisor in order to maintain the value of the CENTURY 21 name and the necessity of operating the Franchised office in compliance with CENTURY 21 standards. Franchisee represents that Franchisee has the present capability and intention to meet those standards.

**D.** If Franchisee is a corporation, Franchisee is duly incorporated, licensed and currently qualified to do business in the state in which Franchisee's Approved Location is to be situated and in any other states in which Franchisee proposes to do business.

**E.** Franchisee has procured such certificates, licenses and permits, in addition to appropriate real estate licenses, necessary for Franchisee to carry on the business contemplated by this Agreement.

**F.** The execution of this Agreement by Franchisee will not violate or constitute a breach of the terms of any other agreement or commitment to which Franchisee is a party.

**G.** The individual executing this Agreement on behalf of Franchisee is duly authorized to do so; upon its execution, the Agreement shall constitute a valid and binding obligation of Franchisee, and all of its partners, if Franchisee is a partnership.

**H.** Franchisee acknowledges that no representations, promises, guarantees or warranties of any kind are made or have been made by Franchisor or by any person representing himself or herself as an authorized agent or representative of Franchisor to induce Franchisee to execute this Agreement, except as specifically set forth in the Franchise Disclosure Documents delivered to Franchisee. Franchisee acknowledges that the success of the Franchise is dependent upon the efforts of Franchisee; or Franchisee's partners, if Franchisee is a partnership; or the officers, directors and Significant Shareholders of Franchisee, if Franchisee is a corporation. Franchisee and the parties listed in Paragraph 30 of this Agreement represent that they intend to engage in the management or supervision of the CENTURY 21 Franchise. Franchisee acknowledges that neither Franchisor, nor any other person has guaranteed or warranted that Franchisee will succeed in the operation of the Franchise, or has provided any sales or income projections of any kind to Franchisee.

**I.** Franchisee, each of the partners of Franchisee (if Franchisee is a partnership), and each of the officers, directors and Significant Shareholders of Franchisee (if Franchisee is a corporation) who will be involved in the management and/or supervision of the Franchise (and whose names are set forth

C21EXHC 7/98

in Paragraph 30 hereof), have read fully this Agreement, the P&P Manual and the CENTURY 21 Franchise Disclosure Documents, and fully understand the terms and the import of same, and represent that each is capable of complying and will comply therewith.

J.  Franchisee has a net worth in tangible assets in excess of Twenty-five Thousand Dollars ($25,000.00), not including the value of Franchisee's interest in this Agreement or Franchisee's principal residence, as of said Commencement Date of this Agreement, as represented by Franchisee's financial statement, which has been prepared in accordance with generally accepted accounting principles.  This representation shall not be construed in any manner that would in any way restrict or limit the responsibility or degree of obligation of Franchisee and its partners, or its officers, directors and shareholders, as the case may be, as may otherwise be set forth herein, or otherwise be required by law.

## 14.  RELATIONSHIP OF PARTIES

A.  Franchisee is and shall be an independent contractor and nothing herein contained shall be construed so as to create an agency relationship, a partnership or joint venture, between Franchisor and Franchisee.  Neither Franchisor, nor Franchisee shall act as agent or representative of the other.  Neither Franchisor nor Franchisee shall guarantee the obligations of the other or in any way become obligated for the debts or expenses of the other unless specifically agreed upon in writing.  Franchisor shall not be entitled to share in any of the profits of Franchisee or be required to share in Franchisee's losses; furthermore, Franchisor shall not have any ownership or equity interest in Franchisee.  All employees or sales associates, as the case may be, hired or engaged by or working for Franchisee shall be the employees or sales associates of Franchisee and shall not by virtue of this Agreement be deemed employees, sales associates, agents or representatives of Franchisor.

B.  Franchisor shall not regulate the hiring or firing of Franchisee's salespeople, the parties from whom Franchisee may accept listings or for whom Franchisee may sell property, the commission rates charged by Franchisee, the commission splits between Franchisee and Franchisee's salespeople, the details of the work performed by Franchisee or its sales associates, the manner in which Franchisee obtains listings or sells property, the working conditions of Franchisee's salespeople, or Franchisee's contracts with clients or customers, except to the extent necessary to protect the CENTURY 21 Marks, trade names and goodwill associated therewith.  The conduct of Franchisee's business shall be determined by its own judgment and discretion, subject only to the provisions of this Franchise Agreement and the P&P Manual as it shall be adopted or revised from time to time.

## 15.  RIGHTS RESERVED BY FRANCHISOR

A.  Franchisee expressly understands and agrees that Franchisor, as regards its relationship with Franchisee, retains all right, title and interest in and to the CENTURY 21 Marks and the CENTURY 21 System, goodwill, trade secrets and proprietary information licensed to Franchisee pursuant to this Agreement.

B.  Franchisee further understands and agrees that Franchisor retains the right to modify the CENTURY 21 Marks, logos, color scheme and/or other trade dress of the system, as well as the CENTURY 21 System and other products and items delivered pursuant to this Agreement and to

C21EXHC 7/98

modify the standards, specifications and other requirements set forth in the P&P Manual. Franchisee is required to comply with any such changes at Franchisee's expense, as provided in this Agreement.

**C.** Franchisor has reserved all rights in the CENTURY 21® Marks not expressly granted to CENTURY 21 Regional Subfranchisors and Franchisee, and has further reserved the right to use and to license the CENTURY 21 Marks to others for uses that may not be related to the operation of a licensed real estate brokerage office.

### 16. ASSIGNMENT OF FRANCHISE

**A.** This Agreement is personal, being entered into in reliance upon and in consideration of the skill, qualifications and representations of, and trust and confidence reposed in, Franchisee, the Responsible Broker, Franchisee's present partners, if Franchisee is a partnership; and Franchisee's present officers, directors and Significant Shareholders, if Franchisee is a corporation, who have represented that they will participate in and/or manage the ownership and operation of the Franchise. Therefore, neither this Agreement nor any of its rights or privileges shall be assigned, transferred, shared or divided, by operation of law or otherwise, in any manner, without the prior written consent of Franchisor; any such purported transfer, assignment, sharing or division without the prior written approval of Franchisor shall be void. Said consent may be withheld by Franchisor, in its sole and absolute discretion. Any consent given by Franchisor may be subject to certain conditions, including, but not limited to: (i) qualification of any proposed transferee or assignee in accordance with the standards Franchisor then applies in evaluating prospective purchasers of new franchises; (ii) payment of all outstanding debts by Franchisee including all payments owing to Franchisor and/or its Affiliates, including, but not limited to, royalty fees payable, NAF contributions, Broker Council assessments, and any other obligation incurred pursuant to the operation of the CENTURY 21 Franchise; (iii) the curing of all defaults and noncompliance under the Franchise Agreement and the then current CENTURY 21 P&P Manual; and the curing of all defaults under any other agreement Franchisee may have with Franchisor, such as other CENTURY 21 Franchise Agreements, including but not limited to, all obligations to pay royalty fees, NAF contributions, Broker Council assessments, interest and late charges, audit fees and other properly chargeable amounts; responsibilities to comply with the P&P Manual then in effect, including trade name and logo guidelines; and obligations to comply with minimum performance standards as provided for in Paragraphs 11C(xi) or 17F hereof; (iv) execution of a general release of claims by Franchisee, and any guarantors of Franchisee's obligations, in a form approved by Franchisor; (v) execution of the then current form of franchise agreement by the proposed assignee(s) and by any continuing co-owners in the Franchise (including the Responsible Broker; all partners, if Franchisee is a partnership; and all officers, directors and Significant Shareholders, if Franchisee is a corporation) for the remaining term of the assigned agreement, which form of agreement may contain materially different terms than those contained in this Agreement; and if requested by Franchisor, execution by any guarantors of this Agreement of a reaffirmation of their guarantee of Franchisee's obligations; (vi) payment by transferee(s) or assignee(s) of a transfer fee to Franchisor equal to the greater of: (1) $5,000 and (2) the amount determined by multiplying the sum for which Franchisor is selling new CENTURY 21 franchises at the time of said transfer or assignment by a fraction, the numerator of which shall be the number of whole months remaining in the term of Franchisee's CENTURY 21 franchise at the time of the transfer or assignment, and the denominator of which shall be the total number of months constituting the full term of Franchisee's franchise (by way

C21EXHC 7/98

of example, if at the date of the transfer or assignment, Franchisor is selling new CENTURY 21 franchises for $25,000 and, on that date, Franchisee has four years remaining of a ten year term, the assignment fee payable by the transferee or assignee shall be determined by multiplying $25,000 by 48/120, for an assignment fee of $10,000); (vii) attendance by the proposed transferee or assignee at the next available "new franchisee training program" at the proposed transferee's or assignee's expense (if two or more transferees or assignees, attendance by only one is required); (viii) execution of an Acknowledgment of Receipt by proposed assignee(s) as to receipt by transferee(s) or assignee(s) of a current copy of Franchise Disclosure Documents at least ten (10) business days prior to any such proposed assignment or the payment of any consideration therefor; and (ix) if Franchisee's proposed assignee intends to conduct business at a location other than the Approved Location specified herein, qualification of the proposed new location (which shall be in the same general vicinity as the Approved Location) and qualification of the proposed new office in accordance with the standards Franchisor then applies in evaluating new franchisees. All such conditions also apply to any consent given pursuant to Paragraphs 16B and 16C hereof.

**B.** If Franchisee or any other party whose interest is subject to this Paragraph shall desire to transfer or assign rights in the Franchise (whether directly or indirectly), Franchisee or the party involved shall serve upon Franchisor a written notice setting forth all of the terms and conditions of the proposed transfer or assignment, a current financial statement regarding the proposed transferee or assignee, and all other information requested by Franchisor concerning the proposed transferee or assignee. Said notice shall provide Franchisor with sufficient time to enable Franchisor to comply with all Franchise Disclosure and Registration requirements with respect to any intended transferee or assignee. Within twenty (20) days after receipt of such notice (or, if Franchisor requests additional information, within fifteen (15) days after receipt of such additional information), Franchisor may either consent or refuse to consent to the transfer or assignment or, at its option, accept the transfer or assignment to itself upon the same terms and conditions specified in the notice. If Franchisor fails to exercise any of its rights or options or otherwise to respond, then consent to the proposed transfer or assignment shall be deemed withheld. Consent to a transfer or assignment upon the specified terms and conditions shall not be deemed to be a consent to a transfer or assignment upon any other terms or conditions, or to any other person, or to any other or subsequent transfer or assignment.

**C.** If Franchisee is a sole proprietorship or partnership, Franchisor expressly consents to the transfer or assignment of this Agreement, without payment of a transfer fee, to a corporation formed, owned and controlled solely by Franchisee to operate the Franchise business, provided that such transfer or assignment shall not relieve the original Franchisee of the obligations of this Agreement nor shall it affect in any manner any obligations to guarantee this Agreement; and further provided that there is no change in the Responsible Broker for the office, unless approved in writing by Franchisor, which approval shall not be unreasonably withheld. Franchisee agrees to notify in writing Franchisor of such transfer or assignment of assets to a corporation at least ten (10) days prior to such a transfer and shall supply Franchisor with such documents as it may request including, but not limited to, transfer or assignment forms, Articles of Incorporation and Bylaws. If Franchisee is a corporation, any merger or reorganization thereof, or sale or transfer of fifty percent (50%) or more of any class of stock, or any series of sales or transfers (whether related or unrelated) totaling in the aggregate fifty percent (50%)or more of any class of stock in such corporate Franchisee or the corporate parent of such Franchisee,

C21EXHC 7/98

whether by operation of law or otherwise, shall be deemed an attempted transfer or assignment of this Agreement, requiring the prior written consent of Franchisor. If Franchisee is a partnership, the sale or transfer or assignment of any general partner's interest, or the sale or series of sales or transfers or assignments of limited partnership interests (whether related or unrelated) totaling in the aggregate fifty percent (50%) or more of such interests, whether by operation of law or otherwise, shall be deemed an attempted transfer or assignment of this Agreement, requiring the prior written consent of Franchisor. For purposes of determining whether fifty percent (50%) or more of the interests of any class of shares of a corporation or limited partnership interests in a limited partnership have been transferred or assigned, all transfers (whether related or unrelated) shall be aggregated. Any proposed transfer or assignment involving less than fifty percent (50%) shall be reported by Franchisee to Franchisor at least twenty (20) days in advance but shall not be subject to the approval of Franchisor so long as there is to be no change in the Responsible Broker and the aforementioned aggregate limits are not involved. Furthermore, if the Franchise is owned by either a partnership or a corporation, which in turn is owned in whole or part by another limited partnership or corporation, this Paragraph shall be construed to apply to these entities as well. It is the intention of the parties that any transfers of ownership in any entity ultimately owning part or all of the Franchise (directly or indirectly) shall be subject to the restrictions imposed by this Paragraph.

**D.** Any assignment of this Franchise made pursuant to the terms of this Agreement is expressly conditioned upon Franchisee, or Franchisee's proposed transferee or assignee agreeing with Franchisor, prior to said transfer or assignment, to make, at Franchisee's sole expense, or at Franchisee's proposed transferee or assignee's sole expense, such reasonable expenditures as are necessary to conform the proposed transferee or assignee's office with Franchisor's then current standards for interior and exterior office size, decor, overall attractiveness, and cleanliness.

**E.** Any change in the Responsible Broker for the franchised office shall require the prior written consent of Franchisor. The Responsible Broker shall be the individual holding a real estate broker's license whose license is to be used for the franchise granted hereby and who is named as the Responsible Broker in Paragraph 30 hereof.

### 17. TERMINATION

This Agreement may not be terminated except as provided in this Agreement. Termination of this Agreement shall not relieve Franchisee of any unfulfilled obligations created hereunder unless agreed to in writing by Franchisor.

In addition to and without limiting any other provisions herein relating to termination, this Agreement may be terminated as follows:

**A.** Upon mutual written consent of the parties hereto.

**B.** At the option of Franchisor, if Franchisee breaches any of Franchisee's representations or warranties or fails to perform any of Franchisee's obligations under this Agreement or under any other agreement or indebtedness Franchisee may have with Franchisor (such as, by way of example but not by way of limitation, other CENTURY 21 franchise agreements), including, but not limited to,

C21EXHC 7/98

obligations to pay royalty fees, National Advertising Fund contributions, Broker Council assessments, interest and late charges, audit fees and other properly chargeable amounts, responsibilities to comply with the P&P Manual, including trade name and logo guidelines; obligations to comply with office size and decor requirements; obligations to comply with the resolution of disputes requirements and obligations to comply with minimum performance standards provided for in Paragraphs 11C(xi) and 17F of this Agreement.

C. At the option of Franchisor, if the real estate brokerage license of Franchisee or the Responsible Broker is suspended or revoked or otherwise is not maintained continuously and actively in full force and effect, and in good standing.

D. At the option of Franchisor, at any time more than: (i) nine (9) months after the death or incapacity of Franchisee, or the appointment of a conservator or guardian for the person or estate of Franchisee, if Franchisee is an individual; (ii) nine (9) months after the death or incapacity of any of the general partners, or the appointment of a conservator or guardian for the person or estate of any of the general partners, if Franchisee is a partnership; or (iii) nine (9) months after the death or incapacity of the Responsible Broker, or the appointment of a conservator or guardian for the person or estate of the Responsible Broker, if Franchisee is a corporation; provided, however, that this Agreement shall not terminate if within said nine (9) months (a) this Agreement or the general partner's interest herein is assigned in accordance with the provisions of Paragraph 16 of this Agreement to a licensed real estate broker approved by Franchisor, or (b) if Franchisee is a partnership or corporation, a licensed real estate broker approved by Franchisor shall become the partner or the Responsible Broker holding a real estate broker's license.

E. At the option of Franchisor, if Franchisee fails to conduct and govern the franchised business according to the Code of Ethics of the National Association of REALTORS, the CENTURY 21 Code of Ethics, or the laws, ordinances and regulations of the federal, state, provincial, district, county or city government.

F. In the event performance of Franchisee falls below the minimum operating standards set forth in this Subparagraph F, Franchisee will be notified in writing setting forth such deficiency and at the option of Franchisor, Franchisee may be placed on probation for a period of not less than three (3) months nor more than six (6) months. If such deficiency is not corrected within said probationary period, Franchisor may, at its option, terminate this Agreement. The minimum operating standard requires that Franchisee shall, in every six (6) month period, beginning with a starting point established by Franchisor, maintain a volume of closed business on which royalty fees have been paid sufficient to produce revenue (for purposes of determining royalty fees) over such period equal to not less than fifty percent (50%) of the average revenue (for purposes of determining royalty fees) generated by all franchisees over such six (6) month period in the same local council or in such other geographic area as Franchisor may reasonably establish from time to time.

G. At the option of Franchisor: (i) if Franchisee becomes insolvent; or (ii) if a receiver is appointed to take possession of Franchisee's business or property or any part thereof; or (iii) if Franchisee shall make a general assignment for the benefit of creditors; or (iv) if a judgment is obtained

against Franchisee which remains unsatisfied for a period of more than thirty (30) days after all rights of appeal have been exhausted.

**H.** At the option of Franchisor, if Franchisee's office shall have been moved without the prior written consent of Franchisor or shall have become vacant, abandoned or deserted, or shall fail to remain open for business as required hereby or by the P&P Manual.

**I.** At the option of Franchisor, if Franchisee, within ninety (90) days of the signing of this Agreement, has not opened a conforming CENTURY 21 franchised office or has not completed converting an existing office to a conforming CENTURY 21 franchised office, which in either case includes, but is not limited to, compliance with all of Franchisor's standards regarding office size, decor and quality; compliance with all sign and logo requirements; and such other requirements as are specified in this Agreement and the P&P Manual.

**J.** At the option of Franchisor, if Franchisee fails at any time to meet the minimum continuing net worth requirements set forth in this Agreement.

**K.** At the option of Franchisor, if any of the parties who have given personal guarantees of Franchisee's performance under this Agreement cancel, renounce or alter such guarantee, or attempt to do any of the foregoing without the prior written consent of Franchisor, unless Franchisee procures a replacement personal guarantor satisfactory to Franchisor in its sole discretion.

**L.** At the option of Franchisor, if the Franchisee shall become bankrupt, or shall become subject to any chapter of the United States Bankruptcy Code, unless Franchisee shall: (i) timely undertake to reaffirm the obligations under this Franchise Agreement; (ii) timely comply with all conditions as legally may be imposed by Franchisor upon such an undertaking to reaffirm this Franchise Agreement; and (iii) timely comply with such other conditions and provide such assurances as may be required in relevant provisions of the United States Bankruptcy Code; provided, however, that the parties acknowledge that this Franchise Agreement constitutes a personal service contract and that Franchisor has relied to a degree and in a manner material to this Agreement upon the personal promises of Franchisee, and/or its directors, officers, shareholders or partners, as the case may be, to participate on a full-time basis in the management and/or operations of the Franchise, and, consequently, the parties agree that any attempt by any other party, including the trustee in bankruptcy or any third party, to assume or to accept an assignment of this Franchise Agreement shall, to the extent permitted by law, be void.

**M.** In the event Franchisor shall elect to terminate this Agreement pursuant to any provision of this Agreement, Franchisor shall give Franchisee ten (10) days notice, or such notice as may be required by the laws of the state or province in which Franchisee's office is located, setting forth the reason or reasons for termination. Franchisee may cure the default within the ten (10) day notice period and thereby avoid termination. Notwithstanding the aforesaid, Franchisor shall have the right to terminate this Agreement upon ten (10) days notice to the Franchisee, if the right to terminate arises from any of the following reasons, in which case the Franchisee shall not have the opportunity to cure the default and this Agreement shall automatically be terminated:

C21EXHC 7/98

(i) the default arises under C or G of this Paragraph 17; or (ii) the default complained of is a result of intentional action or gross misconduct by the Franchisee; or (iii) the default is a default for which Franchisor has given Franchisee a prior notice of default within the previous twelve months; or (iv) the default is a default under Paragraph 11C (xi) or 17F hereof, for which Franchisee has been put on probation within the previous twelve months; or (v) the default is under Paragraph 11C (xi) hereof.

**N.**  In no event shall this Agreement be assumed by, or transferred to, any individual who or entity which does not comply with all requirements for transfer or assignment specified in this Agreement.

### 18.  PROCEDURES AFTER TERMINATION

Upon termination, (including expiration, assignment, or transfer) of this Agreement for any reason, Franchisee shall cease to be an authorized CENTURY 21 franchisee and shall do all of the following acts and things, each of which shall survive the termination of this Agreement and shall remain an ongoing obligation of Franchisee:

**A.**  Promptly pay Franchisor all sums then owing from Franchisee to Franchisor, the NAF and to Franchisee's Broker Council, if any.  Promptly pay Franchisor all sums then owing from Franchisee to Franchisor, if any.

**B.**  Pay to Franchisor the six percent (6%) royalty fee, plus the two percent (2%) NAF contribution, based upon the gross revenue ultimately received from any transaction in process as of the date of termination and the six percent (6%) royalty fee, plus the two percent (2%) NAF contribution, based upon the gross revenue ultimately received from any referral sent to or received from any other CENTURY 21 office prior to the date of termination, said sum to be paid promptly upon receipt of such revenue by Franchisee.  Additionally, Franchisee shall pay Franchisor the six percent (6%) royalty fee, plus the two percent (2%) NAF contribution based upon the gross revenues ultimately received from the closing of any transaction occurring after termination hereof, but the listing for which was initially procured by Franchisee during the time Franchisee was operating the Franchise under this Agreement.

In the event that Franchisor shall exercise its right under Paragraph 9D of this Agreement to require a fixed monthly NAF contribution payment, Franchisee shall pay to Franchisor a pro-rata portion of its NAF contribution obligation for the month in which Franchisee is terminated, in addition to any royalty fees to be paid pursuant to this Paragraph 18.

**C.**  Immediately and permanently discontinue the use of all CENTURY 21 Marks, including, but not limited to, the proprietary mark "CENTURY 21", all similar names and marks, and any name or mark containing the designation "CENTURY 21", "CENTURY", "21" or any other name, designation or mark, or similar colors or lettering indicating or tending to indicate that Franchisee is or ever was an authorized CENTURY 21 franchisee.  If Franchisee is a corporation or partnership and "CENTURY 21" is a part of Franchisee's corporate or partnership name, or if Franchisee adopted an assumed or fictitious name (or its equivalent) containing "CENTURY 21" Franchisee agrees to

C21EXHC 7/98

immediately cause its governing documents, and/or its assumed or fictitious name documents, and/or registration, to be amended to delete both the word "CENTURY" and the numerals "21" and to provide Franchisor with documentation that such changes have been made. Furthermore, Franchisee shall not promote or advertise the fact that the firm was formerly a franchisee or affiliate of the CENTURY 21 organization.

**D.** Promptly destroy, or surrender to Franchisor, all stationery, letterheads, forms, manuals, printed matter, books, cassettes, videotapes, licensed software and advertising containing CENTURY 21 Marks, including, but not limited to, the proprietary mark "CENTURY 21", or any similar names or marks or designation or mark indicating or tending to indicate that Franchisee is or was an authorized CENTURY 21 franchisee and promptly return to Franchisor any equipment leased or lent to Franchisee.

**E.** Immediately and permanently discontinue all advertising as a CENTURY 21 franchisee, including, but not limited to, the immediate removal of all signs from Franchisee's office which contain the CENTURY 21 Marks or other identifying marks, and the immediate removal from any property then listed for sale or lease of all signs or sign posts using CENTURY 21$^{®}$ Marks or other identifying marks or colors, including, but not limited to, the yard sign post and cross arm, and any yard sign or other sign using colors and/or a configuration similar to any CENTURY 21 yard sign, all of which Franchisee acknowledges constitute proprietary trade dress items of Franchisor and which Franchisee has not used at any time in the past in business prior to Franchisee's affiliation with the CENTURY 21 organization. If Franchisee fails to remove the office signs within ten (10) days after the effective date of the termination of this Agreement, Franchisee hereby grants Franchisor the right to enter upon Franchisee's premises and remove all "CENTURY 21" signs and all other indicia of any affiliation by Franchisee with the CENTURY 21 organization. Franchisee shall be obligated to reimburse Franchisor for the cost of removal, storage and disposition of said signs and other materials. If Franchisee fails to claim said signs and related materials removed by Franchisor within five (5) days after their removal, Franchisor shall have the right to sell or otherwise dispose of said signs and related materials, in its sole discretion, and Franchisor may retain the proceeds, if any, from any sale or other disposal, to the extent necessary to offset the costs of removal, storage and disposition of said signs and related materials and to offset any other amounts or obligations that Franchisee may then owe Franchisor, or any of its subsidiaries or affiliates.

**F.** Immediately and forever cease and desist from using the CENTURY 21 System, including, but not limited to, operating manuals, training manuals, sales manuals and aids, listing films and books, advertising and promotional materials, and all trade secret and confidential and proprietary material delivered to Franchisee pursuant to this Agreement.

**G.** At the option of Franchisor, return the P&P Manual and operating manuals and sell all or part of the training manuals, listing books, listing films, sales training cassettes, forms or brochures on hand which contain CENTURY 21 Marks or which are part of the CENTURY 21 System to Franchisor at cost.

**H.** Refrain from doing anything which would indicate that Franchisee is or ever was an

C21EXHC 7/98

authorized CENTURY 21 franchisee.

**I.** Maintain all books, records and reports required by Franchisor pursuant to Paragraph 11 hereof for a period of not less than three (3) years after the termination of this Agreement and allow Franchisor to make final inspection and audit of Franchisee's books and records during normal business hours within said three (3) year period for the purpose of verifying that all royalty fees, NAF contributions and other appropriate amounts have been paid as required herein.

**J.** Promptly cancel and discontinue use of the telephone number(s) which served Franchisee's Approved Location at the time of termination and delete Franchisee's CENTURY 21 listing in the Yellow Pages and any other directory. Franchisee shall be deemed to have granted to Franchisor, pursuant to the terms of this Agreement, a power of attorney with full authority for Franchisor to cancel, terminate, assign, discontinue or take any and all lawful action with respect to the telephone number(s) which serves Franchisee's Approved Location, including, without limitation, the power to take such steps as in the opinion of Franchisor may be necessary to delete Franchisee's CENTURY 21 listing or advertising in the Yellow Pages and any other directories and to terminate any other listing which indicates that Franchisee is or was affiliated with the CENTURY 21 organization. Franchisee shall indemnify and hold harmless each such telephone company, directory publisher and other person or entity against all costs, damages, attorneys' fees, expenses and liabilities which may be incurred or sustained in connection with or as a result of any action taken in reliance on the foregoing power of attorney. Notwithstanding the foregoing, Franchisee shall be free to continue use of the telephone number(s) which served Franchisee's Approved Location at the time of termination, provided that, such termination occurs by reason of the expiration of this Agreement on the Expiration Date or upon early termination of this Agreement, other than by reason of a breach of this Agreement by Franchisee. In such events, within fourteen (14) days of the termination date, Franchisee shall be required to clearly indicate in all respects, including all telephone directories, databases and directory assistance, as well as stationery and signage, that if, he or she is no longer a CENTURY 21 Franchisee or part of the CENTURY 21 System upon termination of this Agreement.

**K.** Immediately and permanently cause all officers, employees, and other Affiliates (as defined in Paragraph 8A(ii)) to discontinue the wearing of career apparel in the distinctive CENTURY 21 gold color or any apparel indicating or tending to indicate that the Franchisee is or was an authorized CENTURY 21 Franchisee, and promptly to destroy or surrender to Franchisor all such career apparel.

**L.** Franchisee acknowledges that during the term of this Agreement and after its termination, (which shall include expiration, where there has been no subsequent assignment or transfer), Franchisor shall, as is hereinafter specified, have the right to access and use (i) all information provided by Franchisee to Franchisor pursuant to that section of the CENTURY 21 P &P Manual, Code of Conduct, entitled "Reporting", which specifically includes all items therein included under the categories entitled "Reporting", "Real Estate Transaction Information", and "Listing Information," as well as any other Reporting item or category which may hereinafter be adopted in the P & P Manual; (ii) all information provided by Franchisee to Franchisor contained in those forms or reports known as Commission Disbursement Authorizations ("CDA's") or Sales Reports ("SR's"), and in such other operational reports as Franchisor may from time to time request from Franchisee; and (iii) all

C21EXHC 7/98

information provided by Franchisee to Franchisor regarding enrollment of Franchisee's customers or clients in the CENTURY 21 Preferred Client Club (which, for purposes of this Subparagraph 18L, shall include such other client/customer contact program(s) as may hereafter be adopted by Franchisor and). The information referred to in (i), (ii) and (iii), above, shall hereinafter be referred to, collectively, as "the Client Information". The Client Information may be used by Franchisor during the term of this Agreement for business purposes which shall include, but shall not be limited to, public relations, advertising and statistical compilations, investigations and resolutions of customer or client complaints, and quality survey. In addition, Franchisor shall have the right, upon termination, to continue to use the Client Information as hereinabove specified, and to make the Client Information available to other CENTURY 21 franchisees for such purposes as Franchisor, in its sole and absolute discretion, deems appropriate. In addition, and not in limitation of the above, upon termination, Franchisee shall be deemed to have assigned all of its CENTURY 21 Preferred Client Club enrollments to Franchisor, which is hereby authorized to deal with said enrollments in such manner as it deems appropriate. Upon termination, the names of Franchisee and Franchisee's sales associates will be deleted from Preferred Client Club mailings.

### 19. ADDITIONAL REMEDIES FOR BREACH

**A.** In the event that prior to the Expiration Date set forth in Paragraph 2 hereof there is an "early termination" of this Agreement, (which for purposes of this Paragraph shall mean any termination of this Agreement by Franchisor "for cause", or any termination of this Agreement made by Franchisee prior to the Expiration Date for any reason), Franchisee shall immediately become obligated to pay Franchisor, Franchisor's "lost future profits" (as hereinafter defined). For purposes of this Agreement "lost future profits" shall consist of all amounts which Franchisee would have paid to Franchisor as royalty fees and as NAF contributions from the date of early termination through the Expiration Date, had there been no early termination. The parties acknowledge and agree that it would be impracticable or extremely difficult to calculate the actual amount of lost future profits payable by Franchisee, and that the following method of calculation represents a fair and reasonable estimate of foreseeable lost future profits: Lost future profits shall be calculated by determining the average monthly royalty fee payment and the average monthly NAF contribution payable by the Franchisee to Franchisor from the Commencement Date of this Agreement through the date of early termination, and multiplying these average amounts by the actual number of months (and any fraction thereof) remaining between the date of early termination and the Expiration Date. The present value of the total of these amounts calculated at a discount rate of 8% shall constitute Franchisor's lost future profits. Franchisee shall be entitled to a credit toward the total amount of lost future profits payable to Franchisor only for those amounts which are paid by Franchisee to Franchisor pursuant to the provisions of Paragraph 18B of this Agreement.

**B.** Franchisee acknowledges that in addition to the provisions of Paragraphs 18A and B, and 19A hereof, which provide that upon termination of this Agreement Franchisee will be responsible to Franchisor for the payment of specified amounts, Franchisee will, upon a termination of this Agreement prior to its Expiration Date, also be responsible to Franchisor for such additional common law damages as may be payable by Franchisee to Franchisor as a result of said termination.

**C.** Franchisee acknowledges that if Franchisee breaches this Agreement and/or continues to

utilize the CENTURY 21 System or CENTURY 21 Marks at such times when Franchisee is not legally entitled to use them, Franchisor shall have no adequate remedy at law. Therefore, Franchisee expressly consents and agrees that Franchisor may, in addition to any other available remedies, obtain an injunction and/or temporary restraining order to terminate or prevent the continuation of any existing default or violation, and to prevent the occurrence of any threatened default or violation, by Franchisee of this Agreement.

### 20. ATTORNEYS' FEES

Should either party incur attorneys' fees in order to enforce the terms and conditions of this Agreement, including post-term covenants, whether or not a legal action is instituted, the party not in default shall be entitled to reimbursement of such attorneys' fees and costs, in addition to any other remedies either party may have at law or in equity. Should any legal action be instituted in connection with this Agreement, the prevailing party shall be entitled to recover all costs and expenses, including attorneys' fees.

### 21. INTEGRATION

**A.** Except as expressly provided in Paragraph 21B hereof, this Agreement contains all agreements, understandings, conditions, warranties and representations of any kind, oral or written, between the parties hereto, and constitutes the entire and final agreement between them with respect to the subject matter addressed herein. Accordingly, all prior and contemporaneous agreements, understandings, conditions, warranties and representations of any kind, oral or written, are hereby superseded and canceled by this Agreement, except as to any monies due and unpaid between the parties to this Agreement at the time of the execution hereof. There are no implied agreements, understandings, conditions, warranties or representations of any kind. No officer, employee or agent of Franchisor has any authority to make any representation or promise not contained in this Agreement.

**B.** Notwithstanding the provisions of Paragraph 21A hereof, this Agreement shall not supersede or cancel the following: (i) information and representations submitted by Franchisee to Franchisor in Franchisee's application for the grant of this Franchise, including, but not limited to, financial statements and references which accompanied Franchisee's application; and (ii) information and representations in the Franchise Disclosure Documents which Franchisee has received in connection with the Franchise which is the subject of this Agreement.

### 22. AMENDMENT

Any modification or change in this Agreement must be in writing, executed by an authorized corporate officer of Franchisor and by Franchisee. NO FIELD REPRESENTATIVE OF FRANCHISOR HAS THE RIGHT OR AUTHORITY TO MAKE ORAL OR WRITTEN MODIFICATIONS OF THIS AGREEMENT, AND ANY SUCH ATTEMPTED MODIFICATIONS SHALL NOT BE BINDING UPON EITHER PARTY HERETO.

### 23. WAIVER

No waiver of any breach of any condition, covenant or agreement herein shall constitute a continuing waiver or a waiver of any subsequent breach of the same or any other condition, covenant

C21EXHC 7/98

or agreement. Any waiver of any provision of this Agreement to be enforceable must be in writing and signed by the waiving party.

### 24. APPROVALS

Except as otherwise provided, Franchisor may withhold any consent or approval provided for herein at its discretion. Furthermore, except as specifically noted otherwise, any consent or approval Franchisee is required to obtain from Franchisor shall be deemed withheld unless given in writing.

### 25. CONSTRUCTION, VENUE AND MISCELLANEOUS

**A.** This Agreement shall be construed according to the laws of the State of New Jersey; provided that the New Jersey Franchise Practices Act shall not apply to any CENTURY 21 franchised brokerage office whose Approved Location is outside the State of New Jersey. Captions or paragraph headings included herein are for reference purposes only and shall not in any way modify or limit the statements contained in any paragraph or provision of this Agreement. All words in this Agreement shall be deemed to include any number or gender as the context or sense of this Agreement requires. In the event of any conflict between this Agreement and the P&P Manual or any other document, this Agreement shall control. Franchisee consents to the non-exclusive personal jurisdiction of the New Jersey state courts situated in Morris County and the United States District Court for the District of New Jersey; Franchisee waives objection to venue in any such courts.

**B.** This Agreement is exclusively for the benefit of the parties hereto and may not give rise to liability to any third party unless this Agreement specifically provides for such liability. The exercise by Franchisor of any right or discretion provided to Franchisor under the provisions of this Agreement shall not constitute the absence of good faith.

### 26. SEVERABILITY

In case any one or more of the provisions of this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and any other application thereof shall not in any way be affected or impaired thereby. If there is a conflict between any of the provisions of this Agreement and the laws or statutes of the state or province of Franchisee's Approved Location, and/or any other law or statute, the provisions of said law(s) or statute(s) shall prevail.

### 27. NOTICES

Any notices to be given hereunder shall be in writing and may be delivered personally, or by certified or registered mail, with postage fully prepaid.

Any notice to be delivered to Franchisor shall be addressed to Century 21 Real Estate Corporation, 6 Sylvan Way, Parsippany, New Jersey 07054, Attention: Legal Department. Any notice to Franchisee shall be delivered to the address of the Approved Location set forth in Paragraph 5 hereof.

The addresses specified herein for service of notices may be changed at any time by the party making the change giving written notice to the other party. Any notice delivered by mail in the manner herein specified shall be deemed delivered five (5) days after mailing if sent Certified, Return Receipt

C21EXHC 7/98

-38-

Requested or, if received earlier, upon actual receipt.

### 28. BINDING ON SUCCESSORS

This Agreement is binding upon and shall inure to the benefit of the parties hereto, their heirs, successors and permitted assigns, except as may be otherwise restricted pursuant to other Paragraphs contained herein. Franchisor reserves the right to assign, pledge, hypothecate or transfer this Agreement, provided that such assignment, pledge, hypothecation or transfer shall not affect materially the rights and privileges granted to Franchisee herein.

### 29. EXCLUSIVE PROPERTY

The form and content of this Agreement and the P&P Manual are the exclusive property of Franchisor and may not be reproduced in whole or in part by Franchisee or others, without the prior written consent of Franchisor.

### 30. ADDITIONAL REPRESENTATIONS

Franchisee makes the following additional warranties and representations:

**A.** Franchisee is a **corporation** (partnership, corporation or sole proprietorship).

**B.** If Franchisee is a corporation or partnership, there is set forth below the name and address of each general partner and each limited partner holding an interest of ten percent (10%) or more of the capital and/or profits of the partnership or of each shareholder in the Franchisee holding a ten percent (10%) or greater interest in the corporation:

| Name | Address | Number of Shares Held | Percentage Interest* |
|------|---------|----------------------|---------------------|
| Tom Barnes | 477 Harvard Street, Brookline, MA 02446 | | 50% |
| | | | |
| Jack Dennehy | 477 Harvard Street, Brookline, MA 02446 | | 50% |
| | | | |

*As to a corporation, this figure shall indicate the percent owned of any class of outstanding stock of the corporation. As to a partnership, this figure shall indicate the percent owned in the capital and/or profits of the partnership.

**C.** The address where Franchisee's records are to be maintained is:
    477 Harvard Street, Brookline, MA  02446

**D.** The full name and business address of Franchisee's Responsible Broker is:
    Tom Barnes - 477 Harvard Street, Brookline, MA  02446

Franchisee shall not substitute a new Responsible Broker without the prior written consent of Franchisor.

C21EXHC 7/98

**E.** If Franchisee is a partnership or corporation, the names and addresses of the partners, officers, directors and shareholders who shall engage in the management and/or supervision of the Franchisee are:

| Name and Title | Address |
|---|---|
| Tom Barnes, President | 477 Harvard Street, Brookline, MA 02446 |
| Jack Dennehy, Secretary | 477 Harvard Street, Brookline, MA 02446 |

**F.** Franchisee acknowledges receipt of a Franchise Disclosure Document dated **July 14**, 19**98** from Franchisor on <u>Sept 22</u>, 19<u>98</u>, which describes the Franchise to be operated pursuant to the terms of this Agreement. Franchisee acknowledges receipt of a complete copy of this Agreement at least five (5) business days prior to its execution.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on this <u>19th</u> day of <u>Nov</u>, 19<u>98</u>.

FRANCHISEE: <u>Dennehy, Barnes, Ventures, Inc.</u>

By: _____
        **Tom Barnes, President**

By: _____
        **Jack Dennehy, Secretary**

(If Franchisee is a corporation, this Agreement must be signed by each person owning twenty-five percent (25%) or more of the total outstanding shares of any class of stock. If Franchisee is a partnership, this Agreement must be signed by each general partner.)

ACCEPTED ON THIS <u>6th</u> DAY OF <u>July</u>, 19<u>99</u>. (ACCEPTANCE BY FRANCHISOR CAN ONLY BE MADE BY AN AUTHORIZED CORPORATE OFFICER.)

CENTURY 21 REAL ESTATE CORPORATION

By _____
      **John Kornfeind**
      **Vice President, Franchise Sales & Administration**

C21EXHC 7/98

## "EXHIBIT A – 1998"
## CENTURY 21 INCENTIVE BONUS PROGRAM FOR CALENDAR YEAR 1998

| NUMBER OF QUALIFIED OFFICES IN THE FIRM | 1% OF GROSS REVENUES IN EXCESS OF: | PLUS 1% OF GROSS REVENUES IN EXCESS OF: | PLUS 1% OF GROSS REVENUES IN EXCESS OF: | PLUS 1% OF GROSS REVENUES IN EXCESS OF: |
|---|---|---|---|---|
| 1 | $1,100,000 | $1,740,000 | $2,610,000 | $3,481,000 |
| 2 | $1,620,000 | $2,319,000 | $3,307,000 | $4,177,000 |
| 3 | $2,141,000 | $2,900,000 | $4,003,000 | $4,874,000 |
| 4 | $2,659,000 | $3,481,000 | $4,700,000 | $5,570,000 |
| 5 | $3,181,000 | $4,061,000 | $5,395,000 | $6,266,000 |
| 6 | $3,700,000 | $4,642,000 | $6,093,000 | $6,963,000 |
| 7 | $4,219,000 | $5,222,000 | $6,788,000 | $7,660,000 |
| 8 | $4,740,000 | $5,802,000 | $7,485,000 | $8,355,000 |
| 9 | $5,259,000 | $6,383,000 | $8,182,000 | $9,053,000 |
| 10 | $5,779,000 | $6,963,000 | $8,878,000 | $9,748,000 |
| 11 | $6,298,000 | $7,543,000 | $9,574,000 | $10,445,000 |
| 12 | $6,818,000 | $8,124,000 | $10,271,000 | $11,140,000 |
| 13 | $7,339,000 | $8,703,000 | $10,967,000 | $11,838,000 |
| 14 | $7,858,000 | $9,285,000 | $11,664,000 | $12,535,000 |
| 15 | $8,378,000 | $9,865,000 | $12,360,000 | $13,232,000 |
| 16 | $8,898,000 | $10,445,000 | $13,057,000 | $13,928,000 |
| 17 | $9,417,000 | $11,025,000 | $13,753,000 | $14,624,000 |
| 18 | $9,936,000 | $11,606,000 | $14,449,000 | $15,320,000 |
| 19 | $10,457,000 | $12,186,000 | $15,147,000 | $16,018,000 |
| 20 | $10,976,000 | $12,767,000 | $15,842,000 | $16,713,000 |

In no event shall the aggregate annual CIB payable to Franchisee as calculated in accordance with this Exhibit A exceed 2% of Franchisee's Gross Revenues for such period. Certain CENTURY 21 franchisees in former non-owned regions operate under CIB Schedules which are different from this Exhibit A.

C21EXHC 7/98

## GUARANTY OF PAYMENT AND PERFORMANCE

This Guaranty of Payment and Performance is given by the undersigned, **Tom Barnes, Jack Dennehy** (individually a "Guarantor" and collectively "Guarantors"), this ꭇꭇ day of Nov , 19 96 to Century 21 Real Estate Corporation ("CENTURY 21"), in order to induce CENTURY 21 to accept **Dennehy, Barnes, Ventures, Inc.** ("Franchisee") as a franchisee of CENTURY 21.

Each Guarantor does hereby, jointly and severally, to the extent herein provided, guaranty to CENTURY 21 the prompt payment and performance when due of all obligations of Franchisee under that certain Franchise Agreement bearing even date hereof, including any renewal, replacement or modification of said Franchise Agreement, and any other franchise agreement or other agreement now existing or hereafter entered into between Franchisee and CENTURY 21. This Guaranty shall apply to the initial franchise fee, all franchise royalty or service fees, NAF contributions, charges for manuals, supplies, materials, services and products furnished by CENTURY 21, audit fees, regional and local council assessments, assignment fees, attorneys fees, referral fees, obligations to indemnify and other such charges, fees and assessments provided for under the aforementioned Franchise Agreement.

This Guaranty shall be deemed continuing in nature. This Guaranty shall not be discharged by renewal of any claims guaranteed by this instrument, the suffering of any indulgence to any debt or extension of time of payment thereof. Presentment, demand, protest, notice of protest and dishonor, and diligence in collecting any obligation under said Franchise Agreement are each and all waived by Guarantors and/or acknowledged as inapplicable. CENTURY 21 shall not be required to pursue any remedy as to said obligations against Franchisee as a condition of the obligation hereunder of Guarantors.

It shall be a condition to the enforcement of this Guaranty that Guarantors shall be given five (5) days prior written notice, either hand-delivered or sent by mail to Guarantors at Franchisee's address or such other place designated in writing by Guarantors to CENTURY 21. Said notice shall state that non-payment or non-performance has occurred, that each Guarantor is liable for all obligations owing to CENTURY 21 on account of the referenced Franchise Agreement, and that demand is made upon said Guarantor for payment of said obligations. Failure to give such notice shall not discharge Guarantor but merely prevent enforcement until so given.

The obligation of each Guarantor hereunder is an absolute and unconditional obligation, and constitutes a guaranty of payment and performance.

Each Guarantor hereby expressly waives notice of the acceptance of this Guaranty and agrees that no action or failure to act by CENTURY 21, including, but not limited to, CENTURY 21's granting of additional time to pay, shall in any way limit or discharge Guarantor's liability hereunder.

Notwithstanding anything herein to the contrary, this Guaranty shall not be applicable to and

C21EXHC 7/98

-42-

each Guarantor shall not be liable or responsible for these certain amounts which might otherwise be payable to CENTURY 21 as a result of termination of the Franchise Agreement prior to its expiration date if all of the following conditions are satisfied:

1. The Franchise Agreement is terminated pursuant to a mutual termination agreement arising out of either a) the illness of the Franchisee's majority stockholder(s), or b) the retirement of the Franchisee's majority stockholder(s);

2. The majority stockholder(s) does not act as a real estate broker or associate broker, either directly or indirectly, within twenty (20) miles of Franchisee's Approved Location (as defined in the Franchise Agreement) during the time period which is equal to the remaining term of the Franchise Agreement at the time of the mutual termination (the "Remaining Time Period"); and

3. The Franchisee has paid all royalty or service fees, NAF contributions, Broker Council fees, and any other charges and fees which were due and owing or otherwise accrued prior to the effective date of termination.

In the event of a mutual termination as above provided, Guarantors will not be responsible to CENTURY 21 or to Franchisee's Broker Council for any lost future profits. All other amounts payable by Guarantors under this Guaranty shall remain due and payable.

Notwithstanding the provisions above, if after the execution of a mutual termination agreement based on the illness or retirement of Franchisee's majority stockholder(s), said majority stockholder(s) nonetheless acts, directly or indirectly, as a real estate broker or associate broker, within twenty (20) miles of Franchise's Approved Location (as defined in the Franchise Agreement) at any time during the Remaining Time Period, Guarantors shall remain responsible to CENTURY 21 for all losses suffered by CENTURY 21 during the Remaining Time Period including those otherwise excluded above.

Individually and Personally:

By _____
Tom Barnes

Individually and Personally:

By _____
Jack Dennehy

C21EXHC 7/98